ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

DAVID ROSSKAM
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-3974
Facsimile: (202) 616-6584
Email: David.Rosskam@usdoj.gov

JOSHUA D. HURWIT, Idaho State Bar No. 9527
United States Attorney
CHRISTINE G. ENGLAND, Idaho State Bar No. 11390
Assistant United States Attorney
District of Idaho
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Telephone: (208) 334-1211
Facsimile:  (208) 334-9375
Email: Christine.England@usdoj.gov

Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | Case No.  1:23-00322-DCN |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO ENTER CONSENT DECREE** |
| J.R. SIMPLOT COMPANY, | |
| Defendant. | |

**Table of Contents**

INTRODUCTION ................................................................................................. 1

I.      BACKGROUND ...................................................................................... 1

        A. RCRA Hazardous Waste Regulation and Federal Enforcement Regarding
           Phosphoric Acid and Phosphate Fertilizer Manufacturing Facilities................ 1

        B. The Simplot Don Plant Facility and the Alleged Violations............................. 6

                1. RCRA.......................................................................................... 9

                2. CAA ........................................................................................... 10

                3. CERCLA and EPCRA ................................................................. 12

        C. The Proposed Consent Decree .......................................................... 15

                1. Waste Management Practices ................................................... 15

                2. Gypstack Construction, Operations, and Closure ................... 16

                3. Financial Assurance. .............................................................. 17

                4. Corrective Action.................................................................... 17

                5. Mitigation................................................................................ 18

                6. Reduction of Fluoride Air Emissions ..................................... 20

                7. Revision of EPCRA Form R Reports ..................................... 21

                8. Civil Penalty........................................................................... 21

                9. Resolution of Claims............................................................... 21

II.     STANDARD FOR APPROVING CONSENT DECREES................................. 22

III.    PUBLIC COMMENTS RECEIVED AND UNITED STATES' RESPONSE .... 25

IV.     ARGUMENT ......................................................................................... 26

        A. The CD is Fair, Adequate, Reasonable and Consistent With the Statutes Under
           Which the Claims Were Brought ....................................................... 26

        B. The Public Comments Received Do Not Warrant Changes to or Disapproval of
           the Consent Decree ......................................................................... 33

1. The United States Agrees with Comments Supporting the CD ............ 34

2. The United States Disagrees with Comments Suggesting the CD Should Include Additional Relief ...................................................... 34

3. Limited Redactions for Confidential Business Information Do Not Preclude Meaningful Review of the CD by the Public ....................... 42

4. Comments and Questions About the Timeline for RCRA Compliance Projects Do Not Warrant Revision or Rejection of the CD ................ 43

5. Comments and Questions About the Fluoride Reduction Provisions Do Not Warrant Revision or Rejection of the CD... .................................. 44

6. Comments and Questions About the Closure Plan and Financial Assurance Provisions Do Not Warrant Revision or Rejection of the CD ........................................................................................... 46

7. Criticisms of the Environmental Mitigation Included in the CD Are Misplaced... .......................................................................... 49

8. Suggested Improvements to the Form and to Certain Details of the CD are Unnecessary ................................................................... 53

9. Various Other Comments and Questions Not Objecting to the CD Terms Are Not Material................................................................... 54

CONCLUSION ............................................................... 55

Exhibit 1     Public Comments Received (Alphabetical)
Exhibit 2     United States' Response to Public Comments
Exhibit 3     Declaration of Van E. Housman
Exhibit 4     Declaration of Kevin Schanilec
Exhibit 5     Declaration of Jennifer Cornell

## Table of Authorities

### Federal Cases

*Arizona v. City of Tucson*,
 761 F.3d 1005 (9th Cir. 2014) ............................................................. 23, 24
*Aro Corp. v. Allied Witan Co.*,
 531 F.2d 1368 (6th Cir.) ........................................................................ 22
*Donovan v. Robbins*,
 752 F.2d 1170 (7th Cir. 1985) ............................................................... 22
*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
 768 F.2d 884 (7th Cir. 1985) ................................................................. 27
*F.T.C. v. Guignon*,
 390 F.2d 323 (8th Cir. 1968) ................................................................. 24
*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*,
 484 U.S. 49 (1987)................................................................................. 33
*In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*,
 712 F. Supp. 1019 (D. Mass. 1989) ...................................................... 22
*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
 478 U.S. 501 (1986).............................................................................. 35
*Nu-West Mining Inc. v. United States*,
 2013 WL 828191 (D. Idaho March 6, 2013) ......................................... 22
*Officers for Justice v. Civil Serv. Comm'n*,
 688 F.2d 615 (9th Cir. 1982) ................................................................. 23
*Sam Fox Publ'g Co. v. United States*,
 366 U.S. 683 (1961).............................................................................. 23
*SEC v Randolph*,
 736 F.2d 525, 529 (9th Cir. 1984) ......................................................... 22
*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Laura Daniel-Davis, et al.*,
 No.: 4:20-cv-00553-BLW (D. Idaho) (March 31, 2023) (Doc. 89)................ 9
*Swift & Co. v. United States*,
 276 U.S. 311 (1928)............................................................................... 24
*United States v. Aerojet*,
 606 F.3d 1142 (9th Cir. 2010) ............................................................... 22
*United States v. Akzo Coatings of Am. Inc.*,
 949 F.2d 1409 (6th Cir. 1991) ......................................................... 22, 23
*United States v. Armour & Co.*,
 402 U.S. 673 ................................................................................... 24, 27
*United States v. Associated Milk Producers, Inc.*,
 534 F.2d 113 (8th Cir. 1976) ................................................................. 24
*United States v. Cannons Eng'g Corp.*,
 899 F.2d 79 (1st Cir. 1990) ................................................. 23, 26, 27, 29
*United States v. City of Fort Lauderdale*,
 81 F. Supp. 2d 1348 (S.D. Fl. 1999)...................................................... 25

*United States v. City of Jackson, Miss.,*
 519 F.2d 1147 (5th Cir. 1975) ................................................................ 22, 25
*United States v. City of Miami,*
 664 F.2d 435 (5th Cir. 1981) ......................................................................... 23
*United States v. Coeur D'Alenes Co.,*
 767 F.3d 873 (9th Cir. 2014) ......................................................................... 26
*United States v. Colorado,*
 937 F.2d 505 (10th Cir. 1991) ....................................................................... 23
*United States v. District of Columbia,*
 933 F. Supp. 42 (D.C.C. 1996) ................................................................ 27, 33
*United States v. FMC Corp. and J.R. Simplot Co.,*
 Civ. No. 99-296-E-BLW (D. Idaho) ................................................................ 7
*United States v. Hercules, Inc.,*
 961 F.2d 796 (8th Cir. 1992) ......................................................................... 24
*United States v. Hooker Chemical & Plastics Corp.,*
 776 F.2d 410 (2d Cir. 1985)........................................................................... 25
*United States, et al. v. J.R. Simplot Co.*
 No. 1:15-cv-00562-BLW, Memorandum Decision and Order Approving  Consent Decree
 (Doc. 10) at 2 (D. Idaho, April 12, 2016) ..................................................... 25
*United States v. Montrose Chem. Corp. of Cal.,*
 50 F.3d 741 (9th Cir. 1995) ..................................................................... 23, 24
*United States v. Oregon,*
 913 F.2d 576 (9th Cir. 1990) ......................................................................... 22
*United Techs. Corp. v. EPA,*
 821 F.2d 714 (D.C. Cir. 1987) ......................................................................... 2

## **Statutes**

31 U.S.C. § 3302(b) ............................................................................................ 41
42 U.S.C. § 1102(a)(2)......................................................................................... 13
42 U.S.C. § 1104(a) ............................................................................................. 13
42 U.S.C. § 6903(5) (1982) ................................................................................... 2
42 U.S.C. § 6903(27) (1982) ................................................................................. 2
42 U.S.C. § 6925(a)-(d) ......................................................................................... 5
42 U.S.C. § 6928(a)(2)........................................................................................... 9
42 U.S.C. § 6934 ................................................................................................. 17
42 U.S.C. § 7410(a) ............................................................................................. 10
42 U.S.C. § 7412 ................................................................................................. 11
42 U.S.C. § 7412(a) ............................................................................................. 11
42 U.S.C. § 7413 ........................................................................................... 11, 12
42 U.S.C. § 7661(2) ............................................................................................. 11
42 U.S.C. § 7661a(a) ........................................................................................... 11
42 U.S.C. § 7661c(a) ........................................................................................... 12
42 U.S.C. § 9602 ................................................................................................. 13
42 U.S.C. § 9603(a) ............................................................................................. 13
42 U.S.C. § 11023 ............................................................................................... 14
42 U.S.C. § 11023(a) ........................................................................................... 14

iv

42 U.S.C. § 11023(b)(1)(c)(i) .................................................................... 14
42 U.S.C. § 11023(h) ............................................................................... 33
42 U.S.C. §§ 6901-6992k ........................................................................ 1
42 U.S.C. §§ 6921-6940 .......................................................................... 2
42 U.S.C. §§ 7401-7671q ........................................................................ 1
42 U.S.C. §§ 7661-7661f ................................................................... 11,12
42 U.S.C. §§ 9601-9675 .......................................................................... 1
42 U.S.C. §§ 11001-11050 ....................................................................... 1
Public Law 96-482 ................................................................................. 3

## Federal Regulations

28 C.F.R. § 50.7 ................................................................................... 25
40 C.F.R. Part 2 .................................................................................. 42
40 C.F.R. Part 63 ................................................................................. 11
40 C.F.R. Part 70 ................................................................................. 11
40 C.F.R. Part 264 ................................................................................. 5
40 C.F.R. Part 302 ............................................................................... 13
40 C.F.R. § 63.2 ................................................................................. 11
40 C.F.R. § 63.602(c) ........................................................................... 12
40 C.F.R. § 70.6(a) .............................................................................. 12
40 C.F.R. § 70.7(b) .............................................................................. 11
40 C.F.R. § 261.3(a)(2)(i) ................................................................. 5, 10
40 C.F.R. § 261.4(b) .............................................................................. 3
40 C.F.R. § 261.4(b)(7) .......................................................................... 3
40 C.F.R. § 302.4 ................................................................................ 13
40 C.F.R. § 355.30 ............................................................................... 13
40 C.F.R. § 372.3 ................................................................................ 14
40 C.F.R. § 372.65 ............................................................................... 14
40 C.F.R. §§ 2.201 – 2.211 ..................................................................... 42

## Miscellaneous

88 Fed. Reg. 51354 (Aug. 3, 2023).......................................................... 25
Executive Order 13175 .......................................................................... 50

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION<br>TO ENTER CONSENT DECREE</u>

Plaintiff, the United States of America, on behalf of the United States

Environmental Protection Agency ("EPA"), submits this memorandum in support of its

accompanying motion seeking this Court's approval and entry of the proposed Consent

Decree (Doc. 2-1, 2-2) ("Consent Decree," "CD," or "Decree"), which the United States

lodged in this action on July 11, 2023 as an exhibit to the United States' Notice of

Lodging of Consent Decree (Doc. 2) ("Notice of Lodging").[1]  If approved by the Court,

the Decree will resolve claims that the United States alleged against Defendant J.R.

Simplot Company ("Simplot") under the Resource Conservation and Recovery Act

("RCRA"), 42 U.S.C. §§ 6901-6992k; the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-

7671q; the Comprehensive Environmental Response Compensation and Liability Act

("CERCLA"), 42 U.S.C. §§ 9601-9675; and, the Emergency Planning and Community-

Right-to-Know Act ("EPCRA"), 42 U.S.C. §§ 11001-11050.  The United States set forth

these claims in its complaint (Doc. 1) ("Complaint") filed in this action on July 11, 2023.

## I.   <u>BACKGROUND</u>

### A.   <u>RCRA Hazardous Waste Regulation and Federal Enforcement Regarding Phosphoric Acid and Phosphate Fertilizer Manufacturing Facilities</u>

Congress enacted RCRA in 1976, as an amendment to the Solid Waste Disposal

Act, to address a problem of enormous magnitude – how to safely manage and dispose of

---

[1] On July 19, 2023, the United States submitted a Supplement (Doc. 3) to its Notice of Lodging, revising the redactions of claimed Confidential Business Information ("CBI") in appendices to the Decree included in the exhibit to the Notice of Lodging.  The United States will shortly file a motion requesting the Court's leave to file under seal the full (unredacted) versions of those CD appendices containing claimed CBI.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -1**

the huge volumes of municipal and industrial waste generated nationwide.  RCRA's primary goals are to protect human health and the environment from the hazards posed by waste disposal; to conserve energy and natural resources through waste recycling and recovery; to reduce or eliminate the amount of waste generated, including hazardous waste; and, to ensure that wastes are managed in a manner that is protective of human health and the environment.  RCRA accordingly establishes a "cradle-to-grave" program for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste and regulates other waste (solid waste) that is not defined as hazardous waste.  *See United Techs. Corp. v. EPA*, 821 F.2d 714, 716 (D.C. Cir. 1987).[2]

RCRA's subchapter III (RCRA §§ 3001-3023, 42 U.S.C. §§ 6921-6940), known as "Subtitle C," required EPA to promulgate regulations establishing performance standards applicable to facilities that generate, transport, treat, store, and dispose of hazardous wastes.  Together, RCRA Subtitle C and its implementing regulations, set forth at 40 C.F.R. Parts 260-279, comprise EPA's RCRA hazardous waste program.

---

[2] The court of appeals explained the distinction between hazardous and solid waste under RCRA:

> Under [RCRA], the term "solid waste" generally encompasses garbage, refuse, sludge or discarded material, excluding wastes contained in irrigation and domestic sewage systems and waste regulated by certain other statutory programs. 42 U.S.C. § 6903(27) (1982).  The term "hazardous waste" means a solid waste which may "cause, or significantly contribute to an increase in mortality or ... illness," or "pose a substantial ... hazard to human health or the environment when improperly ... managed."  42 U.S.C. § 6903(5) (1982).  Thus, although all hazardous wastes are solid wastes, not all solid wastes are hazardous wastes.  [EPA] has identified and listed hazardous wastes subject to regulation under the Act in 40 C.F.R. [Part] 261 (1986).

*Id.*, 821 F.2d at 717 n.1.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -2**

Congress subsequently enacted the Solid Waste Disposal Act Amendments of 1980 (Public Law 96-482), which included, *inter alia*, the Bevill Amendment, temporarily exempting enumerated "special wastes" from RCRA Subtitle C regulation that were thought to be higher in volume and less hazardous than other wastes, and generally not amenable to management practices otherwise required under RCRA.  The Bevill Amendment was in effect until EPA completed a full assessment of each exempted waste, reported its findings to Congress, and then made a regulatory determination as to whether each special waste warranted regulation as a hazardous waste under RCRA. EPA subsequently determined, with limited exceptions, that regulation under RCRA Subtitle C was not warranted for the enumerated Bevill wastes.  Accordingly, EPA revised its regulations to generally exclude those wastes from RCRA Subtitle C hazardous waste coverage, exclusions that are set forth at 40 C.F.R. § 261.4(b).

One of the enumerated wastes under the Bevill Amendment was waste from the extraction, beneficiation, and processing of ores and minerals (including phosphate rock). EPA's Bevill rulemaking led to the exclusion from RCRA Subtitle C hazardous waste regulation of most such wastes, plus 20 specific mineral processing wastes, as set forth at 40 C.F.R. § 261.4(b)(7).  This regulatory Bevill exclusion included two wastes that are relevant to phosphoric acid manufacturing facilities:  phosphogypsum and process wastewater from phosphoric acid production.  *Id.*, § 261.4(b)(7)(ii)(D), (P).  The central dispute underlying this action, and similar actions involving other phosphoric acid and phosphate fertilizer manufacturing facilities, is whether all, or only some, of the generated waste streams at such facilities are excluded from Subtitle C regulation under

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -3**

this latter Bevill exclusion for "process wastewater from phosphoric acid production." *See* Declaration of Van E. Housman (Ex. 3) ("Housman Decl."), ¶¶ 13-14.

Phosphoric acid and phosphate fertilizer manufacturing facilities use phosphate ore as a principal raw material. *Id.* ¶ 8. Phosphate ore is reacted with sulfuric acid to produce phosphoric acid, the main ingredient used in a variety of liquid and solid (granulated) phosphoric acid and fertilizer products that are produced after further chemical and other processing. *Id.* The initial mineral processing yields a liquid phosphoric acid product of a commercially recognized concentration that may be marketed and sold, and thus is known as "merchant grade acid" or "MGA." *Id.* Some facilities also use MGA as feedstock to produce phosphoric acid products containing higher concentrations of acid, and/or to manufacture granulated fertilizer products by reacting MGA with other chemicals, such as ammonia. *Id.*

These manufacturing processes generate large quantities of acidic waste, including phosphogypsum (or "gypsum"), which is the solid calcium sulfate by-product of the reaction of sulfuric acid and phosphate rock, and process wastewater. *Id.* ¶ 9. Most facilities have managed these wastes in large outdoor impoundment(s), each called a phosphogypsum stack ("gypsum stack" or "gypstack") that is engineered to store phosphogypsum waste and to control seepage from wastewater. *Id.* ¶ 12. As noted, EPA's regulations exclude from the definition of hazardous waste both phosphogypsum wastes and process wastewater from phosphoric acid production, so those wastes may be managed in gypstacks without being subject to regulation under RCRA Subtitle C. However, any hazardous wastes that are *not* Bevill-excluded, i.e., wastes that are outside the scope of the Bevill exclusion, *are* subject to RCRA Subtitle C regulation. In addition,

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -4**

even Bevill-excluded wastes (here, phosphogypsum and process wastewaters from phosphoric acid production) are subject to Subtitle C regulation if they are mixed with non-excluded hazardous wastes, and if the resulting mixture continues to exhibit the hazardous characteristics of the non-excluded wastes:  in such circumstances, under EPA's regulations, the entire mixture of Bevill-excluded and non-excluded waste is considered a hazardous waste subject to RCRA Subtitle C regulation, pursuant to 40 C.F.R. § 261.3(a)(2)(i).

Pursuant to RCRA Subtitle C, facilities that treat, store, or dispose of hazardous waste are required to obtain a Treatment, Storage and Disposal ("TSD") permit (other than in specified temporary circumstances not applicable here).  *See* 42 U.S.C. § 6925(a)-(d); 40 C.F.R. Parts 260-279.  The TSD permit prescribes detailed requirements, and covers numerous activities performed at a facility, including security, inspection and personnel training procedures; operating and contingency plans; closure and long-term care plans; location information and insurance coverage; stringent financial assurance obligations; and, for landfills or surface impoundments, all information relating to potential risks of releases, exposure risks, pathways, and the possible magnitude of any such releases.  *See* 40 C.F.R. Part 264.

Almost two decades ago, EPA began investigating environmental violations within the phosphoric acid mineral processing and fertilizer industry, specifically involving the mixing or commingling of hazardous wastes with other mineral processing wastes that are not regulated as hazardous wastes based on the Bevill exclusion. Housman Decl. (Ex. 3) ¶ 13.  EPA subsequently issued notices of violation to owners and operators of phosphoric acid and phosphate fertilizer manufacturing facilities concerning

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -5**

those facilities' management of hazardous wastes in gypstacks where EPA believed that hazardous wastes that are not within the scope of the Bevill exclusion were mixed (commingled) with Bevill-excluded wastes. *Id.* ¶ 14. To date, EPA has required through judicial and administrative settlements that 14 phosphate fertilizer facilities complete extensive injunctive relief and bring their operations into compliance with RCRA. *Id.*

While EPA's investigation of phosphoric acid facilities principally centered on compliance with RCRA, at some facilities, such as the Simplot facility involved in this case, EPA also identified compliance issues arising under other federal environmental laws. The United States' Complaint includes, and the Consent Decree would resolve, alleged violations of the CAA, CERCLA, and EPCRA.

**B.     The Simplot Don Plant Facility and the Alleged Violations**

Simplot is a large privately held agribusiness headquartered in Boise, Idaho. One of Simplot's manufacturing facilities (and the subject of this action and Consent Decree), known as "the Don Plant," is located near Pocatello, Idaho. *See* Complaint at 4, 13-14 (¶¶ 7, 45); Housman Decl. (Ex. 3) ¶ 7. The Don Plant manufactures liquid phosphoric acid products, including MGA, a purified grade of phosphoric acid called "purified phosphoric acid" or "PPA," and a higher concentration grade of phosphoric acid called "superphosphoric acid" or "SPA." Complaint at 14 (¶ 47); Housman Decl. (Ex. 3) ¶¶ 7, 16. Simplot also manufactures dry (granulated) fertilizer products at the Don Plant. *Id.*

Simplot manages the wastes from its manufacturing processes in a gypstack, a principal part of a broader phosphogypsum stack system" ("stack system") at the Don Plant which stores and circulates approximately 200-400 million gallons of process

wastewater.  Complaint at 15 (¶¶ 48-50); Housman Decl. (Ex. 3) ¶¶ 7, 17.  From 2011-

2017, Simplot installed a synthetic high density liner beneath the gypstack to control

seepage into the surrounding environment; prior to that time, the gypstack was unlined

and wastewater in the gypstack was released into soil and groundwater, eventually

migrating to the Portneuf River.  Complaint at 15-16 (¶ 50); Housman Decl. (Ex. 3) ¶¶ 7,

17.  The gypstack at the Don Plant has grown to approximately 500 acres with a height of

up to about 200 feet.  Complaint at 20 (¶ 63); Housman Decl. (Ex. 3) ¶¶ 7, 17.

     The Don Plant has been the subject of prior EPA and state enforcement to

address contamination from the Plant into the environment.  As the Consent Decree

recites in greater detail (*see* Consent Decree at 5-9), in 1990, pursuant to CERCLA, EPA

listed the Eastern Michaud Flats Superfund Site ("EMF Site") – which includes within it

the Don Plant – on the National Priorities List (NPL), initiating a process of extensive

study and determination of the remedial actions that would be required to address the

contamination of groundwater, surface water, and soils.  *See* Declaration of Kevin

Schanilec (Ex. 4) ("Schanilec Decl.") ¶¶ 6, 7, 9; Housman Decl. (Ex. 3) ¶ 7, 27.

     Simplot agreed to perform the EPA-selected remedial actions under a 2002

consent decree entered in *United States v. FMC Corp. and J.R.Simplot Co.*, Civ. No. 99-

296-E-BLW (D. Idaho), and under a subsequent amendment thereto, entered in 2010.

*See* Schanilec Decl. (Ex. 4) ¶ 11; Housman Decl. (Ex. 3) ¶¶ 7, 27.  The amendment to

that consent decree reflected requirements Simplot had already agreed to under a 2008

voluntary consent order with the Idaho Department of Environmental Quality ("Idaho

DEQ"), including the installation of a synthetic liner beneath the existing Don Plant

gypstack and beneath any new or expanded gypstack that might in the future be constructed at the facility. *Id.*

Simplot employs air pollution control devices at the Don Plant that are commonly referred to as "scrubbers." Housman Decl. (Ex. 3) ¶ 18. The scrubbers capture particles and vapors emitted from production processes and equipment containing fluorides and other hazardous air pollutants. *Id.* The scrubbing liquid for each of these scrubbers is process wastewater and/or fresh water, which is pumped through the scrubbers to collect emissions before being discharged to the gypstack where a portion of the contamination settles out. *Id.* Simplot returns much of the water from the gypstack to use in production. *Id.* Heated process water from production flows into evaporative cooling towers through which air is pumped to remove heat so that the (cooled) water may be reclaimed for subsequent use in phosphoric acid production. *Id.* In the cooling process some water and fluorides from the cooling towers evaporate into the air. *Id.*

The Don Plant historically has occupied a total of approximately 1025 acres. Complaint ¶ 45; Housman Decl. (Ex. 3) ¶ 7. In 2020, pursuant to a land exchange with the U.S. Department of the Interior, Bureau of Land Management (BLM), Simplot acquired from BLM an additional 713.67 acres of land adjacent to the Don Plant (in exchange, the federal government acquired from Simplot land near the Chinese Peak-Blackrock Canyon area). *Id.* The Shoshone-Bannock Tribes ("the Tribes"), whose Fort Hall Reservation lies near the boundary of the Don Plant, filed an action in this District

challenging the legality of BLM's decision approving the land exchange.[3]  *See* CD at 9-10; Housman Decl. (Ex. 3) ¶ 7.

    1.   <u>RCRA</u>

    The Complaint sets forth three separate RCRA claims for relief based on:  (1) Simplot's alleged failure to perform hazardous waste characterizations for wastes generated at the Don Plant that are not Bevill-excluded; (2) the alleged failure to comply with permit requirements for facilities that treat, store, or dispose of hazardous waste (including facility closure and financial assurance requirements); and, (3) the alleged failure to meet land disposal regulatory treatment requirements for hazardous wastes that are not Bevill-excluded prior to their disposal in the Don Plant's gypstack.  *See* Complaint at 17-24 (¶¶ 82-76-95) (First, Second, Third Claims for Relief).[4]

---

[3] In an initial decision on cross motions for summary judgment, the district court held, *inter alia*, that BLM's approval of the land exchange breached the federal government's trust obligations to the Tribes and violated the Administrative Procedure Act.  *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Laura Daniel-Davis, et al.*, No.: 4:20-cv-00553-BLW (D. Idaho) (March 31, 2023) (Doc. 89).  The district court initially directed the parties to brief appropriate remedies rather than issuing a final judgment.  Simplot, as an intervenor-defendant, sought certification for interlocutory appeal, which the district court granted.  The Ninth Circuit granted permission to appeal (9th Cir. Nos. 23-35543, 23-35544), and briefing on the appeal is now underway.

[4] EPA has authorized the State of Idaho to administer its hazardous waste program in lieu of the federal program.  In such cases, although EPA has granted such authority to the State, EPA retains jurisdiction and authority to initiate an independent enforcement action, pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).  Idaho Code, Title 39, Chapter 44, Hazardous Waste Management, provides the statutory authority for the regulatory program "Rules and Standards for Hazardous Waste," Idaho Administrative Procedures Act ("IDAPA") 58.01.05," which includes the regulations that are part of the state program authorized by EPA.  Idaho has incorporated by reference into its regulations that constitute the authorized state hazardous waste program EPA's RCRA Subtitle C regulations.  *See* Complaint at 5 (¶ 11); Housman Decl. (Ex. 3) ¶ 7.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -9**

The central basis for the alleged violation of RCRA is the Complaint's allegation in the Second Claim for Relief that, while it has lawfully disposed of Bevill-excluded phosphogypsum and process wastewater from phosphoric acid production in the Don Plant's gypstack, Simplot has unlawfully co-disposed in the gypstack other wastes that are not Bevill-excluded, i.e., that are not excluded from hazardous waste regulation under RCRA. The hazardous wastes at times included (and currently includes some of) the following: process wastewaters *not* associated with the mineral processing from the production of the initial saleable product, MGA, but instead associated with the additional processing required to manufacture PPA and SPA; wastewaters associated with air pollution control equipment and with cleaning processes; and wastes from various spills and leaks. *See* Complaint at 24-25 (¶¶ 82-84). The Complaint alleges that Simplot's management of such hazardous wastes in the gypstack has been illegal without compliance with applicable hazardous waste permit requirements and that, when hazardous wastes have been commingled in the gypstack with Bevill-excluded wastes, and the resulting mixture continued to exhibit the hazardous characteristics of the hazardous wastes, the entire mixture has been a hazardous waste subject to RCRA regulation, pursuant to 40 C.F.R. § 261.3(a)(2)(i). *Id.* at 7, 24-27 (¶¶ 18, 83, 85).

2.   <u>CAA</u>

Under Section 110(a) of the CAA, 42 U.S.C. § 7410(a), each state must submit for EPA approval a state implementation plan ("SIP") that provides for implementing, maintaining, and enforcing compliance with national ambient air quality standards ("NAAQS") that EPA has promulgated under Section 109 of the CAA. The EPA-approved Idaho SIP authorizes Idaho DEQ to issue operating permits and construction

permits.  The SIP permit Idaho DEQ issued to Simplot for the Facility contains a limitation on fluoride emissions from each cooling tower cell (4.9 pounds per hour).  The SIP permit terms and conditions are enforceable by the State of Idaho and are also enforceable by EPA under Section 113 of the CAA, 42 U.S.C. § 7413.

Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA promulgated regulations establishing emission standards (or work practice standards if necessary) for categories of new and existing sources that emit a listed hazardous air pollutant. These standards are known as National Emissions Standards for Hazardous Air Pollutants ("NESHAPs").  EPA promulgated a NESHAP for Phosphate Acid Manufacturing, set forth at 40 C.F.R. Part 63, Subpart AA ("Phosphate Acid Manufacturing NESHAP" or "Subpart AA"), which applies to owners and operators of phosphoric acid manufacturing plants that are "major sources," as defined in Section 112(a), 42 U.S.C. § 7412(a), and 40 C.F.R. § 63.2.  Subpart AA prohibits the owner or operator of a phosphoric acid manufacturing plant from introducing into any subject evaporative cooling tower any liquid effluent from any absorber (also referred to as a wet scrubbing device) installed to control emissions from process equipment. 40 C.F.R. § 63.602(c).  Section 113 of the CAA, 42 U.S.C. § 7413, authorizes EPA to enforce Section 112 of the CAA and its implementing regulations.

Title V of the CAA, 42 U.S.C. §§ 7661-7661f, and EPA's implementing regulations at 40 C.F.R. Part 70, establish an operating permit program for certain sources, including "major sources" as defined in 42 U.S.C. § 7661(2). Under Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and 40 C.F.R. § 70.7(b), once such permit program has been promulgated, it is unlawful for any person to operate a subject source,

except in compliance with a permit issued by a permitting authority under Title V of the CAA. Title V permits must contain enforceable emissions limitations and conditions necessary to assure compliance with the CAA. 42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a), (c). EPA has approved Idaho's Title V permit program. The Title V permit Idaho DEQ issued to Simplot incorporates both the aforementioned SIP permit fluoride limit and the 40 C.F.R. § 63.602(c) prohibition on introducing liquid scrubber effluent into cooling towers. Noncompliance with these requirements violates the Idaho Title V permit and Section 502(a) of the CAA, and thus is subject to state enforcement as well as federal enforcement under Section 113 of the CAA, 42 U.S.C. § 7413.

The Complaint alleges that fluoride emissions from the Facility's cooling towers have, on one or more occasions, exceeded the limit set forth in the Facility's SIP permit, thus violating that permit and the Facility's Title V permit incorporating this SIP permit requirement. *See* Complaint at 30-31 (¶¶ 96-99) (Fourth Claim for Relief). The Complaint also alleges that Simplot has introduced liquid effluent from wet scrubbing devices at the Facility into the Facility's cooling towers, in violation of the Phosphate Acid Manufacturing NESHAP (Subpart AA) and the Facility's Title V permit incorporating the NESHAP prohibition against that practice. *See* Complaint at 31-32 (¶¶ 100-107) (Fifth Claim for Relief).

3. CERCLA and EPCRA

In addition to the RCRA claims, the Complaint also sets forth alleged violations of CERCLA and EPCRA arising from alleged deficiencies in certain past years of Simplot's reporting of hazardous substances released into the environment from the Don

Plant, and of the amounts of toxic chemicals manufactured, processed, or otherwise used there.  *See* Complaint at 32-37 (¶¶ 108-134) (Sixth through Eighth Claims for Relief).

As relevant here, Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), requires that any person in charge of an onshore facility shall, as soon as he has knowledge of any release (other than a federally permitted release) of a hazardous substance from such facility in quantities equal to or greater than the reportable quantity established pursuant to CERCLA Section 102, 42 U.S.C. § 9602, must report the release to the National Response Center (established under the Clean Water Act). EPA promulgated regulations implementing the requirements of CERCLA Section 103(a), which are set forth at 40 C.F.R. Part 302.  Hydrogen fluoride (HF) contained in process wastewater in the Facility's gypstack is a hazardous substance, with a reportable quantity of 100 pounds. 40 C.F.R. § 302.4, Table 302.4.  The Complaint's Sixth Claim for Relief alleges that from at least 2004 to approximately 2016, Simplot released HF from the Don Plant into the environment in quantities exceeding this reporting threshold but failed to report such releases as required by CERCLA Section 103(a).  Complaint at 32-34 (¶¶ 108-18).

If a person is subject to the reporting requirements of CERCLA Section 103(a) because of a release of a hazardous substance, and the hazardous substance is designated as an "extremely hazardous substance" as defined in Section 302(a)(2) of EPCRA, 42 U.S.C. § 1102(a)(2), the person is likewise subject to the notification requirement of Section 304(a) of EPCRA, 42 U.S.C. § 1104(a), and EPA's implementing regulation at 40 C.F.R. § 355.30, which require the immediate provision of notice of the release to designated local and state emergency response authorities. HF is an "extremely hazardous substance" which, if released in a reportable quantity under CERCLA Section 103(a), is

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -13**

also subject to this EPCRA notice requirement. The Complaint's Seventh Claim for Relief alleges that Simplot was required from at least 2004 to approximately 2016 to submit these required notifications but failed to do so to as required by EPCRA Section 304(a).  Complaint at 34-35 (¶¶ 119-28).

Another provision of EPCRA, Section 313, 42 U.S.C. § 11023, requires facility owners and operators to submit to EPA, and to the state in which the facility is located, an annual Toxic Chemical Release Inventory "("TRI") Reporting Form (known as "Form R"), for each toxic chemical listed under section 313(c) of EPCRA and 40 C.F.R. § 372.65, that was "manufactured, processed, or otherwise used during the preceding calendar year in quantities exceeding the toxic chemical threshold quantity established by subsection (f)" (here, the applicable threshold is 25,000 lbs.). 42 U.S.C. § 11023(a).[5]  The Complaint alleges that Simplot's annual Form R reports for the years 2004-2012 violated the requirements of EPCRA Section 313 because those reports failed to include estimates for some metals or metal compounds manufactured at the Don Plant in quantities exceeding the applicable reporting threshold of 25,000 lbs.  Complaint at 35-37 (¶¶ 129-34).

---

[5] The statutory term "manufacture" means "to produce, prepare, import, or compound a toxic chemical" under Section 3l3(b)(1)(C)(i), 42 U.S.C. § 11023(b)(1)(C)(i).  As relevant here, EPA's 1988 rulemaking elaborated further on the statutory definition of "manufacture" as "also appl[ying] to a toxic chemical that is produced coincidentally during the manufacture, processing, use, or disposal of another chemical or mixture of chemicals, including a toxic chemical that is separated from that other chemical or mixture of chemicals as a byproduct, and a toxic chemical that remains in that other chemical or mixture of chemicals as an impurity."  *See* 40 C.F.R. § 372.3.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -14**

C.   **The Proposed Consent Decree**

The CD sets forth both specific compliance requirements and the requirement that Simplot pay a civil penalty, as summarized below.

1.   <u>Waste Management Practices</u>.  The CD establishes requirements for Simplot to make required hazardous waste determinations, *see* CD at 25 (¶ 14), and for managing the waste streams from phosphoric acid production processes at the Don Plant. The specific categories of waste streams, and the way they are required to be managed, are set forth in Paragraphs 15-18 of the Decree, which in turn reference the relevant technical Appendices, notably, the "Facility Report" (Appendix 4).  *Id*. at 25-29 & App. 4.  The Facility Report details the specific waste streams and associated units in the production processes, and where Simplot will be allowed to route those waste streams. Housman Decl. (Ex. 3) ¶ 22.

In particular, the CD details which wastes Simplot may route to the gypstack at the facility and requires that any gypstack used must be lined and comply with the construction, operation, and closure requirements of the Decree (*see infra* Section I.C.2). The CD generally allows Simplot to send to the gypstack wastes from what the Decree defines as "Upstream Operations," generated up to the point that MGA is produced (where the United States contends, and Simplot disputes, the dividing line exists between Bevill-excluded wastes and non-excluded hazardous wastes).  Or, Simplot may recycle such wastes, such that the phosphate value of the waste streams will be recovered for re-use in production, via one of the acid recovery systems Simplot agrees to construct (as detailed in the Facility Report (Appendix 4) and in another appendix (Appendix 6) which

describes and sets the agreed schedule for these compliance projects).  *See* CD at 27-29 (¶¶ 16-18); Housman Decl. (Ex. 3) ¶¶ 23-24.

The CD also details which wastes Simplot may *not* route to the gypstack.  In general, wastes from what the Decree defines as "Downstream Operations," generated after the point at which MGA is produced (that the United States contends, and Simplot disputes, are hazardous wastes that are outside the Bevill exclusion), must be sent to the acid recovery systems, after which the contents may be input to agreed-upon locations within production operations or, if they not re-used, these wastes may not be routed to the gyp stack but must be managed as hazardous wastes in compliance with RCRA.[6]  *See* Housman Decl. (Ex. 3) ¶ 23.  The CD also addresses spills and leaks of phosphoric acid, sulfuric acid, or other solid wastes, classifying these materials as outside the Bevill exclusion, and requiring that they be appropriately managed as set forth in the Best Management Practices Plan appended to the Decree.  *See* CD at 29 (¶ 19) & App. 5A; Housman Decl. (Ex. 3) ¶ 23.

2.      <u>Gypstack Construction, Operations, and Closure</u>.  Paragraph 23 of the CD requires Simplot to comply with requirements concerning the gypstack at the Don Plant (and any future stack constructed there) that are detailed in Appendix 1 to the Decree. CD at 31 (¶ 23).  These detailed requirements, consistent in essential respects with RCRA Subtitle C, set forth methods and controls for safe management for long-term use of the

---

[6] The Decree provides a few exceptions to this general rule, under which certain wastes from Downstream Operations may be managed in the gypsum stack, in light of the characteristics of those wastes and compelling practical considerations, and in light of the strict construction, operational, and closure requirements the Decree establishes for any gypsum stack at the Don Plant.  *See* CD at 25-26 (¶ 15); Housman Decl. (Ex. 3) ¶ 25.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -16**

gypstack (and any future gypstack) at the Don Plant, and eventual closure and remediation of the gypstack(s) at the end of a stack's useful life.  *See* Housman Decl. (Ex. 3) ¶ 26.

       3.    <u>Financial Assurance</u>.  An important aspect of RCRA hazardous waste regulation is ensuring that hazardous waste facility operators provide adequate financial resources so that the public will not have to bear the financial burden of protecting the environment once a facility is no longer operating.  Housman Decl. (Ex. 3) ¶ 29. Paragraph 26 of the CD requires that Simplot must secure and maintain financial assurance in compliance with the detailed provisions included in Appendix 2 of the Decree.  CD at 32 (¶ 26).  The financial assurance is based on the estimated cost of closure, and long-term care following closure, of the gypstack at the Don Plant. Housman Decl. (Ex. 3) ¶ 30.  The cost estimate and the initial closure plan from which the cost estimate is calculated are included in Appendix 8 of the Decree.  *Id*.

       4.    <u>Corrective Action</u>.  One of EPA's objectives in pursuing settlements with companies in this industry was to ensure that, if needed, the companies would perform corrective action to remediate contamination related to past management of wastes in the companies' gypstacks.  Housman Decl. (Ex. 3) ¶ 15.  To facilitate this process, EPA issued orders pursuant to RCRA Section 3013, 42 U.S.C. § 6934, under which most of the companies have investigated the extent of any contamination to determine what corrective action was needed.  Settlements to date have required the companies to implement corrective action as warranted by the results of the Section 3013 investigations.  *Id*.  Here, the CD takes into account that, unlike other phosphoric acid facilities involved in prior settlements, extensive investigation and corrective measures to

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -17**

remediate past contamination at the Don Plant has previously been ordered under CERCLA. *Id.* ¶ 27. Thus, for the Don Plant, EPA concluded that no RCRA corrective action investigation was needed, and that already applicable remediation requirements for the Don Plant (under the 2002 CERCLA consent decree and 2010 amendment thereto, and under the 2008 voluntary consent order with Idaho DEQ) are comparable to corrective action that might otherwise be required under RCRA. *Id.* Accordingly, instead of establishing new corrective action requirements, the Decree references Simplot's existing remedial action obligations and acts as a "back stop" to those requirements. *See id.*; CD at 29-30 (¶ 22) & App. 1A.[7]

     5.   <u>Mitigation</u>. As discussed above, prior enforcement by EPA and Idaho DEQ has resulted in orders obligating Simplot to clean up surface and groundwater contamination caused by releases of hazardous substances from the Don Plant into the environment, and to reduce and eventually eliminate such releases from the gypstack. Although EPA determined that against this backdrop the CD need not establish new corrective action requirements particularly with respect to contaminated groundwater, the United States explored whether there were impacts from the violations here alleged that

---

[7] The CD protects the United States' right to impose additional requirements should that become necessary, although such a need is currently unforeseen. Appendix 1.A establishes requirements for adequate groundwater and surface water monitoring and reporting, and Paragraph 22 provides that if monitoring and reporting meeting those requirements is no longer required by existing or future federal and state obligations, Simplot is required to implement monitoring and reporting that will comply with the Appendix 1.A. In the event further remedial measures are needed (notwithstanding the requirements Simplot is already or may in the future become subject to under federal and state orders or permits), the United States expressly reserves its authority to take any and all actions authorized by law, including ordering Simplot to perform further corrective action work. *See* CD at 62 (¶ 94).

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -18**

would not necessarily be redressed even from the cleanup of past contamination and prevention of future contamination, but which might be addressed through environmental mitigation requirements as part of this settlement.

The United States conferred with Idaho DEQ regarding potential environmental mitigation work beyond what existing remedial requirements were achieving, and then reached agreement with Simplot on specific mitigation to be included in the CD. Housman Decl. (Ex. 3) ¶ 28.  The resulting environmental mitigation provisions set forth in the CD address invasive species along the Portneuf River that have contributed to riverbank instability, erosion, sedimentation, and degraded water quality.  CD at 41-42 (¶ 44) & App. 11.  Because the United States concluded that it was likely that past releases of phosphorous from the previously unlined Don Plant gypstack (the volume of which was increased by commingling non-Bevill hazardous wastes with Bevill-excluded wastes) had contributed to the growth of invasive species, efforts targeting their removal (and replacement with native species) are set forth in the Decree as environmental mitigation compliance requirements.  Housman Decl. (Ex. 3) ¶ 28; *see also* Declaration of Jennifer Cornell (Ex. 5) ("Cornell Decl.") ¶ 9.

The CD thus requires Simplot to provide $200,000 in funding for invasive species removal and planting of native species.  CD at 41-42 (¶ 44) & App. 11.  The funds will be paid to Idaho DEQ, which will disburse the funding to the Tribes (for work within the Fort Hall Reservation) and to the City (for work outside the Reservation) under contracts with Idaho DEQ.  *Id*.  The Tribes and the City will perform the work pursuant to their respective contracts with Idaho DEQ under the oversight of Idaho DEQ.  *Id*.; Cornell Decl. (Ex. 5) ¶ 10.  The CD sets forth milestones for performance of the mitigation, and a

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -19**

requirement that Simplot submit a report certifying that the required mitigation work has been completed.  *See* CD at 42-43 (¶ 46) & App. 11.

      6.    <u>Reduction of Fluoride Air Emissions</u>.  To address the alleged CAA violations, which principally concern fluorides that reach the Don Plant cooling towers and evaporate, resulting in fluoride air emissions, the CD builds on (1) requirements of a 2016 consent order between Idaho DEQ and Simplot that, *inter alia*, addresses fluoride emissions from the Don Plant cooling towers, *see* CD at 9, 33 (¶ 30), and (2) procedures that Simplot has implemented at the Don Plant designed to reduce the amount of fluoride transported to and emitted from the cooling towers.  Regarding the latter, the CD memorializes these current fluoride reduction measures and makes them enforceable operational requirements, until the time those measures are no longer needed upon removal of the cooling towers or other relief.  *See* CD at 33 (¶ 29) & App. 9.

      Regarding the 2016 consent order with Idaho DEQ, that order provided Simplot with two compliance options to reduce fluoride emissions from the cooling towers, one of which was to decommission the cooling towers and replace them with a low emissions alternative before June 27, 2026.  *See* CD at 9.  Because EPA concluded this option would result in the greatest reduction of fluoride emissions, Schanilec Decl. (Ex. 4) ¶ 15, the CD requires Simplot to implement the replacement of the Don Plant cooling towers with one or more newly constructed (and lower emitting) cooling pond(s) by the same 2026 deadline, subject only to a contingency that relates to the BLM land exchange.  CD at 33-34 (¶¶ 30-32).  Inasmuch as the feasibility of replacing the cooling towers with cooling ponds might be affected by the BLM land exchange litigation, the CD provides a process under which, subject to EPA approval, Simplot may assert a claim of infeasibility

and implement an alternative fluoride reduction plan that must minimize cooling tower fluoride emissions to the greatest extent practicable.  *Id*. at 33-35 (¶¶ 30-33).

       7.    <u>Revision of EPCRA Form R Reports</u>.  EPA concluded that while Simplot had addressed and corrected past reporting methodologies in both its CERCLA and EPCRA hazardous substances and toxic chemicals reporting in recent years, *see* Schanilec Decl. (Ex. 4) ¶ 17, to address the United States' EPCRA claim that Simplot failed to submit complete annual toxic chemicals report for the Don Plant for the years 2004-12, the CD requires Simplot, within sixty days after entry of the Decree, to submit revised reports for those years to include reasonable estimates of the quantities of hazardous substances manufactured, processed, and/or released at that facility in accordance with the requirements of EPA's EPCRA regulations.  *See* CD at 35 (¶ 34).

       8.    <u>Civil Penalty</u>.  The CD requires Simplot to pay a civil penalty of $1.5 million, plus interest accruing from the date of lodging of the Consent Decree.  CD at 23 (¶ 10).

       9.    <u>Resolution of Claims</u>.  Subject to Simplot's compliance with the requirements of the Decree, and standard express reservations, the CD resolves the United States' civil claims against Simplot (as to which Simplot does not admit any liability) for the past violations alleged in the Complaint through the date of the Decree's lodging and, for the continuing violations alleged, through the date of termination of the Decree.  *See* CD at 60-63 (¶¶ 91-98).  So long as Simplot operates in compliance with the Decree, the United States covenants not to sue Simplot for violating the specified RCRA requirements, or to require it to obtain a RCRA permit, for the operations and waste management practices the CD allows.  *Id*. at 60-61 (¶¶ 92-93).

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -21**

## II.    <u>STANDARD FOR APPROVING CONSENT DECREES</u>

Approval of a consent decree is within the informed discretion of the Court. *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990); *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).  That discretion generally should be exercised in favor of settlement of litigation.  *See Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir. 1985); *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir.), *cert. denied*, 429 U.S. 862 (1976).  The consent decree is a "highly useful tool for government agencies," for it "maximizes the effectiveness of limited law enforcement resources" by permitting the government to obtain compliance with the law without lengthy litigation.  *United States v. City of Jackson, Miss.*, 519 F.2d 1147, 1151 (5th Cir. 1975).  And the "presumption in favor of voluntary settlement . . . is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field."  *United States v. Akzo Coatings of Am. Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991); *In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 712 F. Supp. 1019, 1029 (D. Mass. 1989) ("Congressional purpose is better served through settlements which provide funds to enhance environmental protection, rather than the expenditure of limited resources on protracted litigation.").

As this Court has previously recognized, approval of a proposed consent decree requires the Court to consider "whether [the consent decree] is procedurally and substantively fair, reasonable, in the public interest, and consistent with the policies of [the underlying statute]."  *Nu-West Mining Inc. v. United States*, 2013 WL 828191, at *2 (D. Idaho March 6, 2013), citing *United States v. Aerojet*, 606 F.3d 1142, 1152 (9th Cir.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -22**

2010); *see also United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 743 (9th Cir. 1995) (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 85 (1st Cir. 1990); *United States, et al. v. J.R. Simplot Co.,* No. 1:15-cv-00562-BLW, Memorandum Decision and Order Approving Consent Decree (Doc. 10) at 2 (D. Idaho, April 12, 2016).

While the court must conduct an independent evaluation, *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014), it "may not substitute" its "own judgment for that of the parties to the decree." *Akzo Coatings*, 949 F.2d at 1435. Thus, while the court may approve or reject the consent decree as submitted, it does not have the authority to modify the decree. *J.R. Simplot Co.* at 2, citing *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982). *See also United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991), citing *United States v. City of Miami*, 664 F.2d 435, 440–41 (5th Cir. 1981) (en banc).

So long as the settlement was negotiated in good faith, a reviewing court should defer to the judgment of the United States and its agencies in settling a matter. *See Sam Fox Publ'g Co. v. United States*, 366 U.S. 683, 689 (1961) ("[S]ound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting."). *See also United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (noting that judicial deference "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement"). Where the EPA stands as a party to the consent decree, a court must

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -23**

"'refrain from second-guessing the Executive' and [ ] defer to the EPA's expertise."

*Arizona v. City of Tucson*, 761 F.3d at 1013 (quoting *Montrose*, 50 F.3d at 746.)

Courts have recognized that settlement entails a process of compromise in which, "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681. In evaluating the compromise embodied in a consent decree, the court should also grant deference to the Decree as reflecting the judgment of the Attorney General or his designee, who has "exclusive authority and plenary power to control the conduct of litigation in which the United States is involved, unless Congress specially authorizes an agency to proceed without the supervision of the Attorney General." *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992) (citing 28 U.S.C. § 516; *F.T.C. v. Guignon*, 390 F.2d 323, 324 (8th Cir. 1968)). This authority places considerable discretion in the hands of the Attorney General to decide whether, and on what terms, to enter into a settlement. *Hercules*, 961 F.2d at 798 (citing *Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928)); *United States v. Associated Milk Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976) ("[T]he Attorney General must retain considerable discretion in controlling government litigation and in determining what is in the public interest.").

In sum, courts reviewing consent decrees to which the United States is a party under environmental laws have generally limited their role to ensuring that there was no evidence of collusion, that all interested persons have been able to review and comment on the proposal, that the governmental agencies have considered and evaluated comments and alternatives, and that the end result appears to be a balanced and workable

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -24**

compromise.  *United States v. Hooker Chemical & Plastics Corp.*, 776 F.2d 410, 411-412 (2d Cir. 1985); *United States v. City of Fort Lauderdale*, 81 F. Supp. 2d 1348, 1350-51 (S.D. Fl. 1999); *City of Jackson*, 519 F.2d at 1152.  As set forth in Section IV below, the Consent Decree in this case meets these criteria.

III.     **PUBLIC COMMENTS RECEIVED AND UNITED STATES' RESPONSE**

As set forth in the accompanying motion, the United States initially provided public notice of the lodging of the CD and invited the public to submit comments on the terms of the CD on July 17, 2023, in accordance with 28 C.F.R. § 50.7 and the public participation provision of the Decree.  Although 28 C.F.R. § 50.7 provides for comments generally to be submitted within a thirty-day period following publication of notice, here the Department of Justice received several requests for additional time to review and comment on the CD and, in consideration of those requests, the United States extended the public comment period through September 25, 2023.  *See* 88 Fed. Reg. 51354 (Aug. 3, 2023).

While not required by regulation or policy, during the public comment period, the United States conducted two virtual community sessions, the first on September 7, 2023, for the Tribes, and the second on September 12, 2023 for any other interested members of the public.  *See* Housman Decl. (Ex. 3) ¶ 35.  EPA and Department of Justice representatives conducting the community sessions stated that the sessions were being held to explain the violations alleged in this action and the proposed relief, and to answer any questions, with a goal of assisting anyone who might wish to submit public comments.  *Id*.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -25**

Nine entities submitted comments on the CD.  The comments are included in Exhibit 1 hereto ("Ex. 1").  Six of the comments (from Bannock County, the City of Chubbuck, the City of Pocatello, Idaho DEQ, the Idaho Mining Association, and the Power County Board of Commissioners) expressed support for the Decree.  Three of the comments (from the Idaho Conservation League ("ICL"), the Portneuf Resource Council ("PRC"), and the Tribes) provided observations, criticisms, questions, suggested analyses, and/or suggested changes to the CD.  EPA and the Department of Justice prepared comprehensive responses to the points raised in the three comments that did not express support for the CD, provided these responses to these commenters, and sets forth these responses in Exhibit 2 hereto ("Ex. 2").

The United States appreciates and carefully considered the thoughtful comments and questions raised in the commenters' submissions.  For the reasons set forth in the United States' complete Response to Public Comments (Ex. 2) and in Section IV.B below, the United States does not conclude that the public comments necessitate any changes to the Decree and urges that the Court approve and enter the CD.

## IV.    ARGUMENT

### A.    The CD is Fair, Adequate, Reasonable and Consistent With the Statutes Under Which the Claims Were Brought

Determining whether a consent decree is fair involves both procedural and substantive components.  *United States v. Coeur D'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014).  To evaluate procedural fairness, "a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g Corp.*, 899 F.2d at 86.  Substantive fairness "introduces into the equation

concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Cannons Eng'g Corp.*, 899 F.2d at 87.

In this case, the CD is procedurally fair. It was reached after extensive discussion of legal issues and years of analysis, study, and discussion of technical issues through arms-length negotiations. *See* Housman Decl. (Ex. 3) ¶ 19. These negotiations involved legal and technical personnel from the United States and Simplot, as well as skilled and experienced outside counsel well-versed in the issues associated with the claims in this case. *Id.* The parties each retained consultants and experts who helped evaluate alternatives and assist the parties in formulating aspects of the detailed injunctive relief included in the settlement. *Id.* The parties had competing interests throughout the negotiations. *Id.; see United States v. District of Columbia*, 933 F. Supp. 42, 49 (D.C.C. 1996) (finding the adversarial relationship between the parties relevant to assessing procedural fairness).

The CD is substantively fair, as it embodies a measure of compromise on both sides. As with any fair settlement, the parties in this case gain the benefit of immediate resolution of the litigation and certainty that flow from a negotiated consensual resolution of the claims. *See E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985), citing *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). Notably, while Simplot does not admit liability for any violations of law, *see* CD at 3-5, 10-11, and is not required to obtain a RCRA permit for its operations at the Don Plant allowed under the CD so long as it complies with the Decree, *id*. at 32, 61 (¶ 28, 92), the various CD Appendices will require Simplot to manage its Don Plant operations under a set of

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -27**

requirements intended to ensure commensurate regulatory objectives and provide financial assurance.  *See supra* Sections I.C.2-I.C.3.

The United States regards the claims asserted in the Complaint as well-founded. At the same time, it recognizes that in litigation Simplot would press potential defenses to liability, and adjudication of the claims and likely defenses would require protracted and resource-intensive litigation.  In particular, Simplot disputes the United States' allegation that particular hazardous wastes at the Don Plant were illegally commingled in the gypstack with Bevill-excluded wastes, as Simplot contends that the Bevill exclusion of process wastewater from phosphoric acid production is broad enough to encompass all or nearly all of the wastes at issue; in particular, Simplot contends that wastes from SPA and PPA production are Bevill-excluded based, *inter alia*, on its interpretation of the Bevill regulatory history.  The United States acknowledges the existence of a risk that it could be unsuccessful in establishing liability as to some or all of the alleged claims.  The United States also acknowledges that, even if it prevailed in whole or in part as to the issues of liability, the scope and timing of the relief to be ordered would also likely be vigorously contested.  Such an eventuality would require further time and resources of the parties and the Court, with no assurance that the ultimate scope and timing of relief obtained would be as favorable as what the CD requires.

In recognition of the uncertainty, time, and resources that the alternative of litigation would require, the parties instead directed their efforts to the detailed technical and engineering analysis to fashion the compromise reflected by the terms of the CD, and to various plant infrastructure projects and improvements, some of which were initiated in anticipation of settlement and some of which have already been completed.  *See*

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -28**

Housman Decl. (Ex. 3) ¶¶ 19-20; CD at 31-32 (¶ 25).  The Decree reflects the parties' careful and informed assessment of the relative merits of the claims and defenses, while taking into consideration the costs and risks associated with litigating a case like this to final resolution.  Had the parties chosen to litigate instead, the time and resources spent would, in the parties' judgment, have detracted from and placed at some degree of risk the achievement of both of the parties' overriding objectives:  (1) the United States' goals of ensuring that Simplot eliminated to the greatest practical extent the commingling of hazardous wastes with Bevill-excluded wastes in the gypstack, that Simplot operates and eventually closes and provides long-term care of the stack system in an environmentally protective manner, and provides financial assurance to ensure such protection; and (2) Simplot's goal of ensuring that it could operate the Don Plant without being subject to allegations of violations, or to requirements that in its view could render operations difficult or impossible from both a practical and financial standpoint.

    In addition to being fair, the Court should also conclude that the CD is adequate and reasonable.  The "reasonableness" of a decree can be determined based on whether it is technically adequate and compensates the public for the alleged violations, while considering the risks of litigation.  *See Cannons Eng'g Corp*, 899 F.2d at 89-90 ("[T]he reasonableness of the consent decree . . . will be basically a question of technical adequacy, primarily concerned with the probable effectiveness of proposed remedial responses.").  Reasonableness also accounts for the "relative strength of the parties' litigating positions" and "must take into account foreseeable risks of loss." *Cannons Eng'g Corp*, 899 F.2d at 90.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -29**

The CD addresses through prospective compliance requirements all of the allegations of the Complaint of ongoing violations and imposes a civil penalty, a mitigation requirement, and other relief for the United States' allegations of past violations.  The Decree's terms reflect that appropriate remedies for the alleged violations were thoroughly evaluated and negotiated.  The scope of the injunctive relief is broad and applies comprehensively to Simplot's operations, including the management of the Don Plant's wastes and fluoride emissions.

A proposed settlement's consistency with the goals of the statutes under which the claims were brought also supports a conclusion that it is adequate, reasonable, and in the public interest.  Here, the requirements of the CD comport with the objectives of RCRA and the other statutes (CAA, CERCLA, and EPCRA) under which the United States asserted claims.

The requirements of the Decree described in Section I.C, *supra*, will enable greater recovery and reuse of phosphate, a valuable resource, at the Don Plant, and this environmentally beneficial waste management practice will reduce overall volumes of hazardous wastes directed to the gypstack – and enable phosphate from both Upstream and Downstream Operations to be recycled in production processes wherever it can most efficiently be re-used.  *See* Housman Decl. (Ex. 3) ¶ 23.  The operating and construction requirements that Simplot must meet for the current gypstack, as well as for any future stack expansion or additions at the Don Plant, are designed to ensure that all operations will be environmentally sound.  *See id.* ¶ 26.

The CD includes a detailed plan setting the terms for the future closure and long-term care of the gypstack and establishes financial assurance requirements, including the

requirement that Simplot must immediately secure and maintain approximately $108 million in dedicated financing to ensure that funding for closure and long-term care of the facility's gypstack will be available when the facility is eventually closed.  *See supra* Section I.C.3; Housman Decl. (Ex. 3) ¶ 30.  Financial assurance is designed to protect against the risk that adequate funding otherwise might not be available to fund such closure and long-term care and that, as a result, the public would have to assume the costs for closure or face significant risks to human health and the environment.  Housman Decl. (Ex. 3) ¶ 29.  In the absence of proper closure and long-term care, the potential would exist for leaks of hazardous wastes into the environment, a catastrophic failure and release of the stack's contents into the environment, as well as the risk of direct contact with untreated wastes that would remain in the stack far into the future.  *Id.*

The CD recognizes the background of federal and state enforcement under CERCLA and Idaho law requiring remediation of groundwater affected by the Don Plant. Because previous federal and state enforcement orders have required the lining of the Don Plant stack system, and continuing treatment and monitoring of groundwater, the Decree acts as a back stop to existing consent orders to ensure that Simplot will continue groundwater monitoring and remediation as needed to address contamination from the Don Plant.  *See supra* Section I.C.4; Housman Decl. (Ex. 3) ¶ 27.  In addition, the CD is the first settlement with companies in this industry to include environmental mitigation – here, work funded by Simplot, overseen by Idaho DEQ, and implemented by the City of Pocatello and by the Tribes to improve shoreline stability and water quality along the Portneuf River, to address the negative impacts of invasive species whose growth may

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -31**

have been related to past activities at the Don Plant.  *See supra* Section I.C.5; Housman

Decl. (Ex. 3) ¶ 28; Cornell Decl. (Ex. 5) ¶ 9.

In all of the foregoing respects, the CD furthers the underlying objectives of

RCRA to protect human health and the environment from the hazards posed by waste

disposal; to conserve energy and natural resources through waste recycling and recovery;

to reduce or eliminate the amount of waste generated, including hazardous waste; and, to

ensure that the facility and its wastes are managed, during operational, closure, and post-

closure periods, in a manner that is protective of human health and the environment.

The CD likewise comports with and furthers the objectives of the CAA by

reducing emissions of pollutants into the air.  The requirements of the Decree, described

in Section I.C.6, *supra*, will require Simplot to replace its existing cooling towers with

newly constructed, lower emitting, cooling pond(s) by June 2026 and that, in the interim,

it will follow practices designed to minimize cooling tower fluoride emissions.  In the

event it becomes infeasible for Simplot to meet this requirement because of litigation

concerning the land it acquired from BLM, the CD will require an alternative fluoride

reduction plan that must attain the greatest practicable fluoride emission reductions.

With respect to Simplot's alleged past violations of reporting and notification

requirements under CERCLA and EPCRA, these statutes do not provide for injunctive

relief.  Nevertheless, in addition to requiring Simplot to pay a civil penalty, the CD

specifies that Simplot will submit revised reports for past years to include estimates of the

metal compounds that the Complaint alleges should been included when those reports

were originally submitted.  *See supra* Section I.C.7.  While these revised reports will be

submitted many years after they originally were due, their revision is warranted under the

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -32**

court's broad equitable authority and consistent with the purposes of toxic chemical reporting under EPCRA, i.e., to provide information to the public about toxic chemicals in their communities, and to facilitate the research or data efforts of government agencies, researchers, or others.  *See* 42 U.S.C. § 11023(h).

Finally, the CD requires Simplot to pay a $1.5 million civil penalty to resolve all statutory claims, *see supra* Section I.C.7.  The United States has wide discretion to determine an appropriate civil penalty in a judicial settlement, including whether to seek a penalty at all. *United States v. District of Columbia*, 933 F. Supp. 42, 51 (D.D.C. 1996); *see Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 61 (1987) (developing or choosing to forego a penalty is within EPA's discretion). Nevertheless, the civil penalty here recoups the gain EPA estimated resulted from the alleged violations, assesses an additional amount in recognition of the gravity of the alleged violations, is consistent with EPA's penalty policies, and is fair in relation to the penalty amounts included in previous comparable settlements.  Housman Decl. (Ex. 3) ¶ 33.  The civil penalty under the CD thus promotes the public interest by acting as a deterrent against violations.

> **B.     The Public Comments Received Do Not Warrant Changes to or Disapproval of the Consent Decree**

While the United States' comprehensive response to the three public comments not expressing support for the CD is set forth in the Response to Public Comments (Ex.  2), in this section we discuss some of the principal and common points raised in the public comments and the reasons the United States concludes that the public comments submitted do not provide a basis either for altering or disapproving the Decree.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -33**

## 1. **The United States Agrees with Comments Supporting the CD**

Bannock County, the City of Chubbuck, the City of Pocatello, Idaho DEQ, the Idaho Mining Association, and the Power County Board of Commissioners all submitted comments supporting the CD. The United States appreciates Idaho DEQ's perspective that "[t]he CD represents years of work and commitment by all parties to solve a very complex matter," Ex. 1 at 15, and that the Decree includes waste management practices that will promote resource sustainability, ensure adequate financial resources for eventual facility closure, and support water quality improvement, as well as important air quality provisions providing for the replacement of the existing Don Plant cooling towers with cooling ponds. *Id.* All other comments supporting the CD *inter alia* cite the closure, financial assurance, and acid recovery provisions of the CD as major accomplishments. *See* Ex. 1 at 2 (Bannock County), 5 (City of Chubbuck), 8 (City of Pocatello), 24 (Idaho Mining Association), 30 (Power County Board of Commissioners).

## 2. **The United States Disagrees with Comments Suggesting the CD Should Include Additional Relief**

The Tribes contend that "[t]he CD does not go far enough to directly address public health on and off the Reservation or the environmental impacts of the contamination from Simplot's facility." Ex. 1 at 33. The scope of the CD requirements (*see supra* Section I.C) is extensive, but if the Tribes' comment reflects an assumption that the United States here must fashion a settlement addressing all health and environmental concerns stemming from the past, present, and future operations of the Don Plant, the United States disagrees.

Where the United States believes that a potential defendant is negotiating in good faith and that claims might be resolved through settlement, the United States pursues settlement so long as it determines that a negotiated resolution will be in the public interest.  The resulting consent decree "normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986).  Thus, the contours of any settlement reflect many factors, including the specific claims alleged, the parties' respective assessments of the relief that might eventually result from the pursuing the alternative of litigation, and the compromise necessary to bridge the parties' divergent positions and perceptions.  Under the applicable standard of review, the Court must defer to the United States' analysis of these factors in considering whether to approve the CD. *See supra* Section II.

The United States does not believe the comments suggesting that the CD should include additional provisions recognize that the specific claims before the Court, alleged in the Complaint, necessarily affect the scope of relief that may appropriately be sought by the United States and ordered by the Court, and that the give and take inherent in settlement negotiations affects what compromise may be obtained.  Thus, for example, PRC's comment that the CD should address Clean Water Act violations, *see* Ex. 1 at 27 (¶ 17), is misplaced:  the Complaint does not allege that Simplot violated the Clean Water Act, 33 U.S.C.  §§ 1251 to 1388 (nor does PRC identify what Clean Water Act violations it thinks occurred), so it would not be appropriate for the CD, intended to resolve the Complaint's allegations, to address such unidentified Clean Water Act violations.  At the

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -35**

same time, nothing in the CD precludes the United States from undertaking enforcement for violations of the Clean Water Act, or any other violations that are not alleged in the Complaint or addressed by the CD, were EPA to identify such violations.  *See* Response to Public Comments (Ex. 2) at 36.

The Tribes' comment states that the CD does not impose all the requirements of a RCRA permit and ask that the United States provide a table identifying all permit requirements and comparing them to what the CD requires.  *See* Ex. 1 at 39 (¶ 5).  If this comment is intended to suggest that the CD is inadequate if it does not impose all the requirements of a RCRA permit, the United States disagrees.  In this case, the parties have opposing legal arguments about whether RCRA hazardous waste requirements have been violated at the Don Plant and whether a RCRA Subtitle C permit is legally required. And, if such a permit were required, it would have to be issued by the State of Idaho (which is not a party to the CD) in accordance with Idaho's EPA-authorized Hazardous Waste Program.  In lieu of a RCRA Subtitle C permit, which Simplot does not agree is required, the CD imposes compliance obligations that EPA has determined are functionally equivalent to what a RCRA Subtitle C permit most likely would require if it were issued.  Housman Decl. (Ex. 3) ¶ 26; *see* Response to Public Comments (Ex. 2) at 12-13.

Several comments also request that the CD should require various additional studies, assessments, analyses, monitoring, reports, plans, and notifications.  *See* Ex. 1 at 35, 39-40 (¶¶ 2, 6, 8-9).  For example, the Tribes ask that the CD require Simplot to pay for community health studies and an ecological risk assessment.  *Id*. at 35 (¶ 2).  PRC asks that the CD require notifications to all local governments, agencies, and developers

of the dangers and hazards of growth in the contamination zone of the EMF Site, river monitoring of all contaminants of concern (COCs) including all wells on both sides of the Portneuf River and onto the Reservation, a failure analysis and emergency response plans with all community entities, an "area info report" that includes public and private wells within two miles of the gypstack, groundwater quality data from both sides of the Portneuf River onto the Reservation, and air monitoring at all schools, day care facilities, care facilities, low-income housing areas, and medical facilities, and that the CD should discuss the contamination of Reservation resources.  *See* Ex. 1 at 26-28 (¶¶ 4, 8, 9, 13-16, 18, 31).

These comments at least in part appear to stem from dissatisfaction with the adequacy of the studies and remedial actions that have been and continue to be required for the EMF Site pursuant to CERCLA.  EPA undertook and required the human health studies and ecological risk assessments that it determined were necessary and appropriate to formulate the remedial actions it would require under CERCLA to protect human health and the environment.  *See* Schanilec Decl. (Ex. 4) ¶ 9.  Simplot remains subject to the 2002 CERCLA consent decree and the 2010 amendment thereto to conduct the remedial actions that EPA specified, and EPA retains the right to seek any additional remedial actions it determines are necessary, to protect human health and the environment.  *Id.* ¶ 14.

To the extent the Tribes believe more needs to be done by EPA's CERCLA program, there are avenues available for the Tribes to provide that input to the CERCLA program.  *Id.*  ¶ 8.  The instant CD is intended to provide appropriate relief addressing the specific claims in this action, not to supplant other consent orders resolving different

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -37**

statutory claims that continue to address and remedy contamination from the Don Plant. Prior enforcement under CERCLA and state law has already achieved dramatic environmental improvement, including a reduction of phosphorous levels in the Portneuf River of approximately 88% from 2008 to 2020 (and a reduction of 95% is required to meet the applicable target).  *Id.*  ¶ 12.  The United States respectfully disagrees that the Decree, addressing the specific violations alleged in this action, must be expanded on the assumption that the prior CERCLA and state consent orders, which have already brought about significant environmental improvements, are not or will not prove to be adequate in addressing the different claims on which those orders were predicated.  *See* Response to Public Comments (Ex. 2) at 7-8.

Commenters also contend that the CD should include expanded relief addressing Simplot's reporting of hazardous substances released from and toxic chemicals manufactured, processed, or otherwise used at the Don Plant.  For example, the Tribes ask that the CD's provision requiring Simplot to revise and resubmit its annual toxics inventory (Form R) reports for the years 2004-12 (CD at 35, ¶ 34) should be supplemented to require additional information, such as an explanation of health and environmental impacts to the community to provide transparent disclosures that can be better understood by affected communities, and that Simplot's Form R reports and related summaries should be posted on the pubic website the CD requires Simplot to maintain for specified reports that Simplot submits pursuant to the CD (CD at 65, ¶ 103).  *See* Ex. 1 at 33 (¶ 1); *see also* Ex. 1 at 28 (¶ 30) (PRC) (requesting that CD require Simplot to publish annual Don Plant toxics inventory in all local and regional newspapers).

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -38**

The United States disagrees.  The suggested additional requirements concerning hazardous substances/toxics reporting are neither necessary, *see* Response to Public Comments (Ex. 2) at 3-4, nor does the United States conclude they would have been obtainable in settlement negotiations.  Neither CERCLA nor EPCRA authorize injunctive relief in an action asserting violations of the reporting requirements alleged in the Complaint.  Nor does anything in these statutes or in the regulations EPA promulgated thereunder require a reporting entity to provide a narrative explaining to the public the health or environmental significance of either reported releases from a facility, or of chemicals listed on Form R as having been manufactured at a facility, or additional publication on the internet or in other media.  *See id*. at 4, 39-40.

Nevertheless, the Tribes contend that such "additional transparency" should have been required based on the United States' trust responsibilities to the Tribes or based on the Federal Government's commitment to environmental justice (embodied in Executive Order), *see* Ex. 1 at 35 (¶ 1).  While the Court possesses equitable authority to fashion appropriate relief, the Tribes' suggestion overlooks the practical limitations in settlement negotiations for relief to reasonably correspond with the statutory requirements at issue and be acceptable to both parties.  Nor do the Tribes' comments recognize or acknowledge that Form R reports are already publicly available, and that EPA already maintains a public website with resources for tribal communities regarding the toxic release inventory (TRI) information contained in Form R reports, including specific links to allow tribes to identify and track toxic chemical releases that may impact their communities, including links to how tribes can quickly get TRI information, obtain more in-depth TRI data, determine risks from toxic chemicals, and obtain additional help from

designated TRI contacts, coordinators, and managers, and from available online tools. *See* Response to Public Comments (Ex. 2) at 3-4.

Several commenters also question the sufficiency of the $1.5 million civil penalty the CD requires Simplot to pay.  ICL comments on the importance of any civil penalty recouping the economic benefit a violator obtained from its noncompliance with the law, speculated that the time span of violations and Simplot's revenues suggests that here the penalty is less than the economic benefit, requests further information from the United States on its calculations, and asks for the penalty amount to be reevaluated if economic benefit is not sufficiently recouped.  *See* Ex. 1 at 10-11.  PRC similarly asks for disclosure of the amount of economic benefit of non-compliance.  *See* Ex. 1 at 26 (¶ 10). PRC also states that the civil penalty amount is inappropriate and "potentially damaging to the communities surrounding the [Don Plant]" noting that in a previous settlement involving FMC Corporation (which formerly operated a facility on the Fort Hall Reservation), the civil penalty was much higher, and that while the civil penalty here is approximately double the civil penalty in [a previous judicially approved settlement in the District of Wyoming involving] Simplot's Rock Springs facility, the "population effects are so much greater at the Don Plant."  *See id.* (¶¶ 1, 4).

The United States agrees that a civil penalty should recoup the economic benefit of noncompliance.  EPA has promulgated penalty policies under the various statutes it enforces, and these policies reflect the importance of recouping economic benefit (usually calculated using a publicly available computer model known as "BEN"), of deterring violations by including a "gravity" component that considers factors such as the extent of the violations and their environmental impact, the size of the violator, willfulness or

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -40**

cooperation, and also reflects litigation risks or other factors that justice may require.  *See* Housman Decl. (Ex. 3) ¶ 33.  We disagree with ICL's assumption that the civil penalty here does not recoup economic benefit because Simplot has high annual revenues; this is a *non sequitur* because EPA estimates economic benefit based on the cost of the least expensive measures the company could have implemented to avoid the alleged violations and not based on a company's revenues.  *Id*.; *see* Response to Public Comments (Ex. 2) at 26-27.

Settlement negotiations are confidential and the United States does not disclose figures presented in such negotiations, including calculations estimating the economic benefit of noncompliance.  Here, the civil penalty recoups the economic benefit of noncompliance that EPA estimated, and an appropriate gravity component that considered, among other things, the environmental impact of the alleged violations and the size of the violator.  *Id*.  In these respects, the penalty calculation adhered to EPA's civil penalty policies, and the negotiated civil penalty amount is fair in relation to the civil penalties contained in previous settlements both with Simplot and other companies in the phosphoric acid industry that have received court approval.  *Id*.  While all civil penalties are by law required to be deposited directly into the United States Treasury, 31 U.S.C. § 3302(b), and are not directed to specific communities, the compliance requirements of the CD, including the mitigation Simplot must fund, are designed to protect and benefit the communities surrounding the Don Plant.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -41**

### 3. Limited Redactions for Confidential Business Information Do Not Preclude Meaningful Review of the CD by the Public

The Tribes' comment contends that "much of the information needed to assess" the CD is redacted and that the redactions "make it almost impossible" for the Tribes to understand what the CD requires and provide complete comments on the Decree. *See* Ex. 1 at 33. The United States disagrees. Simplot asserted that some of the information contained in the CD appendices is confidential business information ("CBI") and should be protected from public disclosure, as is its right pursuant to EPA regulations set forth at 40 C.F.R. Part 2, Subpart B. As will be set forth in the parties' Consent Motion to Seal Unredacted Portions of Consent Decree Appendices and to Enter Stipulated Protective Order (to be filed shortly, *see supra* n. 1), Simplot's claim of CBI binds the United States to treat the material so designated as confidential until and unless EPA rejects the claim and EPA's determination is upheld in any subsequent administrative or judicial appeal. *See* 40 C.F.R. §§ 2.201 – 2.211; Response to Public Comments (Ex. 2) at 18-19.

After the CD was lodged, the Tribes expressed the desire to review the redacted material. The United States obtained Simplot's consent to hold a call with representatives of the Tribes in which, without providing the unredacted material, the United States endeavored to describe the redacted information and answer any questions the Tribes had about the redactions. *See* Housman Decl. (Ex. 3) ¶ 34. The United States intended that this should have reasonably assured the Tribes that nothing in the redactions precluded a full understanding of the CD, and we regret if it did not. The overwhelming majority of material in the CD's technical appendices is unredacted, and the limited redactions of portions of three appendices does not prevent review and understanding of

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -42**

the Decree.  *Id.*; Response to Public Comments (Ex. 2) at 18-19.  If the Court grants the

upcoming Consent Motion to Seal, the United States will file under seal the unredacted

Appendices.  This will not only permit the Court to have before it the entire, unredacted

CD before acting on the instant motion for entry, but it will also permit the Court to

satisfy itself that the limited redactions for CBI have not prevented the public from

fundamentally understanding the proposed terms of the Decree or from meaningfully

commenting thereon.

### 4.   Comments and Questions About the Timeline for RCRA Compliance Projects Do Not Warrant Revision or Rejection of the CD

Several comments address the timeline for RCRA compliance projects required

by the CD (CD ¶ 13 & App. 6).  ICL asks what statutes, regulations, or guidance applies

in determining the schedule for those projects and what procedures or penalties apply in

the event of noncompliance with the required schedule, why CD ¶¶ 67 and 104

(concerning requirements that Simplot agrees it is bound to perform even prior to entry of

the CD by the Court) only pertains to some and not all compliance projects, and for

additional analysis justifying what it terms a "protracted" compliance schedule.  *See* Ex.

1 at 12.  ICL urges that the compliance projects should be completed as expeditiously as

possible to prevent, reverse, or correct any environmental harm.  *Id.*  The Tribes comment

that there is a disconnect in the time frame for the actions required under the CD's best

management practices (BMP) plan (see CD ¶ 13 & App. 5.A) and the much longer time

frame for the Appendix 6 compliance projects.  *See* Ex. 1 at 42.

The RCRA compliance project timelines consider engineering requirements,

permitting and approvals, equipment lead times, the limited seasonal construction

window, other practical considerations, as well as the schedules required under previous phosphoric acid settlements.  Housman Decl. (Ex. 3) ¶ 24.  Some of the projects require new construction and process changes to reduce waste toxicity and recover phosphate from waste streams, and their complexity necessitates a longer timeline for completion than other projects.  *Id*.  The timelines were a subject of settlement negotiations, *id*. and were not dictated by statute, regulation, or agency guidance.  The United States shares ICL's desire that the projects be completed expeditiously and negotiated a schedule that it determined would be expeditious, taking into account reasonable feasibility considerations, and the similarity of the compliance schedule required here with the schedules required under previous phosphoric acid settlements.  *Id*.  Nor does the United States agree that the BMP and Appendix 6 timeframes are somehow at odds simply because some required actions under each can be completed relatively quickly and others will take longer.  *See* Response to Public Comments (Ex. 2) at 19-20, 28-29.

### 5.   Comments and Questions About the Fluoride Reduction Provisions Do Not Warrant Revision or Rejection of the CD

While the CD requires decommissioning of the Don Plant's existing cooling towers and their replacement with one or more newly constructed cooling pond(s), *see supra* Section I.C.6, the Tribes criticize the CD for not also requiring that such decommissioning and associated waste disposal comply with requirements for a mixed waste facility.  *See* Ex. 1 at 40 (¶ 7).  PRC states that emissions from the proposed cooling pond(s) have not been properly characterized and analyzed by Idaho DEQ and complains about excess fluoride emissions, fluoride in forage, and wind-blown fluoride dust emanating from the gypstack.  *Id*. at 27 (¶ 20).  ICL questions Idaho DEQ's use of a

specific emission factor (AP-42) in calculating the amount of fluoride reduction that will
be achieved by decommissioning the cooling towers and replacing them with cooling
pond(s).  *Id*. at 12-13.

 The United States does not believe any of these comments counsel a change to the
CD or its rejection by the Court.  EPA does not agree that the CD should subject the
cooling towers to the RCRA rules for "mixed waste" units, because EPA disagrees that
the cooling towers are mixed waste units under RCRA.  *See* Response to Public
Comments (Ex. 2) at 14-15.  And while the United States agrees that cooling tower
emissions have on occasion exceeded fluoride standards (as alleged in the Complaint),
the "forage" standards the commenters reference are state standards that are not federally
enforceable, and therefore they appropriately are not specifically addressed by the CD.
*Id*. at 8.  Wind-blown fluoride emissions from the gypstack occur but are a small fraction
of the fluoride emissions from the cooling towers at the Don Plant, and the requirement to
replace the cooling towers with cooling pond(s) will reduce overall fluoride emissions
from the Don Plant by at least four-fifths.  *Id*. at 8, 29-30, 37.  The criticism of Idaho
DEQ's use of a specific emission factor in its permitting process is not pertinent to the
CD's terms.  The CD is not itself a permit, and while some of the relief under the CD
requires permitting by the state, it is a matter for the state's permitting authority to follow
its own permitting process.  *Id*. at 29-30.  Emission factors (such as the AP-42 factor
cited by ICL) are used in permitting, drawn from experience across the country.  *Id*. at 30.
Use of such generic factors necessarily produces only an emissions estimate inasmuch as
emissions vary from site to site.  *Id*.  An attempt to determine an exact emissions factor
for the proposed Don Plant cooling pond(s) in lieu of using a generic emissions factor

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -45**

such as AP-42 is not necessary, nor would it in any event affect EPA's conclusion that

the replacement of the cooling towers with cooling pond(s) at the Don Plant will result in

very significant reductions of fluoride emissions. *Id.*; Schanilec Decl. (Ex. 4) ¶ 15 (90%

reduction in fluoride emissions from cooling towers and more than a four-fifths reduction

in overall fluoride emissions from the Don Plant).

### 6. Comments and Questions About the Closure Plan and Financial Assurance Provisions Do Not Warrant Revision or Rejection of the CD

As noted, the CD includes an initial closure plan and associated estimate of what

the cost will be of closure of the Don Plant and post-closure care. *See supra* Section

I.C.3. The CD in turn requires Simplot to provide financial assurance sufficient to fund

closure and post-closure care based on the cost estimate. *Id.* The cost estimate must be

updated annually to reflect inflation; in addition, the closure plan itself and the associated

cost estimate must be reviewed periodically (every five years) and updated to incorporate

relevant changes (e.g., changes to the Don Plant or adjustments to closure techniques and

costs), and the CD requires that Simplot maintain full financial assurance based on future

adjustments to the cost estimate. *See* CD & App. 2; Housman Decl. (Ex. 3) ¶ 30.

Several comments question the initial closure plan and financial assurance

provisions. Among other questions and comments, PRC states that the timeline for

closure is "way too slow," that the cost estimate for closure is "too low," that long-term

care of the closed facility and gypstack should be "in perpetuity, not just for a limited

time," and that details on how inflation will be accounted for, and how the funding will

be secured, are "missing." *See* Ex. 1 at 26-27 (¶¶ 2, 11-12). The Tribes, *inter alia*,

question whether the closure plan provisions that leave water in the gypstack may cause

continued contamination and stability issues and suggest several language changes to the initial closure plan that is included as Appendix 8 to the CD.  *See* Ex. 1 at 42-43.

The United States concludes that the above comments misapprehend the requirements for closure and post-closure care under RCRA and under the CD.  The comments cite no specific facts to support a contention that closure is too slow or that the closure cost estimate is too low, and the United States provides support for its determination that the initial closure plan and associated cost estimate are reasonable and consistent with RCRA.  *See* Housman Decl. (Ex. 3) ¶¶ 26, 30-32; Response to Public Comments (Ex. 2) at 22, 31, 34.  The CD sets forth how funding for financial assurance will be secured and how inflation will be accounted for to ensure the continuing adequacy of financial assurance in the future, and the stringent closure requirements of CD Appendix 1.C apply to any final closure plan for the Don Plant.  *See* Housman Decl. (Ex. 3) ¶¶ 30-31; Response to Public Comments (Ex. 2) at 31, 32.

The final closure plan (or "permanent closure plan") that will govern closure of the Don Plant is a closure plan that will be approved at a *future* time when the Don Plant will be closed, although it must at a minimum meet the stringent requirements set forth in CD Appendix 1.C – requirements that the United States has also included in prior consent decrees approved by courts for other phosphoric acid production facilities.  Housman Decl. (Ex. 3) ¶ 31.  The initial closure plan that is included in the CD (CD App. 8) does not purport to be the permanent closure plan, but rather was developed principally for purposes of establishing a cost estimate that is used to provide the financial assurance the Decree requires.  *Id*.  But even if the provisions in the permanent closure plan adopted in

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -47**

the future for the Don Plant substantially track the initial closure plan, the United States disagrees with commenters' statements.

The CD appropriately reflects that closure of a facility is performed in steps, with the most expensive tasks occurring within the first five years, followed by decreasing expenditures for subsequent tasks over time. *Id.* ¶ 32. The initial closure plan sets forth specific requirements including, among other things, grading and installing liners on gypstacks, establishing a stable vegetation cover to limit rainwater infiltration and erosion, treating and removing water from ditches and ponds that contain process wastewater, daily inspections of all components of the stack system(s) (the current stack system and any additional stack systems that may be constructed at the Don Plant in the future), and ultimately, closing the ditches and ponds and installing a top cover. *Id.* Some water will remain in the gypstack during closure; however, water volume will be reduced by evaporation, which is a commonly accepted treatment and closure practice especially in arid locations like Idaho where evaporation far exceeds precipitation. *Id.* For the first five years after the facility ceases operations, the volumes of wastewater requiring treatment will highest, but will be continuously reduced over time to such a point that it is only a small fraction of its original volume 20 years later. *Id.* A certain amount of liquid will remain indefinitely within the interior of the gypstack. *Id.* After closing the stack system(s), Simplot must monitor, capture and treat any discharges and safeguard the stack system(s) (i.e., long-term care) for fifty years, when the expected drainage rate for any remaining liquid is expected to be virtually zero, thus making it unnecessary to require long-term care in perpetuity. *Id.*; Response to Public Comments (Ex. 2) at 22, 34-35.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -48**

### 7.  Criticisms of the Environmental Mitigation Included in the CD Are Misplaced

ICL, PRC and the Tribes all raise questions or concerns about the environmental mitigation provided in the CD (*see supra* Section I.C.5).  These comments principally address the process followed to develop mitigation although the comments also include some statements about the substance or scope of the mitigation requirement.

With respect to process, while ICL's comments recognize that the Department of Justice's 2022 Tribal Consultation Policy specifically excludes active litigation and settlement negotiations from the matters requiring formal consultation, *see* Ex. 1 at 10, ICL nonetheless suggests there was an absence or formal or informal communication with the Tribes about mitigation (and the CD as a whole) that the United States should now remedy by inquiring whether the Tribes may be interested in direct discussion about mitigation and other provisions of the CD.  *See* Ex. 1 at 10.  The Tribes similarly criticize an absence of consultation with the Tribes in developing mitigation, state that this absence was a failure by the United States to fulfill its tribal consultation obligations, and that the United States should now remedy that asserted failure by requiring a full risk assessment to identify human health risks and ecological impacts that the Tribes have experienced and, once such an assessment is completed, mitigation projects should then be planned with the Tribes.  *See* Ex. 1 at 38 (¶ 4).  In particular, while the Tribes acknowledge some of the communications that occurred with the Tribes and Tribal staff members in connection with mitigation, they state that formal consultation with the Tribes' Business Council was necessary.  *Id.*  And PRC asked who from Tribes was

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -49**

consulted regarding mitigation and says any consultation should have been an official one with the Fort Hall Business Council.  *See* Ex. 1 at 27 (¶ 19).

The United States disagrees that, in developing mitigation relief for settlement, or any other provisions of the CD, the United States must have engaged in the suggested consultation with the Tribes.  As explained in the Response to Public Comments (*see* Ex. 2 at 9), settlements fall outside the scope of government-to-government consultation pursuant to Executive Order 13175 (Consultation and Coordination with Indian Tribal Government).  Under the Department of Justice Policy on Tribal Consultation approved by the Attorney General, it is the policy of the DOJ to engage in such consultations before adopting "policies" with tribal implications.  DOJ Policy Statement 0300.01 (Nov. 30, 2022), at p. 4.  The Policy Statement goes on to clarify that "policies" refers to: (1) regulations or regulatory policies; (2) proposed legislation; (3) decisions regarding whether to establish federal standards; and (4) other policies for which the Department determines consultation is appropriate and practicable.  The term "policies" does not include (as ICL acknowledged) matters that are the subject of investigation, anticipated or active litigation, or settlement negotiations.  *Id.*  Because the CD is the product of settlement negotiations related to anticipated litigation, the CD is outside the scope of policies concerning tribal consultation by the Department of Justice.  Absence of consultation (that was not here required) does not render the CD unfair, unreasonable, or inconsistent with applicable law.

However, although tribal consultation was not required, the United States here undertook a reasonable process to identify and include appropriate mitigation requirements in the CD.  Against the backdrop of significant prior enforcement orders

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -50**

seeking to remedy contamination from the Don Plant's operations, *see supra* at 7;

Schanilec Decl. (Ex. 4) ¶¶ 7, 11, 14, the United States sought to determine if potential

additional work might be appropriate mitigation in a settlement of this action.  Housman

Decl. (Ex. 3) ¶¶ 27-28; Response to Public Comments (Ex. 2) at 10-11.  The United

States conferred with Idaho DEQ, which has specific experience on various water quality

issues in the vicinity of the Don Plant.  Housman Decl. (Ex. 3) ¶ 28; Cornell Decl. (Ex. 5)

¶ 5.  In discussions with Idaho DEQ, the United States learned that DEQ had itself

received input from relevant stakeholders, including technical staff from both the City of

Pocatello and the Tribes' professional staff, on a number of potential projects that might

supplement the remedial actions that are already being implemented under the prior

enforcement orders.  *See* Cornell Decl. (Ex. 5) ¶¶ 6-8.  Specifically, with respect to work

to redress the harm from invasive species along portions of the Portneuf River, both the

City and the Tribes' staff were supportive of such work and had assisted by helping to

identify the areas where the work would be beneficial.  *Id.*; Response to Public

Comments (Ex. 2) at 10, 25.

While acknowledging the communications with the United States on this subject,

the Tribes contend that "Tribal staff made recommendations to DOJ of possible

mitigation projects all of which were rejected," Ex. 1 at 38 (¶ 4).  This statement is not a

fair characterization of the process here undertaken, nor does it in any way counsel

rejection of the CD.  Here, the United States specifically sought the Tribes' input as to

environmentally beneficial projects that the Tribes would like to see included in a

potential settlement with Simplot, and the Tribes' comment does not appear to recognize

the possibility that either the specific projects that Tribal staff suggested could not

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -51**

appropriately be included as mitigation, or that the projects otherwise could not be negotiated with Simplot. *See* Response to Public Comments (Ex. 2) at 10.

With respect to the substance of the mitigation provisions, the Tribes do *not* contend that the mitigation included in the CD will fail to redress the adverse environmental impacts the CD identifies. Rather, the Tribes seek to have more far-reaching mitigation provisions developed by assessing additional impacts to resources used in the Tribes cultural and customary areas and by including the Tribes in a formal process to select mitigation projects. *See* Ex. 1 at 39 (¶ 4). The Tribes also question how IDEQ will oversee work on the Fort Hall Reservation where it has no jurisdiction. *Id*. PRC states that the mitigation "does nothing to remedy the negative effects that the Simplot Don Plant has had on the surrounding environment and the health of the communities." Ex. 1 at 26 (¶ 3).

Notably, here the United States explored what mitigation actions could be included in the CD against the background of extensive remediation already undertaken pursuant to CERCLA and state law to address the impacts of the Don Plant on the surrounding environment, and there is no basis to reject the CD for not including additional, undefined actions that might or might not meet the requirements for mitigation under policy or law. The United States determined that, over and above the requirements of prior federal and state enforcement orders relating to the Don Plant (which Simplot estimates it has spent approximately $100 million thus far to implement), and what the CD requires for RCRA compliance (which Simplot estimates will cost approximately $150 million), the mitigation required by the CD would redress an adverse environmental impact associated with the RCRA violations alleged in the Complaint that

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -52**

would not otherwise be remedied.  *See* Housman Decl. (Ex. 3) ¶¶ 27-28, 33; Cornell

Decl. (Ex. 5) ¶ 9; Schanilec Decl. (Ex. 4) ¶ 11; Response to Public Comments (Ex. 2) at

11.  Regarding the Tribes' comment questioning the role of Idaho DEQ in overseeing the

mitigation actions to be performed inside the Fort Hall Reservation, the CD reflects that

DEQ's oversight will be pursuant to a contract that DEQ will enter into with the Tribes

under which the Tribes will perform the mitigation actions in the agreed areas inside the

Reservation.  *See* CD at 41-42 (¶ 44) & App. 11 at 3-4; Cornell Decl. (Ex. 5) ¶ 9;

Response to Public Comments (Ex. 2) at 11.

### 8.  Suggested Improvements to the Form and to Certain Details of the CD are Unnecessary

The Response to Public Comments (Ex. 2) addresses a variety of suggestions

commenters offer about certain specific format or substantive details of the CD, and the

United States sets forth therein why it concludes that these suggested changes to the

Decree are not necessary.[8]

---

[8] For example, the Tribes comment that definitions that appear in Appendix 10 of the
Decree should be located at the beginning of the CD, and that certain documents referred
to the CD should be attached to it.  *See* Ex. 1 at 44.  However, the CD already includes
near the beginning extensive definitions of terms used within the body of the CD, and the
parties made a reasonable choice to define other terms, used solely in the CD
Appendices, in those Appendices.  *See* Response to Public Comments (Ex. 2) at 24.  Nor
did the parties conclude it was necessary to attach to the CD documents that are publicly
available or that could be obtained on request. *See id.*  Similarly, PRC recommends that
the United States and/or the State of Idaho list in one location all legal decisions and
permits relating to the Don Plant and provide relevant points of contact, and that the CD
should include a discussion of contamination of Reservation resources, *see* Ex. 1 at 27
(¶¶ 18, 24).  But the CD is intended to memorialize the parties' settlement agreement, not
to compile all documents relating to the facility that are obtainable elsewhere, nor to
include discussion beyond what the parties agree is necessary background (and
background on the Don Plant's impacts on resources used by the Tribes *is* set forth in the
CD's "whereas" clauses, *see* CD at 5-6, 8-9).  *See* Response to Public Comments (Ex. 2)
at 36.  The Tribes also suggest that Appendix 1.D to the CD include a definition of a

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -53**

**9.  Various Other Comments and Questions Not Objecting to the CD Terms Are Not Material**

Commenters include numerous other questions, requests, observations, and criticisms that the United States addresses in its Response to Public Comments (Ex. 2). However, because these comments do not appear to be specific objections to the terms of the CD, they are not material to the Court's consideration whether to approve the Decree.[9]

---

"critical condition," *see* Ex. 1 at 41, although that term *is* already defined there (CD Appendix 1.D § I.4).  *See* Response to Public Comments (Ex. 2) at 17.  Both the Tribes and ICL question or make suggestions about the Best Management Practices (BMP) Plan provisions of the CD that sets forth how Simplot will manage and minimize spills and leaks (*see* CD ¶¶ 13, 19 & App. 5.A).  Specifically, ICL asks that the United States explain and justify the "actionable" volume thresholds that trigger the requirements of the BMP Plan and reevaluate those thresholds as necessary.  *See* Ex. 1 at 13-14.  The Tribes urge that the CD should require compliance with the BMP, and that the BMP be amended to require reporting within 24 hours of any spills that may impact groundwater and surface water.  *See id*. at 39-40 (¶ 6).  But the CD *does* already require that Simplot comply with the BMP for spills and leaks, CD at 24-25, 29 (¶¶ 13, 19), and the BMP thresholds and reporting requirements are reasonable and do *not* supplant any other applicable statutory requirements.  *See* Response to Public Comments (Ex. 2) at 14, 32. PRC comments that "Simplot's denials of violations in the settlement agreement are unacceptable and present a risk to the communities of the Shoshone-Bannock Tribes, the city of Pocatello, and the city of Chubbuck," Ex. 1 at 26 (¶ 5), although such provisions where the government alleges violations that a defendant denies, are common to most civil consent decrees.  *See* Response to Public Comments (Ex. 2) at 33.

[9] For example, criticisms of conclusions reached by EPA and Idaho DEQ programs in prior enforcement related to the Don Plant, *see* Ex. 1 at 36-37 (¶ 3) may properly be communicated to those programs but do not counsel changes to the terms of the CD.  *See* Response to Public Comments (Ex. 2) at 7.  Comments about EPA's community engagement, including an interpretation of an answer the United States provided in the informational sessions that EPA arranged during the public comment period, *see* Ex. 1 at 10 (ICL), 28 (PRC), likewise are not material to the terms of the Decree.  *See* Response to Public Comments (Ex. 2) at 25, 41.  Commentary about the political and lobbying effort relative to Congress' passage of the Bevill Amendment, *see* Ex. 1 at 28 (¶ 32) (PRC), whatever its merit may be, likewise is not relevant to the Court's consideration of the terms of the CD.  *See* Response to Public Comments (Ex. 2) at 40.

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -54**

* * *

In sum, even if the Court were to agree with some of commenters' contentions that the CD ideally would include additional or different provisions, that should not affect the Court's determination that the CD as presented is fair, reasonable, consistent with the underlying statutes – and thus the Decree should be approved under the standard governing judicial review of consent decrees (*see supra* Section II).

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court grant the United States' motion, approve the CD, and enter it as the Court's judgment in this action.

Dated:  March 20, 2024

Respectfully submitted,

ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

*/s/ David Rosskam*
DAVID ROSSKAM
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20004-7611
Telephone: (202) 514-3974
Fax:  (202) 514-8865
david.rosskam@usdoj.gov

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -55**

JOSHUA D. HURWIT, ISB No. 9527
United States Attorney

/s/ *Christine G. England*
CHRISTINE G. ENGLAND, ISB No. 11390
Assistant United States Attorney
District Of Idaho
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Telephone: (208) 334-1211
Facsimile:  (208) 334-9375
Email: Christine.England@usdoj.gov

Attorneys for Plaintiff United States of America

**MEMORANDUM SUPPORTING MOTION TO ENTER CONSENT DECREE -56**