# Exhibit 1

Public Comments Received

(Alphabetical)



BANNOCK COUNTY COMMISSIONERS
624 E. Center St., Pocatello, ID 83201
Phone: (208) 236-7210 • Fax: (208) 232-7363

ERNIE MOSER
Commissioner
1st District

JEFF HOUGH
Commissioner
2nd District

JOHN CROWDER
Commissioner
3rdDisf:lict

September 19, 2023

The Honorable Todd Kim
U.S. Department of Justice
Assistant Attorney General
Environment and Natural Resources Division
PO Box 7611
Washington, DC 20044-7611

Comments Sent Via Email: pubcomment-ees.enrd@usdoj.gov

**RE: Comments on the Consent Decree between the United States and the J.R. Simplot Company, *United States of America v. J.R. Simplot Company,* D.J. Ref. No. 90-7-1-08388/23**

Dear Mr. Kim:

The Board of County Commissioners of Bannock County, Idaho, have reviewed the Consent Decree between the United States and the J.R. Simplot Company, lodged in federal court on July 19, 2023. We write to express our support for the Consent Decree. It is imperative that the Federal Government recognize that the long-term sustainability of Simplot's Don Plant is critical to Bannock County, the State of Idaho, and the United States.

The J.R. Simplot Company's Don Plant is located in Power County, adjacent to our County. Most of the 350 employees who work at the Don Plant live in Bannock County. The Plant has been a major employer and economic force in our county since 1944; to our knowledge, the only phosphate production plant in No1th American that has operated continuously for 79 years. Southeast Idaho is one of the few regions in the United States that is rich in phosphate deposits; and the processing of phosphate ore at the Don Plant has been a major anchor in this region and for Western agriculture. In addition to the jobs and supporting businesses created by the Don Plant, the employees of the plant volunteer in our community non-profits, churches, little-league programs, hospital boards and economic development efforts. The Simplot Company is a major corporate citizen in our county and has been a part of our economic and cultural DNA for nearly eight decades.

We know Simplot's phosphate reserves will continue to provide raw mate1ial for the Don Plant far into the future, but only as long as the plant can eventually expand to improve operational efficiencies. We are in favor of the Consent Decree as it and the Blackrock Land Exchange are

integral in maintaining the long-term benefits of the Don Plant in an environmentally responsible manner.

The Bannock County Board of County Commissioners wish to offer the following comments for the record in support of specific provisions of the Consent Decree:

1. We appreciate that the Consent Decree recognizes the vast number of resources that Simplot has invested in improving the environmental conditions at the plant. In 2017, the Company finished installing a synthetic intermediate liner on the existing gypsum stack at the Don Plant (Page 8, and Paragraph 25). The results of this investment have been remarkable. As described in a separate regulatory process (the Final Environmental Impact Statement for the Blackrock Land Exchange), the synthetic liner has reduced phosphorous concentrations in the Portneuf River by over 85% over the past decade, and any impacts from the expansion of the existing gypstack are projected to be minimal. This environmental progress will only continue with a viable phosphoric acid production plant.

2. We appreciate Simplot's commitment to maintain adequate financial assurance for the closure of the gypsum stack (Paragraph 26). The closure plan (Appendix 8) also reflects a common-sense approach based on site-specific conditions. These are major accomplishments in the Consent Decree, and demonstrate the Company's commitment to ensuring that our taxpayers will not be responsible for any closure of the gypsum stack in the future.

3. We support the Consent Decree's innovative Acid Value Recovery System (Appendix 4). This is a win-win for both recovering additional phosphate resources and benefitting the environment.

4. The Consent Decree correctly recognizes the importance of the Blackrock Land Exchange (Paragraph 31) to the long-term sustainability of the Don Plant. Without adjacent land, the environmental benefits of this provision will not be realized. Further, any expansion of the gypsum stack will have meet stringent design requirements, including a synthetic liner, groundwater monitoring and other requirements in Appendix 1.A. This is the second time the Federal Government (2010 EMF Order) has recognized that expansion of the gypsum stack under certain conditions is permissible. In short, the Federal Government must continue to support this land exchange.

5. We appreciate Simplot's $200,000 mitigation commitment to continue to improve conditions in the Portneuf River (Paragraph 44).

We urge the federal government to be cautious about accepting unsupported statements or claims of any special interest group that undermine these key negotiated provisions. Eliminating, or significantly reducing phosphate fertilizer manufacturing would have disastrous consequences for Bannock County, the State of Idaho, the nation's farmers, and American consumers. Phosphate fertilizer manufacturing is critical for our nation's food supply. The negotiated provisions provide the proper balance between environmental responsibility and utilization of phosphate manufacturing to ensure America's food production is not threatened by short-sighted and irresponsible policy decisions.

2

We join with other leaders in Southeast Idaho in supporting the Consent Decree and strongly urge the Federal Government's continued support of the Blackrock Land Exchange. Both are critical to our community, the State of Idaho, and the food security of our country.

BANNOCK COUNTY COMMISSIONERS

_____
Ernie Moser, Chair

_____
Jeff Hough, Commissioner

_____
John Crowder, Commissioner

Sept 12, 2023

The Honorable Todd Kim

U.S. Department of Justice

Assistant Attorney General

Environment and Natural Resources Division

PO Box 7611

Washington, DC 20044-7611


Comments Sent Via Email: pubcomment-ees.enrd@usdoj.gov


**RE: Comments on the Consent Decree between the United States and the J.R. Simplot Company,** *United States of America v. J.R. Simplot Company*, **D.J. Ref. No. 90-7-1-08388/23**

Dear Mr. Kim:

The City of Chubbuck, Idaho has reviewed the Consent Decree between the United States and the J.R. Simplot Company, lodged in federal court on July 19, 2023. We write to express our support for the Consent Decree. It is imperative that the Federal Government recognize that the long-term sustainability of Simplot's Don Plant is critical to our city, the State of Idaho, and the United States.

The J.R. Simplot Company's Don Plant is located adjacent to Chubbuck, and most of the 350 employees who work at the Don Plant live in Chubbuck or Pocatello.  The Plant has been a major employer and economic force in our city since 1944; to our knowledge, the only phosphate production plant in North American that has operated continuously for 79 years. Southeast Idaho is one of the few regions in the United States that is rich in phosphate deposits; and the processing of phosphate ore at the Don Plant has been a major anchor in this region and for Western agriculture. In addition to the jobs and supporting businesses created by the Don Plant, the employees of the plant volunteer in our community non-profits, churches, little-league programs, hospital boards and economic development efforts. The Simplot Company is a major corporate citizen in Chubbuck and has been a part of our economic and cultural DNA for nearly eight decades.

We know Simplot's phosphate reserves will continue to provide raw material for the Don Plant far into the future, but only as long as the plant can eventually expand to improve operational efficiencies. We are in favor of the Consent Decree as it and the Blackrock Land Exchange are integral in maintaining the long-term benefits of the Don Plant in an environmentally responsible manner.

The City of Chubbuck offers the following comments for the record in support of specific provisions of the Consent Decree:

1. We appreciate that the Consent Decree recognizes the vast number of resources that Simplot has invested in improving the environmental conditions at the plant. In 2017, the Company finished installing a synthetic intermediate liner on the existing gypsum stack at the Don Plant (Page 8, and Paragraph 25). The results of this investment have been remarkable. As described in a separate regulatory process (the Final Environmental Impact Statement for the Blackrock Land Exchange), the synthetic liner has reduced phosphorous concentrations in the Portneuf River by over 85% over the past decade, and any impacts from the expansion of the existing gypstack are projected to be minimal. This environmental progress will only continue with a viable phosphoric acid production plant.

2. We appreciate Simplot's commitment to maintain adequate financial assurance for the closure of the gypsum stack (Paragraph 26). The closure plan (Appendix 8) also reflects a common-sense approach based on site-specific conditions. These are major accomplishments in the Consent Decree and demonstrate the Company's commitment to ensuring that our taxpayers will not be responsible for any closure of the gypsum stack in the future.

3. We support the Consent Decree's innovative Acid Value Recovery System (Appendix 4). This is a win-win for both recovering additional phosphate resources and benefiting the environment.

4. The Consent Decree correctly recognizes the importance of the Blackrock Land Exchange (Paragraph 31) to the long-term sustainability of the Don Plant. Without adjacent land, the environmental benefits of this provision will not be realized. Further, any expansion of the gypsum stack will have met stringent design requirements, including a synthetic liner, groundwater monitoring and other requirements in Appendix 1.A. This is the second time the Federal Government (2010 EMF Order) has recognized that expansion of the gypsum stack under certain conditions is permissible. In short, the Federal Government must continue to support this land exchange.

5. We appreciate Simplot's $200,000 mitigation commitment to continue to improve conditions in the Portneuf River (Paragraph 44).

We urge the Federal Government to resist the wild claims and factually unsupported statements of special interest groups that undermine these key negotiated provisions. It seems to us their

only aim is to eliminate phosphate fertilizer manufacturing, regardless of the cultural and economic impacts to Pocatello, the state of Idaho, and the nation's farmers.

We join with other leaders in Southeast Idaho in supporting the Consent Decree and strongly urge the Federal Government's continued support of the Blackrock Land Exchange. Both are critical to our community, the State of Idaho, and the food security of our country.

Sincerely,

Mayor Kevin England



OFFICE OF THE MAYOR/COUNCIL
911 North 7th Avenue
P.O. Box 4169
Pocatello, Idaho 83205-4169

Office: (208) 234-6163
www.pocatello.us

BRIAN C. BLAD
*Mayor*

Pocatello City Council:

RICK CHEATUM
LINDA LEEUWRIK
COREY MANGUM
JOSH MANSFIELD
SCOTT MARCHAND
BRENT R. NICHOLS

September 19, 2023

The Honorable Todd Kim
U.S. Department of Justice
Assistant Attorney General
Environment and Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611

**Via Email:** pubcomment-ees.enrd@usdoj.gov

**RE: Comments on the Consent Decree between the United States and the J.R. Simplot Company, *United States of America v. J.R. Simplot Company*, D.J. Ref. No. 90-7-1-08388/23**

Dear Todd Kim:

I have reviewed the Consent Decree between the United States and the J.R. Simplot Company, lodged in federal court on July 19, 2023. I write to express my support for the Consent Decree. It is imperative the Federal Government recognize that the long-term sustainability of Simplot's Don Plant is critical to our city, the State of Idaho, and the United States.

The J.R. Simplot Company's Don Plant is located just west of Pocatello, and most of the 350 employees who work at the Don Plant live in our city. The Plant has been a major employer and economic force in our city since 1944. To our knowledge, it is the only phosphate production plant in North American that has operated continuously for 79 years. Southeast Idaho is one of the few regions in the United States that is rich in phosphate deposits, and the processing of phosphate ore at the Don Plant has been a major anchor in this region and for Western agriculture. In addition to the jobs and supporting businesses created by the Don Plant, the employees of the Plant volunteer in our community non-profits, churches, little-league programs, hospital boards and economic development efforts. The Simplot Company is a major corporate citizen in Pocatello and has been a part of our economic and cultural DNA for nearly eight decades.

We know Simplot's phosphate reserves will continue to provide raw material for the Don Plant far into the future, but only as long as the plant can eventually expand to improve operational efficiencies. I am in favor of the Consent Decree as it and the Blackrock Land Exchange are integral in maintaining the long-term benefits of the Don Plant in an environmentally responsible manner.

I agree with Simplot that the Bevill Exclusion has always been clear as it relates to the phosphate industry. However, the U.S. Environmental Protection Agency's (EPA) interpretation of that exclusion has been inconsistent over the years. If EPA believed that clarification was necessary, then proper rulemaking rather than defining through a costly and expensive enforcement initiative was the correct course.

The Honorable Todd Kim
**D.J. Ref. No. 90-7-1-08388/23**
September 19, 2023
Page Two

I offer the following comments for the record in support of specific provisions of the Consent Decree:

1. I appreciate that the Consent Decree recognizes the vast number of resources Simplot has invested in improving the environmental conditions at the plant. In 2017, the Company finished installing a synthetic intermediate liner on the existing gypsum stack at the Don Plant (Page 8, and Paragraph 25). The results of this investment have been remarkable. As described in a separate regulatory process (the Final Environmental Impact Statement for the Blackrock Land Exchange), the synthetic liner has reduced phosphorous concentrations in the Portneuf River by over 85% over the past decade, and any impacts from the expansion of the existing gypsum stack are projected to be minimal. This environmental progress will only continue with a viable phosphoric acid production plant.

2. I appreciate Simplot's commitment to maintain adequate financial assurance for the closure of the gypsum stack (Paragraph 26). The closure plan (Appendix 8) also reflects a common-sense approach based on site-specific conditions. These are major accomplishments in the Consent Decree, and demonstrate the Company's commitment to ensuring that our taxpayers will not be responsible for any closure of the gypsum stack in the future.

3. I support the Consent Decree's innovative Acid Value Recovery System (Appendix 4). This is a win-win for both recovering additional phosphate resources and benefitting the environment.

4. The Consent Decree correctly recognizes the importance of the Blackrock Land Exchange (Paragraph 31) to the long-term sustainability of the Don Plant. Without adjacent land, the environmental benefits of this provision will not be realized. Further, any expansion of the gypsum stack will have meet stringent design requirements, including a synthetic liner, groundwater monitoring and other requirements in Appendix 1.A. This is the second time the Federal Government (2010 EMF Order) has recognized that expansion of the gypsum stack under certain conditions is permissible. In short, the Federal Government must continue to support this land exchange.

5. I appreciate Simplot's $200,000 mitigation commitment to continue to improve conditions in the Portneuf River (Paragraph 44).

I urge the Federal Government to resist factually unsupported statements of special interest groups that undermine these key negotiated provisions. It seems to me their only aim is to eliminate phosphate fertilizer manufacturing, regardless of the cultural and economic impacts to Pocatello, the state of Idaho, and the nation's farmers.

I join with other leaders in Southeast Idaho in supporting the Consent Decree and strongly urge the Federal Government's continued support of the Blackrock Land Exchange. Both are critical to our community, the State of Idaho, and the food security of our country.

Sincerely,

Brian C. Blad
Mayor



208.345.6933 • PO Box 844, Boise, ID 83702 • www.idahoconservation.org

September 22, 2023

Assistant Attorney General, U.S. DOJ—ENRD
pubcomment-ees.enrd@usdoj.gov
P.O. Box 7611, Washington, DC 20044

**RE: Proposed Consent Decree, United States of America v. J.R. Simplot**

To Whom It May Concern:

I am writing on behalf of the Idaho Conservation League (ICL) to submit comments on the proposed Consent Decree (CD) between the United States of America and J.R. Simplot Company. Since 1973, the Idaho Conservation League has had a long history of involvement with air and water quality issues. As Idaho's largest state-based conservation organization we represent over 25,000 members and supporters who have a deep personal interest in ensuring that our air and water quality are protected throughout the state.

We thank you for the opportunity to submit comments and ask that you please send us any response to public comments on this opportunity. Please feel free to contact us if you have any questions or require additional information.

Sincerely,

**Will Tiedemann**
Conservation Associate
Idaho Conservation League
wtiedemann@idahoconservation.org
208.286.444

**Tribal Consultation**

Per information shared by the Environmental Protection Agency (EPA) and the Department of Justice (DOJ) during the virtual information session for the public held on Tuesday, September 12, 2023, the Shoshone-Bannock Tribes (the Tribe) was not directly contacted as part of the process of developing the proposed Mitigation Projects (as outlined within Appendix 11 Mitigation Project Summary of the CD). Instead, it was explained that the Idaho Department of Environmental Quality (DEQ) served as a proxy representing Tribal interests. Considering many of the impacts of the alleged violations with in the CD affect Tribal lands or land historically and currently used by the Tribe, and that two of the three proposed projects/sites within the Appendix 11 Mitigation Project Summary are to be implemented by the Tribe, the lack of direct consultation with the Tribe is particularly concerning. The Biden Administration's recent commitment to Tribal Justice[1] and the DOJ's recent commitment to Tribal Justice in the adjacent sphere of violence against Tribal members[2] only add to our concerns regarding the lack of direct consultation with the Tribe. While the Tribe may or may not have objections to the CD proposed mitigation projects and strategy, DEQ should not serve as a proxy for Tribal interests.

Furthermore, it is not clear from the CD to what degree the Tribal was consulted in developing the full CD itself. While it should be acknowledged that the DOJ's 2022 Tribal Consultation Policy[3] (the Policy) specifically does not include active litigation or settlement negotiations as "policies" that require formal Consultation, the Policy does not preclude the DOJ from carrying out the spirit and intent of the Policy via informal discussion. In fact, the Policy states, "...communication between Tribes and the Department of Justice is not limited to formal Consultation. To this end, the Department of Justice will engage in ongoing communication with Tribes beyond formal Consultation."

Given the above concerns, we respectfully request the DOJ inquire with the Tribe about any interest they may have in initiating direct, informal discussion about proposed mitigation projects as well as any and all aspects of the CD as a whole.

**Benefit of Noncompliance**

The importance of both recuperating the benefit of noncompliance (BEN) and the financial models to do so are well documented by the EPA[4]. Simply said, the BEN is a violator's economic benefit from delaying or avoiding pollution control expenditures. Per the CD, Simplot is agreeing to pay a $1.5 million civil penalty. Considering that some of the alleged violations span decades, and Simplot's annual revenue is estimated to fall between $5 to $10 billion[5], at face value, the

---

[1]
https://www.whitehouse.gov/briefing-room/statements-releases/2022/11/30/fact-sheet-biden-harris-administration-announces-new-actions-to-support-indian-country-and-native-communities-ahead-of-the-administrations-second-tribal-nations-summit/
[2] https://www.justice.gov/tribal/mmip/about
[3] https://www.justice.gov/d9/2022-12/doj-memorandum-tribal-consultation.pdf
[4] https://www.epa.gov/enforcement/penalty-and-financial-models
[5] https://www.forbes.com/companies/jr-simplot/?sh=2b02cda324ce

stipulated $1.5 million penalty would seem minimal compared to the BEN Simplot likely sustained from the alleged violations.

To be sure, the question of whether the BEN is being sufficiently recuperated is informed by several factors. One, the violations described in the CD are alleged and disputed by Simplot. Two, per the CD, Simplot agrees to implement specific waste management measures it has valued at nearly $150 million, and three, there is a substantial amount of case and settlement penalty precedent established by fourteen previous violation settlements with other phosphate manufacturing facilities. However, it is unclear from the CD how the DOJ approached the above factors and whether the economic benefit of noncompliance by Simplot is ultimately being sufficiently recuperated by this penalty.

We leave that first factor to be addressed by the DOJ in any response to comments. As to the second factor, while the $150 million Simplot will devote to improved waste management is a commendable provision secured by the CD, it is not clear what amount of these to-be-implemented waste management methods are voluntary compared to merely practices that have always been legally require by applicable environmental law/regulation but not yet implemented by Simplot. It would seem inappropriate to include money and investment (if any) spent on practices that have always been required as counting toward recuperating the BEN. Finally, as to the third factor, while case law and precedent significantly inform pending litigation, they should not be roadblocks for correcting any possible previous deficiencies in past settlements that have been carried over to this CD.

Given the above concerns, we request the DOJ provide further information on how the recuperation of the BEN was approached (including any models or calculations utilized) and how the $1.5 million civil penalty included within the CD meets or does not meet applicable law, regulations and guidance. Should it be found that the BEN is not sufficiently being recuperated within the proposed CD, we request that a re-evaluation be performed.

**Closure Cost Estimating**

Appendix 8 - Initial Closure Plan for the Facility of the CD presents information and calculations for how closure costs were estimated. Per the Initial Closure Plan, in general, closure costs were based on December 2018 dollars. However, some "Long-Term Costs" were inflated to 2020. Although the CD includes provisions and procedures to re-estimate and adjust closure costs annually, given the well-documented inflation that occurred in the United States since 2018 (and even 2020), it is unclear why the CD would defer the almost certainly necessary inflation-related readjustment until a future date.

We respectfully request the DOJ clarify exactly what inflationary adjustments were applied to estimated closure costs. Furthermore, we respectfully request that the CD include inflation adjustments made to 2023 (or as close as practically possible), unless a justifiable reason to not do so can be demonstrated.

**Compliance Projects Timeline**

Appendix 6 - RCRA Project Narrative & Compliance Schedule (Compliance Project Schedule) of the CD outlines the compliance projects that would be required of Simplot, as well as their timeline for completion. The Compliance Project Schedule states that "the length of time required (to complete compliance projects) is influenced by engineering requirements, permitting and approvals, equipment lead times, a limited seasonal construction window, coordination with plant turnarounds, training development, and coordination with employee work schedules. However, it is unclear from the Compliance Project Schedule or the CD how each of these factors applies to each proposed project. We would like to see these projects be completed as expeditiously as possible. The sooner the proposed compliance projects can be completed, the quicker any environmental harm can be prevented, reversed, or corrected. Other environmental laws include regulations on compliance schedule timetables, for example, any schedule for compliance included within a National Pollution Discharge Elimination (NPDES) Permit under the Clean Water Act must require compliance as soon as possible[6]. We are curious as to which applicable statutes, regulations, or guidance are applicable to this CD and the proposed Compliance Project Schedule. <u>We ask the DOJ to please provide context as to what statutes, regulations, or guidance are applicable to the proposed Compliance Project Schedule.</u>

We also would like to know what procedures and/or penalties are in place should Simplot fail to meet the Compliance Project Schedule timelines. Paragraphs 67 and 104 of the CD include language that appears to bind Simplot to complete certain compliance projects by their stipulated dates and potential penalties for failing to do so. However, paragraphs 67 and 104 of the CD also appear to only apply to Compliance Projects 4 through 6. It is unclear why this is the case. <u>We ask the DOJ to please clarify this assumption and further elaborate on what procedures and/or penalties are in place should Simplot fail to meet compliance projects timelines.</u>

<u>In addition, we respectfully request the DOJ to require Simplot to provide further analysis justifying how the proposed protracted Compliance Project Schedule timeline is in the public's best interest.</u>

**Fluoride Emissions Reduction**

The paragraph 47 of the CD explains that State Air Permitting will allow for the credit of fluoride emissions reduction by removing the cooling towers and instead using cooling ponds. On January 20th, 2023, Idaho DEQ issued a modified Permit to Construct P-2016.0055 to the Don Plant permitting the decommission of the cooling towers and allowing the use of cooling ponds resulting in a stated reduction of over 42 tons per year of fluoride emissions. However, as stated in public comments submitted to DEQ by ICL, this 42 tons per year reduction was predicated on the use of outdated AP-42 emission factors for fluoride from cooling ponds (specifically 1.6 lbs of fluoride per acre of cooling pond per day). In fact, the most current fifth edition of AP-42

---

[6] Per 40 C.F.R 127.47(a)(1)

Chapter 8.9 Phosphoric Acid[7,8] states that fluoride emission from gypstack cooling ponds are "site specific" and that "based on our findings concerning the emissions of fluoride from gypsum ponds, it was concluded that no investigator had as yet established experimentally the fluoride emission from gypsum ponds."[9]

Despite this fact, DEQ allowed the use of a gypstack cooling pond fluoride emission factor that was used in previous permitting actions but one that was ultimately derived from a now outdated version of AP-42 (specifically from the Third Edition of AP-42 updated from 1978 to 1985). In a response to comments, DEQ stated they worked with Simplot to resolve this issue, and reviewed a 1978 EPA study  "Evaluation of Emissions and Control Techniques for Reducing Fluoride Emissions from Gypsum Ponds in the Phosphoric Acid Industry, EPA-600/2-78-124" to determine the DEQ approved 1.6 lbs fluoride per acre per day emission factor was appropriate. Ultimately DEQ concluded that "since there have been no documented investigations that are readily available to describe the emissions of fluoride from the gypsum stack system, DEQ must accept the use of the previously approved emission factor until such a time that a better source is made available."

It does not appear DEQ seriously considered the need for Simplot and Don Plant Facility to conduct a site-specific study of gypstack cooling pond fluoride emissions as the fifth edition of AP-42 Chapter 8.9 would imply is most prudent.

<u>We respectfully request for the DOJ and/or the EPA to comment as to whether they find the fluoride emissions reduction calculation approach used by DEQ acceptable.</u> Furthermore, the CD appears to limit the authority to which the DOJ and the CD have over the fluoride reduction permitting action of DEQ (see paragraph 30 of the CD) compared to the authority the CD is granted in reviewing and approving an "Alternative Proposed Fluoride Reduction Plan" in lieu of the DEQ approved approach. <u>Given this consideration, we respectfully request the DOJ and/or the EPA to comment on what course of action may be available to correct DEQ's approach if it is found to be unacceptable.</u>

**BMP Actionable Thresholds**

Appendix 5.A - Minimizing and Addressing Spills and Leaks of the CD includes required procedures for reducing unintended inputs of phosphoric acid, sulfuric acid, and nitric acid to Process Wastewater entering the Phosphogypsum Stack System. More specifically, Table 1 - BMP Actionable Volumes includes thresholds for which specific BMPs must be initiated. However, little support for why these specifically proposed thresholds are most appropriate is provided in the document.

---

[7] https://www.epa.gov/sites/default/files/2020-09/documents/8.9_phosphoric_acid.pdf
[8] AP-42 Fourth Edition, supplement F, 1993 specifically notes that Phosphoric Acid emission factors underwent a major revision to removing the previous numeric fluoride emissions factor for gypstack cooling ponds and instead listing "Site Specific"
https://www.epa.gov/sites/default/files/2020-11/documents/ap42_4thed_suppf_july1993.pdf
[9] See AP-42 Chapter 8.9, Table 8.9-1 footnote "e"

<u>We respectfully request that the DOJ expand on how these thresholds were developed, provide supporting justification for the proposed threshold, and reevaluate as necessary.</u>



1410 N Hilton Street
Boise, ID 83706 • (208) 373-0502

Brad Little, Governor
Jess Byrne, Director

September 25, 2023

Department of Justice
Assistant Attorney General
Environment and Natural Resources Division
*pubcomment-ees.enrd@usdoj.gov*

**Subject:**      **United States of America v. J.R. Simplot Company, Consent Decree**
**D.J. Ref. No. 90–7–1–08388/23**

To Whom it May Concern:

On behalf of the Idaho Department of Environmental Quality (DEQ), I write to express support for the subject Consent Decree (CD).  The CD represents years of work and commitment by all parties to solve a very complex matter. It also puts another important piece in place that complements the significant environmental improvements that are already occurring as a result of other agreements between Simplot, the Environmental Protection Agency, and DEQ. The CD recognizes the significant progress that is already being achieved to reduce phosphorous concentrations in the Portneuf River through the installation of a synthetic intermediate liner on the existing gypsum stack.

The CD outlines proactive waste management practices Simplot will take moving forward at the Don Plant that will:

- Provide for the sustainability of the Portneuf Valley's prized natural resources, the Portneuf River, the Lower Portneuf River Aquifer System, and the Portneuf Valley Airshed.
- Provides that the operation of the Don Plant will have long-term environmental sustainability by requiring the recovery of phosphoric acid/product historically lost either to the phosphogypsum stack or to the environment.
- Provide adequate financial resources for the eventual closure of the facility.
- Provide $200,000 in additional funding to support water quality improvement projects in the Portneuf River.

The CD also recognizes the importance of the expansion of the phosphogypsum stack to allow for the replacement of the existing reclaim cooling towers with cooling ponds—which is very important to DEQ from an air quality perspective (see included October 16, 2018, letter).

As the department within Idaho responsible for protecting human health and the environment, DEQ expresses its appreciation to the US Environmental Protection Agency, the Department of Justice, and the J.R. Simplot company for their perseverance to reach consensus on this agreement.

Sincerely,

Jess Byrne
Director, Idaho Department of Environmental Quality

EDMS 2023BCP1202

STATE OF IDAHO
DEPARTMENT OF
ENVIRONMENTAL QUALITY

1410 North Hilton · Boise, Idaho 83706 · (208) 373-0502
www.deq.idaho.gov

C.L. "Butch" Otter, Governor
John H. Tippets, Director

October 16, 2018

VIA CERTIFIED MAIL

Mary D'Aversa, Idaho Falls District Manager
Bureau of Land Management
1405 Hollipark Drive
Idaho Falls, Idaho 83401

RE:    Blackrock Land Exchange

Dear Ms. D'Aversa:

The Department of Environmental Quality (DEQ) submits this letter in support of the proposed
Blackrock Land Exchange between the federal Bureau of Land Management (BLM) and the J.R.
Simplot Company (Simplot). Simplot has worked cooperatively with DEQ over the years to
reduce air pollutant emissions from Simplot's phosphate fertilizer plant in Pocatello (aka the Don
Plant). One of the last remaining environmental concerns are the particulate matter and fluoride
emissions from the reclaim cooling towers. Simplot entered into a negotiated settlement
agreement with DEQ's Air Quality Division on June 27, 2016, to address these concerns.

Simplot must achieve the particulate matter and fluoride emissions reductions required by this
agreement. It is DEQ's understanding that Simplot's largest hurdle to achieving the required
emissions reductions is acquiring sufficient land, of a particular quality and quantity, necessary
to construct a low emissions alternative, likely cooling pond(s) to replace the use of the existing
high emitting cooling towers.

Additionally, Simplot entered into an earlier voluntary agreement with DEQ's Water Quality
Division on April 11, 2008 to address phosphorus releases to the Portneuf River via a ground
water pathway. This agreement further recommended that Simplot include the "description of
plans for the completion of the Blackrock Land Exchange and the development of a[ny] new,
lined gypsum storage facility" to DEQ should this development also impact phosphorus releases
to the soil or ground water from the Don Plant.

While I recognize your agency has not solicited DEQ's input in this matter, because the
exchange would reduce air pollutant emissions in the area to ensure compliance with state law
and the federal Clean Air Act and reduce phosphorus releases to ground water, we felt it was
important for you to hear from the state of Idaho. DEQ supports the proposed Blackrock Land
Exchange from an emissions reduction standpoint. Because of the limited availability of land
surrounding the Don Plant, acceptance of the proposed land exchange is critical to (1) Simplot

and (2) the air quality in the immediate area, as it would enable Simplot to replace all of its high pollutant emitting reclaim cooling towers with a low emission alternative.

I appreciate your time to consider these comments. We support you and your agency's efforts to serve the public through responsible and defensible decisions. To that end, if you have any follow-up questions regarding this correspondence or the agreement that would aid in these efforts, then I encourage you to contact Bruce Olenick, Regional Administrator of the Pocatello Regional Office at (208) 236-6160 or via email at bruce.olenick@deq.idaho.gov.

Sincerely,

John H. Tippets
Director



IDAHO MINING ASSOCIATION

P.O. Box 1660 • Boise, ID 83701
208.342.0031 • mineidaho.com

September 22, 2023

The Honorable Todd Kim

U.S. Department of Justice

Assistant Attorney General

Environment and Natural Resources Division

PO Box 7611

Washington, DC 20044-7611

Comments Sent Via Email: pubcomment-ees.enrd@usdoj.gov

RE: Comments on the Consent Decree between the United States and the J.R. Simplot Company, *United States of America v. J.R. Simplot Company*, D.J. Ref. No. 90-7-1-08388/23

The Idaho Mining Association (IMA) has carefully reviewed the Consent Decree between the United States and the J.R. Simplot Company (Simplot), lodged in federal court on July 19, 2023. IMA appreciates the opportunity to provide comments on the Consent Decree. While IMA supports Simplot's considerable efforts in resolving this complicated issue via Consent Decree with the United States, there are many aspects of this enforcement initiative that our member companies do not support. Nevertheless, we recognized Simplot has expended significant resources to negotiate forward-thinking solutions with the United States that both benefit the environment and the public at large. IMA is supportive of those efforts.

IMA and its member companies have a direct interest in this Consent Decree. Since 1903, IMA has represented miners and mining companies engaged in mineral exploration, mineral developments, and land reclamation throughout the state of Idaho. IMA represents more than 100 member companies and the thousands of employees and contractors they each employ in exploration, development, mining and reclamation, as well as in the

affiliated and ancillary business sectors. Our membership includes large mining companies and contractors as well as smaller family owned businesses, representing the entire cross section of the mining industry in and throughout the state of Idaho. IMA and its members are committed to responsible and sustainable mineral withdrawal in Idaho and our member companies continue to utilize and explore more innovative and science backed methods to extract minerals needed for everyday life, while protecting and preserving the environment in Idaho for future generations.

As described in more detail below, IMA urges the United States to recognize and continue its support for the development of phosphate resources in southeast Idaho as it is one of the only regions in the United States that is rich in phosphate deposits. IMA highlights for the United States' consideration the importance of recognizing that mining and mineral processing can responsibly occur while companies also address legacy environmental impacts from past practices. IMA recognizes and appreciates the Federal government's effort in this Consent Decree to both provide certain uniform environmental benefits through injunctive measures, but also providing the flexibility to achieve those benefits according to the site-specific conditions of their operations.

Finally, IMA urges the United States to continue its support for the Blackrock Land Exchange as the exchange is crucial for Simplot to both comply with some of the environmental obligations required in this Consent Decree and providing long-term benefits to the Pocatello community, State of Idaho, and the Nation's food security.

Importance of Phosphate:

As way of background for our comments, the importance of phosphate to our Nation's food security has been recognized for over a century. The United States has substantial phosphate deposits primarily focused in the Southeast and the Mountain West (primarily located on public lands), and are an important source of nutrients for U.S. crops. The Western Phosphate Field covers over 350,000 km$^2$ in Idaho, Montana, Utah, and Wyoming and is one of the largest resources of phosphate rock in the world.[1] A significant portion of the phosphate in this field is on public lands permitted by federal agencies such as the Department of the Interior's (Interior) Bureau of Land Management (Bureau) and U.S. Forest Service.

On December 9, 1908, the Interior Secretary issued a Secretarial Order that created a "temporary" phosphate reserve of 18,400 km$^2$ in Idaho, Utah and Wyoming. Three additional Secretarial withdrawal actions in 1908 and 1909 added approximately 18,600 km$^2$ to the phosphate reserve. On June 25, 1910, the U.S. Congress passed the Pickett Act that provided Interior the authority to withdraw certain federal lands from exploration

---

[1] William H. Lee, *A History of Phosphate Mining in Southeastern Idaho*, U.S. Geological Survey (2000); Hein, 2004, Life Cycle of the Phosphoria Formation. Elsevier B.V. Amsterdam.

and occupation. Under the Pickett Act, Presidents Taft and Wilson withdrew approximately 10,500 km$^2$ in Idaho, Utah, and Wyoming (1910-1917) and formally created the Western Phosphate Reserve.

Passage of the Mineral Leasing Act of 1920 obviated the need for further phosphate withdrawals. Eventually, Interior created Known Phosphate Leasing Areas (KPLAs) where the phosphate resource is available only through the competitive leasing provisions of the MLA. Simplot's and other IMA members' leases are within Interior's KPLAs. The leases convey exclusive rights to explore for and develop phosphate resources within the lease boundaries. Leases convey a right and privilege, subject to the terms and conditions of the lease, to explore and develop the federally-managed mineral estate and use the surface of federal lands within the boundaries of the lease. Phosphate leases, by regulation, are issued for an indefinite period and exist for as long as rentals and royalties are paid and if the terms and conditions of the lease are met. Phosphate leases are not cancelable by the United States, except by due process in the case where the lessee does not meet the terms and conditions of the lease.

The Bureau is required to evaluate mining proposals and issue decisions related to the phosphate leases pursuant to the MLA. This includes allowing the lessee to exercise its right to develop the lease, and ensuring *economically viable* development of the phosphate resources, in accordance with established requirements, including the requirement for *ultimate maximum ore recovery*. Forest Service authorization is required for operations related to the proposed mine project located outside of the phosphate lease boundaries on Nation Forest System lands. As mandated by the MLA, companies will pay rent and a gross value royalty on phosphate productions to the United States, of which half will be returned to Idaho for use by the State. Thus, cooperation between federal agencies is necessary to meet the requirements of the MLA and ensure economically viable development of these important resources.

Western phosphate is a major source of fertilizers used to grow crops in the United States. Approximately 1.2 million tons of phosphate fertilizer (*i.e.*, $P_2O_5$) is produced in the Western Phosphate field annually. This can provide fertilizer to grow up to 24 million acres of corn every year.[2] For context, in 2021, approximately 93 million acres of corn were grown in the United States.[3] Thus, maintaining resilient domestic production capacity for phosphate fertilizers is crucial to ensuring food security for Americans.

---

[2] *Western Fertilizer Handbook, 8th ed.*, California Fertilizer Association (1995). Approximately 100 lbs. of $P_2O_5$ is needed per acre of corn.

[3] *Feed Grains Database*, U.S. Department of Agriculture Economic Research Service (2022), https://data.ers.usda.gov/FEED-GRAINS-custom-query.aspx.

Despite the national importance of phosphate to our Nation's food security,[4] several substantial hurdles discourage opening new mines and processing facilities. Like many sectors of industry, the mining industry faces difficulties obtaining permitting to access phosphate reserves found on public lands, threats from unfair import competition that do not have modern environmental policies, and challenges related to domestic and global energy policies. For example, phosphate mines take an average of more than 10 years and hundreds of million dollars to complete. Generally, parties seeking to challenge the mine permit should exhaust their administrative remedies through the IBLA; however, federal district courts seldom require this important step that provides important notice to the agency and company. Thus, mining companies, including IMA members can face an impossible choice – namely, whether to proceed with development given the delays in permitting or wait for any group to challenge the permit in federal court for the six-year statute of limitations.

IMA applauds the Biden Administration's recognition of the importance of phosphate and is a step in the right direction. In 2022, President Biden announced the availability of $500 million in grants under the Fertilizer Product Expansion Program ("FPEP") to spur competition and combat price hikes on U.S. farmers.[5] The Administration recognized that "increased costs for fertilizer and other inputs have put a strain on farmers" and intends to distribute funds under the FPEP as a mechanism for ensuring fair prices for U.S. farmers by supporting domestic production.[6]  However, only $29 million was awarded under the first FPEP funding round for projects capable of increasing domestic fertilizer production capacity in the near-term, and such funding is not nearly sufficient to move the needle on domestic production.[7] All of this is to underscore an immediate need for significant coordination between the federal agencies that have either regulatory or permitting oversight over the development and processing of phosphate resources including the EPA and DOJ. IMA urges greater coordination between the relevant agencies to ensure development of these key resources.

---

[4] S*ee* Department of Energy 2023 "Critical Materials Assessment" (pages 89-90, 181-82).

[5] Grant funds awarded under this program may be used to expand processing capacity through activities such as: (1) construction of a new facility or purchase of an existing facility for purposes of expanding capacity or increasing output, including the purchase of land; (2) modernizing or expanding an existing facility, including expansion and modifications to existing buildings and construction of new buildings at existing facilities; (3) purchasing new, or modernizing existing processing and manufacturing equipment; and (4) modernizing, customizing, and installing climate-smart equipment that reduces greenhouse gas emissions, increases fertilizer use efficiency, improves air and water quality, or meets one or more of USDA's climate action goals.

[6] *Id.*

[7] *USDA Announces $29 Million to Increase American-Made Fertilizer Production* (Mar. 10, 2023), available at https://www.usda.gov/media/press-releases/2023/03/10/usda-announces-29-million-increase-american-made-fertilizer.  USDA received $3 billion in applications from over 350 businesses during the first two funding rounds of the FPEP which concluded on November 14, 2022, and December 29, 2022, respectively.  *Fertilizer Production Expansion Program*, available at https://www.rd.usda.gov/programs-services/business-programs/fertilizer-production-expansion-program.

Scope of the Bevill Exclusion:

IMA believes that U.S. Environmental Protection Agency's interpretation of the Bevill Exclusion, 40 C.F.R. §261.4(b)(7), has been arbitrary and inconsistent over the years. (Page 3). Congress correctly recognized the national importance of mineral processing by providing for the Bevill Exclusion to address certain low toxicity, high volume wastes. It is imperative to maintain this exclusion for phosphogypsum and process wastewater from the production of phosphoric acid. If EPA believed, based on a thorough examination of the facts, that it was necessary, EPA should have been clarified (to the extent necessary) through proper rulemaking channels instead of initiating a national enforcement initiative leasing to this massive and costly Consent Decree.

Responsible Mining and Processing Can Occur While also Remediating Legacy Issues:

IMA appreciates that the Consent Decree recognizes the vast number of resources that Simplot has invested in improving the environmental conditions at the plant, while also continuing valuable production. The United States needs to highlight and recognize these win-win scenarios. Too often, EPA approaches these situations with an intent to extract resources from companies, rather than seek innovative solutions to resolve these complex issues that provide immediate environmental benefits.

Under Simplot's 2002 and 2010 Consent Decrees under CERCLA, Simplot has installed a vast network of monitoring wells, made significant infrastructure improvements, installed several extraction wells, and in 2017 finished installing a synthetic intermediate liner on the existing gypsum stack at the Don Plant (Page 8, and Paragraph 25 of the Decree). The results of this significant investment have been remarkable. As described in a separate regulatory process (the Final Environmental Impact Statement for the Blackrock Land Exchange), the synthetic liner has reduced phosphorous concentrations in the Portneuf River by over 85% over the past decade, and because of the effectiveness of the liner, any impacts from the expansion of the existing gypstack are projected to be minimal. This environmental progress will only continue with a viable phosphoric acid production plant.

EPA Needs to Maintain Flexibility:

From IMA's perspective, one of the main issues in this enforcement initiative was DOJ and EPA's demand for uniform measures in every Consent Decree, regardless of the site-specific issues each company faced (so-called "level playing field"). This insistence—without proper understanding of the underlying facts—resulted in significant unnecessary delays and greatly increased the costs associated with resolving this complicated issue. With this Consent Decree, EPA appears to have adopted a better paradigm for resolving these issues in meaningful negotiation with companies. IMA strongly urges the Federal government to maintain this important flexibility and resist the call from national

environmental groups, Tribes and others seeking closure (rather than improvement) of these facilities.

IMA appreciates the United States approach to Simplot's closure plan, financial assurance and the Acid Value Recovery System in lieu of requiring the Company to obtain a RCRA permit.  These are major accomplishments in the Consent Decree, and demonstrate the Company's commitment to ensuring that taxpayers will not be responsible for any closure of the gypsum stack in the future.

<u>The Government Must Continue to Support the Blackrock Land Exchange</u>:

The Consent Decree correctly recognizes the importance of the Blackrock Land Exchange (Paragraph 31) to the long-term sustainability of the Don Plant. Without adjacent land, the environmental benefits of this provision will not be realized. Further, any expansion of the gypsum stack will have to meet stringent design requirements, including a synthetic liner, groundwater monitoring and other requirements in Appendix 1.A. This is the second time the Federal Government (2010 EMF Order) has recognized that expansion of the gypsum stack under certain conditions is permissible. In short, the Federal Government must continue to support this land exchange.

We join with other leaders in Southeast Idaho in supporting the Company's efforts to resolve this issue via Consent Decree. IMA urges the Federal government to maintain the important flexibility that was negotiated in good faith by the parties. Finally, IMA highlights the importance of continued government support for the Blackrock Land Exchange.

Kindest Regards,

Benjamin J. Davenport
Executive V.P., Idaho Mining Association



**Portneuf Resource Council**
**PO Box 4419**
**Pocatello, ID 83201**

September 25, 2023

Assistant Attorney General, U.S. DOJ—ENRD
pubcomment-ees.enrd@usdoj.gov
P.O. Box 7611, Washington, DC 20044

**RE: Proposed Consent Decree, United States of America v. J.R. Simplot**

To Whom It May Concern:
On behalf of the Portneuf Council (PRC), I am submitting comments on the proposed Consent
Decree (CD) between the United States of America and J.R. Simplot Company. The Portneuf
Resource Council (PRC) is committed to helping build sustainable environmental communities
that balance economic growth with the health of people and stewardship of the environment.
Our focus is in the Portneuf River Valley, the city of Pocatello and its surrounding communities.

Thank you for the opportunity to provide comments on this Proposed Consent Decree, for
extending the comment period, and for the September 12 online information session.  In
addition, please send us any response(s) to public comments on this document. If you have
questions or need additional information, please contact us.

Regards,

**Mike Engle, Chair**
208 284 3825
www.PortneufResourceCouncil.org
mike.w.engle@gmail.com

**Shannon Ansley, Policy Director**
208 220 2851
www.PortneufResourceCouncil.org
Anslshan59@gmail.com

1. For comparison to this CD/SA (Settlement Agreement), the 1998 FMC RCRA violation and the civil penalty was for numerous RCRA hazardous waste violations at its phosphorus production facility in Pocatello, Idaho. In the settlement, FMC agreed to spend a total of approximately $170 million -- including the largest civil penalty ever obtained to date under the Resource Conservation and Recovery Act (RCRA) of $11,864,800. Consequently, the proposed fine for violations of environmental regulations at the Simplot Don Plant is inappropriate and potentially damaging to the communities surrounding the Simplot Don Plant.

2. The estimate for closing the Don Plant is too low and details on how the cost will account for inflation and how the money will be secured are missing from the agreement.

3. Mitigation proposed does nothing to remedy the negative effects that the Simplot Don Plant has had on the surrounding environment and the health of the communities.

4. The proposed fine is double the Simplot Rock Springs plant fine, but the population effects are so much greater at the Don Plant. High population here in Pocatello and Chubbuck and unchecked development is getting closer and closer to the plant and the gypstack. Environmental and health liabilities increase as residential, educational, and economic developments grow closer and closer to the Don Plant and gypstack. Local agencies, municipal organizations, city, and county liabilities increase as these developments are approved without notice to the affected populations. Please add provisions in the CD/SA that the Simplot Don Plant must notify all local governments, agencies, and developers of the dangers and hazards of growth in the contamination zone of this Superfund Site.

5. Simplot's denials of violations in the settlement agreement are unacceptable and present a risk to the communities of the Shoshone-Bannock Tribes, the city of Pocatello, and the city of Chubbuck.

6. App. 1E Permanent Closure Application. We recommend that Simplot submit the permanent closure application now with date to start closure in 2025.

7. The CD/SA fails to address a potential collapse of the gypstack across Portneuf River, damming it and causing flooding throughout the Portneuf River Valley, even after stack closure. Local authorities and agencies are completely unprepared for such an occurrence and there has been no emergency planning for such an event. Denying that it could ever occur is unacceptable and irresponsible of Simplot and all surrounding agencies and municipalities.

8. River monitoring of all contaminants of concern (COCs) associated with the Simplot Don Plant Superfund Site should start now and into perpetuity.

9. Stability analysis is included but no emergency response plan exists within Simplot, the Cities of Pocatello and Chubbuck, or FEMA. Do a failure analysis and emergency response plans with all community entities.

10. Economic benefit of noncompliance: What was the economic benefit to the Don Plant for non-compliance during the negotiations and that amount should be clearly disclosed to the public.

11. Long-term care of a closed facility and gypstack should be in perpetuity, not just for a limited time.

12. Timeline for closure is way too slow.

13. Area info report: Info should include public and private wells within 2 miles of the stack.

14. All contaminants of concern (COCs) should be included in surface and groundwater sampling, not just phosphorous.

15. Simplot should provide groundwater quality data from both sides of the Portneuf River and onto the Reservation.

16. Monitoring in the assessment area must include all contaminants of concern (COCs) in all wells on both sides of the river and all the way onto the Reservation.

17. Clean Water Act violations should be included in the CD/SA.

18. Contamination of Reservation resources should be discussed in the CD/SA.

19. Specifically, who with the Tribes was conferred with on Appendix II, Mitigation? Was it an official Tribal consultation with the Fort Hall Business Council? If not, then it should have been.

20. Fluoride emissions within a 1-mile radius of the Don Plant: Fluoride in forage (within a one-mile radius of the Don Plant has exceeded the agreed upon standard for the past 22+ years. Fluoride emissions from the Don Plant towers also exceed fluoride air standards. Evaporative emissions from gypstack ponds and wind-blown fluoride dust from gypstack are high. Proposed cooling ponds will also have emissions that have been improperly characterized and predicted by IDEQ.

21. How and who will regulate the site to ensure the settlement agreement is properly followed and completed? Who will regulate and enforce?

22. How will the bond or financial instrument that covers decommissioning and revegetation of the site upon closing be updated for inflation? Should not all exposed areas and slopes have temporary revegetation for erosion and stormwater control and be bonded as well?

23. How will dust particulates be controlled over time if the gypstack is not revegetated as it is built and used?

24. It is recommended that either DOJ or EPA with IDEQ list in one location all the legal decisions and permits under all environmental jurisdictions with permitting points of contact for all Records of Decisions, Voluntary Consent Orders for all State and Federal jurisdictions. Including permits and VCO's under the CAA, CERCLA, RCRA and CWA. There needs to be one inclusive list of all permit authorizations. The complexity of this site requires an understanding of the public of all the pieces and the big picture.

25. How will the legislation passed by the Idaho State Legislature that codifies in law the engineering requirements of the Simplot Wyoming Agreement and Settlement as pushed by Simplot be integrated into this Settlement? How will new technology and solutions in the future be integrated? Going back to the Idaho legislature to change standards that were not specific to the Don Plant Operations needs to be fully understood and disclosed to the public.

26. Closure costs were based on December 2018 dollars. That is almost 5 years old. Why were costed equated to 2022/23 at the latest plus an assumed 3% inflation into 2025? "Long-term Costs" were inflated to 2020, though. Why not 2023 (see pg 440 of 509).

This same page seems to then indicate all costs were inflated to 2020. Can EPA clarify the ultimate cost estimation.

27. A most expensive closure date is assumed to be 2025, yet no discussion on why this assumption is presented. What if the facility expands? How would a successful land swap affect this assumption?

28. Appendix B, Attachment 2, STACK CLOSURE AND LONG-TERM CARE COST ESTIMATE FOR PHOSPHOGYPSUM STACK SYSTEM (pg 212 of 509) What is the history of this calculation document? How was it developed? Do previous settlements show this calculation method is effective?

29. Appendix 8, Initial Closure Plan for the Facility (pg 420 of 509) - "No treated wastewater will be discharged into adjacent surface waters" (pg 421 of 509) What about land application and functionally equivalent discharge?

30. Please add a provision in the CD/SA that the Simplot Don Plant must publish their annual toxics inventory in all the local and regional newspapers.

31. Please add a provision in the CD/SA that Simplot will provide air monitoring (PM10 and chemical content) at all schools, day care facilities, care facilities, low-income housing areas, and medical facilities to ensure that these vulnerable populations are shown equitable protection from Don Plant emissions.

32. The Bevill Amendment was the result of a successful political and industry lobbying effort. Just because phosphogypsum at wet acid plants is exempt from regulation as hazardous waste does not mean that the material is not dangerous to human health and the environment.

Additional notes to EPA and DOJ regarding the information session on September 12, 2023.

1. EPA Region 10 is strongly encouraged to improve its responsibilities to communicate with Pocatello and Chubbuck communities and regularly inform the public of actions at the Eastern Michaud Flats Superfund Site.

2. Idaho DEQ has never been a proxy for communication with the Shoshone-Bannock Tribes, a sovereign nation. For DOJ and EPA to make that statement during the information session was both inappropriate and ignorant of local governments and their relationships.



# Power County Board Of Commissioners

Commission Chambers 543 Bannock Ave.
American Falls, ID 83211

Board Members:
Ron Funk, Chair (District #1)
Bill Lasley, (District #2)
Delane Anderson (District #3)

rjffarms@gmail.com
blasley@co.power.id.us
anderson.delane@gmail.com

Website:
www.co.power.id.us
Phone: (208) 226-7610
Fax: (208) 226-7612

September 11, 2023

The Honorable Todd Kim
U.S. Department of Justice
Assistant Attorney General
Environment and Natural Resources Division
PO Box 7611
Washington, DC 20044-7611

Comments Sent Via Email: pubcomment-ees.enrd@usdoj.gov

**RE: Comments on the Consent Decree between the United States and the J.R. Simplot Company, *United States of America v. J.R. Simplot Company*, D.J. Ref. No. 90-7-1-08388/23**

Dear Mr. Kim:

The Board of County Commissioners of Power County, Idaho, have reviewed the Consent Decree between the United States and the J.R. Simplot Company, lodged in federal court on July 19, 2023. We write to express our support for the Consent Decree. It is imperative that the Federal Government recognize that the long-term sustainability of Simplot's Don Plant is critical to Power County, the State of Idaho, and the United States.

The J.R. Simplot Company's Don Plant, located in Power County, has been a major employer and economic force in our county since 1944. Southeast Idaho is one of the only regions in the United States that is rich in phosphate deposits; and the processing of phosphate ore at the Don Plant has been a major anchor in this region and for Western agriculture. In addition to the jobs and supporting businesses created by the Don Plant, the employees of the plant volunteer in our community non-profits, churches, little-league programs, hospital boards and economic development efforts. In fact, a recent study by the American Falls School District found that tax revenues from the JR Simplot Company's Don Plant provide more funding to our district than any other private entity.

We know Simplot's phosphate reserves will continue to provide raw material for the Don Plant far into the future, but only as long as the plant can eventually expand to improve operational efficiencies. We are in favor of the Consent Decree as it and the Blackrock Land Exchange are integral in maintaining the long-term benefits of the Don Plant in an environmentally responsible manner.

To us, the Bevill Exclusion has always been clear as it relates to the phosphate industry. However, the U.S. Environmental Protection Agency's interpretation of that exclusion has been inconsistent over the years (see Page 3). If EPA believed that clarification was necessary, then proper rulemaking rather than defining through a costly and expensive enforcement initiative was the correct course.

The Power County Board of County Commissioners wish to offer the following comments in support of specific provisions of the Consent Decree:

1. We appreciate that the Consent Decree recognizes the vast number of resources that Simplot has invested in improving the environmental conditions at the plant. In 2017, the Company finished installing a synthetic intermediate liner on the existing gypsum stack at the Don Plant (Page 8, and Paragraph 25). The results of this investment have been remarkable. As described in a separate regulatory process (the Final Environmental Impact Statement for the Blackrock Land Exchange), the synthetic liner has reduced phosphorous concentrations in the Portneuf River by over 85% over the past decade, and any impacts from the expansion of the existing gypstack are projected to be minimal. This environmental progress will only continue with a viable phosphoric acid production plant.

2. We appreciate Simplot's commitment to maintain adequate financial assurance for the closure of the gypsum stack (Paragraph 26). The closure plan (Appendix 8) also reflects a common-sense approach based on site-specific conditions. These are major accomplishments in the Consent Decree, and demonstrate the Company's commitment to ensuring that our taxpayers will not be responsible for any closure of the gypsum stack in the future.

3. We support the Consent Decree's innovative Acid Value Recovery System (Appendix 4). This is a win-win for both recovering additional phosphate resources and benefitting the environment.

4. The Consent Decree correctly recognizes the importance of the Blackrock Land Exchange (Paragraph 31) to the long-term sustainability of the Don Plant. Without adjacent land, the environmental benefits of this provision will not be realized. Further, any expansion of the gypsum stack will have meet stringent design requirements, including a synthetic liner, groundwater monitoring and other requirements in Appendix 1.A. This is the second time the Federal Government (2010 EMF Order) has recognized that expansion of the gypsum stack under certain conditions is permissible. In short, the Federal Government must continue to support this land exchange.

5. We appreciate Simplot's $200,000 mitigation commitment to continue to improve conditions in the Portneuf River (Paragraph 44).

We urge the Federal Government to resist the wild claims and factually unsupported statements of national advocacy groups that undermine these key negotiated provisions. It seems to us their

only aim is to eliminate phosphate fertilizer manufacturing, regardless of the cultural and economic impacts to our county let alone the nation's farmers.

We join with other leaders in Southeast Idaho in supporting the Consent Decree and strongly urge the Federal Government's continued support of the Blackrock Land Exchange. Both are critical to our community, the State of Idaho, and the food security of our country.

Sincerely,

Run Funk
District 1 Commissioner

Bill Lasley
District 2 Commissioner

Delane Anderson
District 3 Commissioner

# *The* SHOSHONE-BANNOCK TRIBES

FORT HALL INDIAN RESERVATION
PHONE    (208) 478-3700
FAX #    (208) 237-0797

FORT HALL BUSINESS COUNCIL
P.O. BOX 306
FORT HALL, IDAHO 83203

September 25, 2023

BY EMAIL TO: pubcomment-ees.enrd@usdoj.gov.
Todd Kim, Assistant Attorney General,
U.S. Department of Justice —ENRD
P.O. Box 7611
Washington, DC 20044–7611

**Re: United States of America v. J.R. Simplot Company, D.J. Ref. No. 90-7-1-08388**

Dear Mr. Kim:

The Shoshone-Bannock Tribes (Tribes) submit these comments regarding the proposed consent decree in United States v. J.R. Simplot Co., D.J. Ref. No. 90-7-1-08388.

**Background:**

The J.R. Simplot Co. (Simplot) Don Plant, the sulfuric acid and phosphate plant subject to the proposed consent decree (CD), is in Pocatello, Idaho, adjacent to the Tribes' Fort Hall Reservation. It occupies a portion of the Tribes' aboriginal territory on which the Tribes have off-reservation treaty rights. These lands remain an important cultural site for the Tribes, even though they are contaminated and privately owned.

Fluoride, metals, arsenic, and other contaminants from this manufacturing plant impact the Fort Hall Reservation, tribal trust resources, and the health of tribal members and others living or working there. The Tribes are deeply concerned that these emissions and impacts continue to be released and go unmonitored. Tribal resources and practices have been and continue to be impacted by the emissions of this facility. Chronic and acute exposures to these contaminants may be associated with certain medical conditions.

As the United States' Complaint in this case explains, phosphate ore mined in Idaho contains 25-30% phosphate and a variety of metals and mineral compounds, including aluminum, arsenic, chromium, copper, lead, magnesium, manganese, mercury, nickel, uranium, and zinc. During manufacturing, when the phosphate ore is dissolved in phosphoric and sulfuric acids,

fluorine is liberated as hydrogen fluoride, and metal compounds converted to other forms are also liberated. The liberated metals and hydrogen fluoride become concentrated and wind up in the water used in the production processes at the plant, including water that enters the plant's air pollution control devices (scrubbers). Simplot also has allowed the concentrated contaminants listed above to move into the plant's reclaim cooling towers. Simplot's towers then emit Hazardous Air Pollutants and contaminants into the air, exposing residents of the Fort Hall Reservation and the cities of Pocatello and Chubbuck to hazardous and toxic metals. These emissions violated Simplot's air permit issued by the Idaho Department of Environmental Quality (IDEQ). In addition, from 2004 to at least 2016, Simplot released hydrogen fluoride above the reportable quantity of 100 pounds. Because of the direct impacts of contaminants from Simplot's facility on the Tribes' health, natural and cultural resources, and traditional practices, the Tribes thoroughly reviewed the proposed CD. The Tribes agree that Simplot must be penalized for failing to comply with the Clean Air Act, Resource Conservation and Recovery Act (RCRA), and Emergency Planning and Community Right-to-Know Act (EPCRA). Simplot not only must confront past unlawful contamination but also must make improvements to its plant and plant processes to reduce future contamination.

The CD does not go far enough to directly address public health on and off the Reservation or the environmental impacts of the contamination from Simplot's facility. The Tribes provide the following comments and suggestions to clarify the CD's requirements and to strengthen them. In doing so, however, the Tribes point out that much of the information needed to assess this CD's technical, financial, and legal merits are redacted. For example, the Tribes cannot reasonably evaluate the Initial Closure Plan for the Facility in Appendix 8 with the existing redactions (nor can the public). Likewise, the redactions surrounding the Purified Phosphoric Acid plant make it almost impossible to understand what the CD requires of Simplot. Without this information, the Tribes cannot evaluate the CD and provide complete comments.

**Comments:**

1.      The CD Should Require Transparent Disclosure of Hazardous Substance Releases. Simplot misrepresented its toxic emissions for years. Although Simplot is finally being required to disclose accurate information about hazardous releases, it should be required to include an explanation of the health and environmental impacts of those releases on the community and to do so in a manner that is accessible to the impacted communities, so that they can grasp the important of those releases.

Impacts on local communities and their environment are significant and have sometimes been severe. It is appropriate to require Simplot to submit revised EPCRA reports detailing its past unreported contamination (see CD ¶ 34). However, it does not satisfy the United States' trust responsibilities to the Tribes or its stated commitment to environmental justice because it does not provide transparent disclosures about the hazardous releases so that the affected communities can grasp their important. To accomplish that goal, the Tribes request that the CD be amended to supplement the CERCLA and EPCRA reporting requirements in CD ¶ 34.

EPCRA Form R reports are formatted in a manner that fails to transparently, clearly, and concisely inform the community of the impacts of hazardous substance releases. The CD should also require Simplot to create a summary report for all past and future Form R submittals that describes vital information about the hazardous releases in a clear, reader-friendly format. These new summary reports should provide critical data about the releases, including the percent increase of metals and other contaminants of concern (COCs) (including EPCRA-regulated radionuclides) released from all processes downstream from the first marketable phosphoric acid product, based on reasonable estimates of the quantities of those metals and other COC.s the U.S. contends should be considered to have been manufactured. In these reports, Simplot should identify if the releases were to the air, soils, or groundwater and include diagrams or graphics showing the fate and transport of the releases.

In addition, CD ¶ 56 should be clarified to ensure its proviso against requiring the resubmittal of reports does not include the CERCLA and EPCRA reports required to be resubmitted under ¶ 34. Further, CD ¶ 103 should be amended to require Simplot to post the ECPRA Form R reports and related summaries on the website it establishes for other reporting requirements listed in CD ¶ 52. Like the revised Form R reports, the reader-friendly reports should also be posted on the website Simplot creates. The reader-friendly reports should also be widely distributed throughout the community, including by posting flyers (in English and Spanish) at local public libraries and major grocery stores and sent to local newspapers for posting on their websites. The reports should include an informational contact name and number to allow the community to ask additional questions or raise concerns.

The United States should require this additional transparency from Simplot based not only on the United States' trust responsibilities to the Tribes but also on the United States' commitment to environmental justice. Recently, President Biden expanded on the federal government's commitment to environmental justice and issued an Executive Order on Advancing Racial Equity and Support for Underserved Communities through the Federal Government, explaining the goal to prioritize environmental justice and that "the Federal Government should pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." [1] "The order formalizes President Biden's commitment to make environmental justice a part of every agency's mission by directing federal agencies to develop programs, policies, and activities to address the disproportionate health, environmental, economic, and climate impacts on disadvantaged communities." [2]

Requiring a company to transparently disclose the environmental burdens it has misrepresented and inflicted on local communities are consistent with the most basic principles of environmental justice.

2.      The CD Should Require Health Studies and an Ecological Risk Assessment
Simplot should be ordered to pay for a community health survey and an updated ecological risk assessment to assess the public health and environmental impacts (including identifying and evaluating species sensitive to the contaminants and emissions at issue) of its past and ongoing contamination of areas around the Don Plant, including the Fort Hall Reservation and the Cities of Pocatello and Chubbuck. These assessments should be submitted to the U.S. Environmental Protection Agency (EPA), with a copy to the Tribes. They should be supplemented by a comprehensive human health study for the neighborhoods surrounding the Don Plant to investigate the health impacts of Simplot's ongoing pollution.

The human health study should include a baseline health analysis to be conducted in the next one to two years, followed by an analysis in five to ten years to evaluate whether reductions in emissions under the CD have correlated with a decrease in health impacts. Although the scope of the health study should be determined with Tribal input and under the guidance of a health researcher selected by EPA, at a minimum, this study must identify the incidence of leukemia and anemia precursors, bone cancer, liver cancer, lung cancer, thyroid cancer, hair and tooth loss, COPD, chronic fatigue, burn-like lesions, skin tumors, Parkinson's Disease, vision impairment and chronic health effects from long-term or lifetime exposure to levels of ionizing radiation and other hazardous

---

[1] Exec. Order No. 13,990 of Jan. 20, 2021, 86 Fed. Reg. 7,037 (Jan. 25, 2021).

[2] The White House Briefing Room, FACT SHEET: President Biden Takes Executive Actions to Tackle the Climate Crisis at Home and Abroad, Create Jobs, and Restore Scientific Integrity Across Federal Government (Jan. 27, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/27/fact-sheet-president-biden-takes-executive-actions-to-tackle-the-climate-crisis-at-home-and-abroad-create-jobs-and-restore-scientific-integrity-across-federal-government/.

or toxic materials present in the water and air in areas surrounding the plant's phosphogypsum stacks.[3] Employee exposure to and illnesses from toxic and hazardous substances should also be evaluated. Simplot must release records of current and former employees' health impacts for epidemiological analysis as part of this health study.

3.   Given Simplot's Past History of Non-Compliance, More Oversight Is Needed and the United States Must Ensure that EPA's CERCLA Program Is Enforcing the CERCLA Interim Record of Decision Rather Than Allowing Noncompliance to Persist.

The United States must do more to ensure that Simplot complies with the CD requirements, considering Simplot's history of noncompliance and IDEQ's history of nonenforcement. The CD relies on other agencies and consent decrees as a backstop, like the CERCLA Interim Record of Decision Amendment (IRODA) for the Eastern Michaud Flats CERCLA site or the 2008 Voluntary Consent Order (VCO) with Idaho, to ensure Simplot is adequately addressing ongoing contamination. However, EPA's CERCLA program needs to do more to address contamination, and IDEQ needs to enforce its VCO.

For example, EPA's CERCLA program concluded in 2020 that no hazards remained for the Off-Site Operable Unit, even though the data collected for fluoride clearly showed increased concentrations and more frequent locations within the groundwater plume. The Tribes do not believe EPA has evaluated human health impacts from fluoride or hydrogen fluoride. Moreover, humans are not the only ones being impacted by fluoride deposition. Cattle and other animals are impacted, but Simplot and the EPA did not thoroughly investigate impacts on those species, even though it is commonly known that fluoride adversely affects them.[4]

Second, groundwater remediation and monitoring fall under EPA's CERCLA program, and that program's compliance efforts need to be improved. Simplot is out of compliance with the IRODA, which requires Simplot to capture contaminated groundwater. Instead, Simplot extracts approximately 60% of the contaminated

---

[3]Gypsum is radioactive and gypsum dust from the phosphogypsum stack is blown into the air and deposited onto surrounding land and water. RCRA does not regulate radioactivity, making it all the more important for this health study to be conducted. Although radioactivity is addressed under CERCLA, EPA's CERCLA program has not focused on the issue.

[4] PDF pages 8 and 9 of the CD summarize the "Off-Plant Operable Unit" of the EMF Site. The summary leads the reader to believe that the EPA conducted additional ecological risk assessments and reassessment of the EPA's prior analysis of potential human health risks from fluoride. EPA concluded in June 2020 that the fluoride monitoring remedy for the Off-Plant OU was complete and that no additional source control actions to reduce fluoride emissions from Simplot's Don Plant were required or warranted under CERCLA but, if needed, could be adequately addressed under state and federal programs. The Tribes disagree. The ecological risk assessments indicated the deer mouse and avian receptors were subject to risk. Fluoride emissions are not adequately addressed under state or federal programs. This CD is proof of that. Continued violations of state forage standards have occurred annually with no enforcement. The Ecological Risk Assessment that was completed to form the Eastern Michaud Flats Record of Decision found only a marginal risk to avian species so that further action was not required. However, for 23 additional years, Simplot has been emitting fluoride, violating its state permits with no recourse. The fluoride emissions have been deposited on the Reservation and private homeowners' property. The state and federal programs have done nothing. This CD requires only a regulatory process, consisting of coordinating with other programs, but does not separately evaluate performance and ensure compliance.

groundwater and, with EPA's full knowledge, allows the remainder to flow onto the Fort Hall Reservation. [5]

Third, the Portneuf River needs to meet the Clean Water Act Total Maximum Daily Load (TMDL) for phosphorous because Simplot has failed to reduce its phosphorous emissions sufficiently, and no regulatory agency has required it to comply.

Fourth, as the Tribes have continually noted, Simplot has violated emission limits in state-issued permits, Permits to Construct, and Tier I/ Title V air permits by introducing liquid effluent from absorbers into its cooling towers. Neither EPA nor IDEQ effectively monitors the Simplot facility, and when they do, they only monitor air emissions at the stacks, not where the impacts occur in the community. Looking at the fluoride emissions for the last 30 years only once has the facility not violated the IDEQ permit to construct. Tribes continue to raise this issue with the EPA and have been told that it is an unenforceable state standard.

Yet, despite these ongoing violations, the CD allows enforcement by the same EPA CERCLA, and IDEQ programs that have allowed the violations to continue. [6]

The Tribes, therefore, request that EPA thoroughly oversee Simplot's compliance with the CD requirements. The Tribes ask that locations and contaminants identified in the CD be monitored more effectively. Groundwater monitoring by EPA's CERCLA program currently does not include wells on the east side of the Portneuf River or radionuclide monitoring in the river. The CD should require that Simplot take additional measures, including adding these monitoring wells and increasing groundwater extraction rates to capture more of the contaminated groundwater plume and prevent more contamination from flowing off-site.

---

[5] The CERCLA program is also not addressing nitrate contamination even though it should be measured and properly regulated.
[6] In 2022, IDEQ issued new requirements regarding the development of gypsum stacks and IDEQ's oversight role was reduced.

Reporting and notice requirements in the proposed CD must be revised to require Simplot to submit copies to the Tribes of all the necessary reports and notices, including monitoring reports and notices of any violation of the CD or threats to public health or welfare or the environment, in addition to providing them to EPA and IDEQ. Alternatively, EPA should create a system to ensure that, whenever it receives a report or notice from Simplot pursuant to the CD or pursuant to permits revised to include the CD monitoring, reporting, and notice requirements, EPA will automatically provide a copy of the report or notice to the Tribes at an address of their choosing. Having such a system would guard against the possibility that the requirement to provide copies to the Tribes could be overlooked due to a change in EPA personnel or for other reasons. [7]

4.  **The United States Failed to Fulfill Its Consultation Duties When Developing Mitigation Projects and Must Remedy That Failure.**

The Tribes were not included as a party to this CD and have had very little input despite bearing the brunt of the impacts of Simplot's violations. Regarding mitigation projects, the Tribes met with the U.S. Department of Justice (DOJ) in 2005 and provided information regarding the Tribes' uses of the Portneuf River. Toward the end of DOJ's negotiations with Simplot, Tribal staff made recommendations to DOJ of possible mitigation projects, all of which were rejected. There was never a formal consultation with the Tribes on mitigation projects, and the Tribes do not concur with the proposed project in the CD.

The United States has a duty to consult with the Tribes when developing on-reservation mitigation projects but failed to do so for the proposed mitigation project. Instead, a few Tribal staff met with IDEQ staff regarding funding ($100,000) that might be available for improvements along the Portneuf River without knowing the source or purpose of that funding. [8] The United States' duty to consult requires contacting the Fort Hall Business Council. The United States cannot fulfill its consultation duties by contacting Tribal staff only and certainly not by conferring indirectly through a state agency, as happened here.

---

[7] Under proposed revisions to the Air Emissions Reporting Rule, Simplot will be required to report hazardous air pollution directly to EPA, 88 Fed. Reg. 54118, 54123 (Aug. 9, 2023), which would make that data available to communities. The Tribes ask that these emissions be reported to the Tribes starting this year, rather than awaiting the 2027 implementation of the AERR.

[8] At one point Tribal staff asked EPA where these resources were coming from. EPA's response was IDEQ has some additional monies that needed to be spent by the end of the fiscal year and both the Tribes and City of Pocatello would possibly be getting these resources.

The CD provides for a mitigation project where IDEQ will contract with the Tribes and the City of Pocatello to perform mitigation under the oversight of IDEQ. Simplot CD ¶ 44. The mitigation involves replacing invasive plant species with native ones at three locations, including Papoose Springs and the Fort Hall Bottoms on the Reservation. Id.; Appendix 11. This proposed mitigation project fails to address several key issues stemming from Simplot's river contamination, as indicated below. Additionally, the Tribes do not understand how IDEQ will oversee projects on the Reservation because IDEQ has no jurisdiction there.

To remedy this consultation failure, the Tribes request that the CD require a full Native American Risk Assessment to identify human health risks and ecological impacts to resources used in the Shoshone-Bannock Tribes' cultural and customary activities in the Fort Hall Bottoms and other areas where the contamination may have been deposited. Tribal cultural and customary areas are impacted by groundwater contamination and air emissions. Once complete, mitigation projects that address identified impacts should be planned with the Tribes.

In addition, Appendix 11, Figures 1 and 4 showing the mitigation project should be corrected because the diagram identifying the "Fort Hall Bottoms" is inaccurate. All of the land along the Portneuf River, starting at Siphon Bridge, is part of the Bottoms, and it encompasses both sides of the river down to the American Falls Reservoir.

5.     The CD Does Not Impose All the Requirements of a RCRA Permit and the CD Should Clearly Describe the Differences.

The phosphogypsum stack at the Don Plant has operated as a RCRA Treatment, Storage and Disposal Facility for decades without a permit. The Tribes request that a clear and concise table be provided to identify all RCRA permit requirements, including reporting and public participation requirements, and compare them to what the CD requires.

6.     The CD Should Require Compliance with the Best Management Practices Plan for Minimizing and Addressing Spills and Leaks.

The Facility Report and the Best Management Practices (BMP) Plan for Minimizing and Addressing Spills and Leaks sets forth how Simplot plans to reduce unintended inputs of phosphoric acid, sulfuric acid, and nitric acid to Process Wastewater entering the Phosphogypsum Stack System, which includes the scrubbers. The CD should require compliance with the BMP Plan. The BMP Plan states that at any time during a calendar quarter when two or more leak or spill events of phosphoric acid, nitric acid, or sulfuric acid in a rolling 24-hour period exceed, or may exceed, Actionable Volumes, Simplot will report them pursuant to the procedures in the CD. The Actionable Volumes are 1,100 gallons of phosphoric acid, with less volume based on acid concentration, Sulfuric Acid at 70 gallons, and Nitric Acid at 170 gallons. A rolling 24-hour period could result in 1,100 gallons being spilled daily without reporting. The Tribes request that the CD

additionally require the B.M.P. Plan to be amended so that any spills that may impact groundwater and surface water must be reported within 24 hours.

In addition, the B.M.P. Plan seems inconsistent with reporting requirements under CERCLA and EPCRA. EPCRA § 304 requires notification for any release of a CERCLA hazardous substance or extremely hazardous substance at or above the reportable quantity with potential exposure to persons off-site. 42 U.S.C. § 11004(a)-(b); 40 C.F.R. § 355.42(a). CERCLA § 103 requires any person in charge of a facility to report any release of any CERCLA hazardous substance into the environment, whether on-site or off-site (other than a federally permitted release), at or above its specified reportable quantity. Such a release must be reported to the National Response Center as soon as the person has knowledge of any release. 42 U.S.C. § 9603(a); 40 C.F.R. § 302.6(a). This includes reporting any release of an unlisted hazardous waste exhibiting the characteristic of toxicity or corrosivity.

Both CERCLA and ECPRA require affected tribes to be notified of relevant spills, CERCLA via the National Response Center notifying the On-Scene Coordinator once a spill is reported, 40 CFR § 300.405(e), who then notifies the tribe, and ECPRA requiring direct reporting to a tribe. ECPRA § 304; 40 CFR § 355.42(a); see also 55 Fed. Reg. at 30632 (July 26, 1990) (designating Tribes as the implementing authority for EPCRA in Indian Country). The Tribes ask that these provisions be added to the B.M.P. Plan and required by the CD.

7.     The CD Should Require the Cooling Tower Decommissioning Process to Be Conducted According to the Requirements for a Mixed Waste Facility.

The CD should require that decommissioning of the cooling tower should be conducted according to the requirements for a mixed waste facility, and the waste should be properly disposed of per the appropriate waste rules.

8.     The Periodic Reporting Period in the CD Must Be Extended.

CD ¶ 52 requires Periodic Reporting for two years. The requirement must be extended since in the E.M. Plan, IDEQ will take at least one year to get the relevant contracts in place, and two field seasons are requested for these improvements. Given this timing, the reporting timeframe should be extended by at least a year to include all necessary documentation.

9.     **Comments on the CD Appendices**.
**Appendix 1.A: I.6(b)(i)(7) (PDF p. 80)**:
Chemical characterization needs to include radiological constituents as well. Phosphate ore is associated with uranium 238 and its associated decay daughters. Although RCRA does not cover radiological constituents, they are covered by CERCLA, and Simplot's facility is part of a listed CERCLA Superfund site, so the information is needed.

**Appendix 1.B:**

Proper characterization of all dike material needs to be completed and analytical results should include chemical and radiological analyses. This material becomes airborne and should be considered as an emission source under the Clean Air Act.

**Appendix 1.C:**

- During the development of the first pond, sluffing was noted. During the normal operations of the past few years, Simplot's Don Plant has had several ponds where sluffing off the pond walls was mentioned as coming towards the facility. Sluffing must be appropriately reported to all agencies and not ignored. Removing liquid out of the ponds over time does not prevent sluffing.

- More details are needed for placing the 12 inches of locally available soils and grass/vegetated slopes. This Appendix should clarify what sort of grasses will be planted and what kind of maintenance will be done to verify that erosion will be prevented or eliminated.

- Page 8 (of 20) Define what is meant by stating that seepage rates will be "reduced significantly to warrant closure."

**Appendix 1.D:**

Need to define "critical condition."

**Appendix 1.E:**

Needs information added to include the Court Name and Civil Action Number, and the Closure Plans need to be provided to the federal and state agencies and the local agencies that could be impacted by an accident or critical condition.

**Appendix 4:**

- Redacted Information makes it hard to understand the processes involved, and one cannot correctly evaluate possible impacts on human health and the environment; reviewing information this way is technically and scientifically challenging.

- Why is the SPA considered to be confidential business information?

- Figure 3. What do the color differences indicate?

**Appendix 5.A:**

Nowhere is it stated that the EPA, IDEQ or Local Emergency Planning Committee (LEPC) will be notified of any spills or leaks. This is critical for all agencies involved, especially if the LEPC is activated to show up on-site and assist.

**Appendix 5.B:**

Some information classified as confidential business information elsewhere appears to have yet to be removed from this Appendix, casting doubt on whether that information truly is CBI.

**Appendix 6:**

The timing does not match up, given that within nine months, the BMP will be completed, but many of the projects will not be up and operating for at least 70 months.

**Appendix 7:**

- Page 9 --East Valley expansion has a predicted leakage rate of 0.18 gpm, which means that annually, it will be leaking 94,608 gallons per year, and the total volume of water being released over the 40-year projection of 3,784,320 gallons of contaminated water will be leaking from this pond alone. With the basalt outcrops in this area, the Portneuf River will be contaminated from a different location than the Batiste Springs area. The water going into the East Valley expansion must be properly characterized.

- The South Valley Expansion will use a predicted leakage rate of 0.21 gpm or 110,376 gallons per year. Thus, for their 40-year prediction, 4,415,040 gallons will reach the Portneuf River. The Clean Water Act anti-degradation policy does not allow for this much additional contamination to be added to the river. Some of the other leaking ponds associated with the existing phosphogypsum stack should be reducing their contribution, but these ponds instead will be seeing a significant increase in concentrations making it to the river.

**Appendix 8:   Closure Plan for the Facility:**

- The Closure Plan appears as a rough estimate. Closure information is for 2025; however, the table in Section 2.3.3 states it may take between 14 and 163 years to close the facility. The numbers should be confirmed and corrected throughout.

- The Closure Plan relies on high evaporation rates and estimating fluoride and other emissions. PM 10 or 2.5 monitors should be placed around any evaporation source, with speciation required. Water irrigation is proposed, but it is impossible to understand estimated water balances or assess due to redactions throughout. The Tribes have recognized that the plan is to permanently leave water within the stack. Leaving water in the stack will continue to cause a hydraulic head throughout the stack, leading to continued groundwater contamination.

- Stack stability based on closures and actions of stacks in the south should not be used on the J.R. Simplot Don Plant stack. Dry, arid climates may lead to preferential drying in areas of the proposed 499-acre stack, leading to stability issues.

- The Tribes request information be provided to assess Closure Liability, Water Inventory projected, Process water evaporation, and a water balance to assess the necessary irrigation area.

- Again, the Tribes are unable to fully understand if the process will be protecting human health and the environment because key information is redacted.

- 2nd paragraph on Page 4, states that Simplot's process water will be partially evaporated and permanently retained in the lined phosphogypsum stack. The next comment made about the treatment residue being evaporated could be more transparent. First, liners leak, so the claim that it's permanent is grossly in error. Next, the treatment residue will be evaporated. This sentence is also misleading. It should be reworded to say that the treated water will be evaporated and treatment residue will be placed in a lined pond with the understanding that this composition will be in liquid form.

- Figure 32. is redacted, which was a graph that predicted seepage rate as a function of time. Why was it redacted along with all the other Figures?

**Attachment 1 to the Closure Plan:**
> This attachment is completely redacted. This was the information used for the 2018 Unit cost so it needs to be clarified how DOJ can justify redacting it as confidential business information.

**Attachment #2 to the Closure Plan:**
> More details explaining the rationale as to why it was utilized would provide a better economic analysis.

**Appendix 9:**
- Page 4 of 9 § 2.1 states that fluoride compounds are added to the cooling tower via make-up water. Historically, some of this make-up water came from the leachate collected from the gypsum stack and was indirectly put into the system to help with the operation of the cooling tower. These structures should be considered as mixed waste in accordance with the RCRA regulations.
- Page 5 of 9 §2.3 explains that a variety of waters are recycled within the facility, which includes hazardous constituents associated with the various processes. The processing of minerals causes many environmental harms and negatively impacts human health and the environment.
- Page 6 of 9 §2.4: The Blend System simply transferred the higher concentrations of fluoride back into the gypsum stack, where the water picks up more chemicals along the way, which are then emitted

**Appendix 10: Additional Definitions:**

Definitions are generally included at the beginning of a document, not the end. The general reader does not fully understand these acronyms.

**10.    Missing Documents**

- CD ¶ 15 refers to the State of Idaho Reuse Permit. The CD should attach a copy of this permit or identify the compliance with the terms and conditions.
- CD ¶ 18 – Acid Value Recovery System: Wastes or Other Materials Placed Directly in Production Process refers to a Consolidated Materials Management Practices report dated November 2022. This Report must be available for review and inspection to understand units that serve to manage, store, or transport Bevill-Excluded Wastes.

Thank you for providing us with the opportunity to raise our concerns with the CD. We look forward to having them addressed.

Sincerely,

Lee Juan Tyler, Chairman
Fort Hall Business Council
Shoshone-Bannock Tribes

.cc      Fort Hall Business Council (7)