# Exhibit 2

United States' Response to Public Comments

**_U.S. v. J.R. Simplot Company_ Proposed Consent Decree:**
**Response to Public Comments**

      The United States Department of Justice ("DOJ") and the United States Environmental Protection Agency ("EPA") (collectively, "the United States") hereby respond to comments received during the public comment period on the Proposed Consent Decree ("CD") that was lodged in United States v. J.R. Simplot Company, Civil Action Number: 1:23-cv-00322-DCN (D. Idaho).

**Overview**

      This document responds to public comments submitted on the proposed CD lodged July 11, 2023, in the U.S. District Court for the District of Idaho. If approved by the Court, the CD will resolve claims that the United States alleged against Defendant J.R. Simplot Company ("Simplot") under the Resource Conservation and Recovery Act ("RCRA"), the Clean Air Act ("CAA"), the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), and the Emergency Planning and Community-Right-to-Know Act ("EPCRA"), at Simplot's manufacturing facility known as the "Don Plant" located near Pocatello, Idaho.

      Formal notice of the proposed CD and the commencement of the public comment period was published in the Federal Register on July 17, 2023, and a corrected notice was published on July 25, 2023 (88 Fed. Reg. 47907). After the initial lodging and Federal Register notice, the Department of Justice received requests to extend the public comment period. In consideration of those requests, the public comment period was extended through September 25, 2023 (88 Fed. Reg. 51354 (Aug. 3, 2023)).

      Although not required by regulation or policy, during the public comment period, the United States conducted two virtual information sessions regarding the CD, the first on September 7, 2023, for the Shoshone-Bannock Tribes ("Tribes" or "SBT"), and the second on September 12, 2023, for any other interested members of the public. EPA and DOJ representatives conducting these sessions stated that they were being held to explain the violations alleged in this action and the proposed relief, and to answer any questions, with a goal of assisting anyone who might wish to submit public comments.

      Nine entities submitted comments on the CD.  Six of the comment letters (from Bannock County, the City of Chubbuck, the City of Pocatello, Idaho Department of Environmental Quality ("Idaho DEQ"), the Idaho Mining Association, and the Power County Board of Commissioners) expressed support for the CD. Three of the commenters (the Idaho Conservation League ("ICL"), the Portneuf Resource Council ("PRC"), and the Tribes) did not express support for the CD but provided various comments.

      The United States greatly appreciates the thoughtful submissions from all commenters. After giving careful consideration to those submissions, the United States sets forth below its response to the points raised in the comments submitted by the Tribes, ICL, and PRC.

## Comments Received from The Shoshone-Bannock Tribes

**SBT 1.** *The CD Should Require Transparent Disclosure of Hazardous Substance Releases. Simplot misrepresented its toxic emissions for years. Although Simplot is finally being required to disclose accurate information about hazardous releases, it should be required to include an explanation of the health and environmental impacts of those releases on the community and to do so in a manner that is accessible to the impacted communities, so that they can grasp the importance of those releases.*

*Impacts on local communities and their environment are significant and have sometimes been severe. It is appropriate to require Simplot to submit revised EPCRA reports detailing its past unreported contamination (see CD ¶ 34). However, it does not satisfy the United States' trust responsibilities to the Tribes or its stated commitment to environmental justice because it does not provide transparent disclosures about the hazardous releases so that the affected communities can grasp their importance. To accomplish that goal, the Tribes request that the CD be amended to supplement the CERCLA and EPCRA reporting requirements in CD ¶ 34.*

*EPCRA Form R reports are formatted in a manner that fails to transparently, clearly, and concisely inform the community of the impacts of hazardous substance releases. The CD should also require Simplot to create a summary report for all past and future Form R submittals that describes vital information about the hazardous releases in a clear, reader-friendly format. These new summary reports should provide critical data about the releases, including the percent increase of metals and other contaminants of concern (COCs) (including EPCRA-regulated radionuclides) released from all processes downstream from the first marketable phosphoric acid product, based on reasonable estimates of the quantities of those metals and other COCs the U.S. contends should be considered to have been manufactured. In these reports, Simplot should identify if the releases were to the air, soils, or groundwater and include diagrams or graphics showing the fate and transport of the releases.*

*In addition, CD ¶ 56 should be clarified to ensure its proviso against requiring the resubmittal of reports does not include the CERCLA and EPCRA reports required to be resubmitted under ¶ 34. Further, CD ¶ 103 should be amended to require Simplot to post the ECPRA Form R reports and related summaries on the website it establishes for other reporting requirements listed in CD ¶ 52. Like the revised Form R reports, the reader-friendly reports should also be posted on the website Simplot creates. The reader-friendly reports should also be widely distributed throughout the community, including by posting flyers (in English and Spanish) at local public libraries and major grocery stores and sent to local newspapers for posting on their websites. The reports should include an informational contact name and number to allow the community to ask additional questions or raise concerns.*

*The United States should require this additional transparency from Simplot based not only on the United States' trust responsibilities to the Tribes but also on the United States' commitment to environmental justice. Recently, President Biden expanded on the federal government's commitment to environmental justice and issued an Executive Order on Advancing Racial Equity and Support for Underserved Communities through the Federal Government, explaining the goal to prioritize environmental justice and that "the Federal*

*Government should pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." "The order formalizes President Biden's commitment to make environmental justice a part of every agency's mission by directing federal agencies to develop programs, policies, and activities to address the disproportionate health, environmental, economic, and climate impacts on disadvantaged communities."*

*Requiring a company to transparently disclose the environmental burdens it has misrepresented and inflicted on local communities are consistent with the most basic principles of environmental justice.*

**Response:** The United States concluded that the above comments do not warrant changes to the terms of the CD, but we provide additional information and explanation responsive to these comments below.

The following table provides the expected form of each reportable metal compound that is manufactured and then released into the phosphogypsum stack system, based on Simplot's knowledge and understanding of the chemical processes which take place in its manufacturing equipment:

| Metal | Released Compound |
|---|---|
| Antimony | $Sb_2(SO_4)_3$ |
| Arsenic | $Ca_3(AsO_4)_2$ |
| Barium | $BaSO_4$ |
| Beryllium | $BeSO_4$ |
| Cadmium | $CdSO_4$ |
| Chromium | $CaCrO_4$ |
| Cobalt | $CoSO_4$ |
| Copper | $Cu_2SO_4$ |
| Lead | $PbSO_4$ |
| Manganese | $MnSO_4 \bullet 7H_2O$ |
| Mercury | $HgS_2$ |
| Nickel | $NiSO_4 \bullet 7H_2O$ |
| Selenium | $CaSeO_4$ |
| Silver | $Ag_2SO_4$ |
| Thallium | $Tl_2(SO_4)_3 \bullet 7H_2O$ |
| Vanadium | $VSO_4 \bullet 7H_2O$ |
| Zinc | $ZnSO_4 \bullet 7H_2O$ |

The requirement to report these specific compounds listed above was mandated by Section 313(c) of EPCRA (see 52 FR 21152, June 4, 1987). Further, EPCRA does not require reporting of radionuclide releases.

The reporting statutes do not provide for injunctive relief to address past reporting deficiencies. Nevertheless, the CD requires Simplot to submit revised reports for past years to include estimates of the metal compounds that the Complaint alleges should been included when those reports were originally submitted. While the Court may fashion appropriate relief under its equitable authority, there are practical limitations in settlement negotiations for relief to reasonably correspond with the statutory requirements at issue and be acceptable to both parties. CERCLA and EPCRA, and the relevant implementing regulations, do not require Simplot to describe the potential importance of those releases or their fate and transport, nor provide summary reports beyond the Form R submittals providing the additional information the Tribes would like to see. Additionally, no other phosphoric acid/phosphate fertilizer production facility involved in the national enforcement effort for this industry that EPA and DOJ have undertaken over the past two decades has been compelled to provide summary reports in addition to what is required pursuant to the law and regulations. This fact calls into question whether it would be appropriate to require or feasible to obtain Simplot's agreement to do so in this case as a condition for settlement.

The Form R information submitted by Simplot is available on a public website, in the TRI portion of EPA's Envirofacts website. The TRI Facility Report for the Don Plant is available at this link:

https://enviro.epa.gov/facts/tri/ef-facilities/#/Facility/83201JRSMPDONSI

The website contains the toxics release inventory information for all facilities which submit reports. Given this open and immediate availability of Simplot's toxics release inventory information, the United States does not conclude that posting the information in local or regional newspapers is necessary. Nor does either EPCRA or CERCLA require any companies to do so.

EPA also has a website dedicated to providing Tribal Communities with toxics release inventory information and guidelines, including links that allow tribal communities to identify and track toxic chemical releases that may impact their communities, obtain TRI information quickly, obtain more in-depth TRI data, determine risks from toxic chemicals, and obtain additional help from designated TRI contacts, coordinators, and managers, and from available online tools:

https://www.epa.gov/toxics-release-inventory-tri-program/tri-tribal-communities

**SBT 2.** *The CD Should Require Health Studies and an Ecological Risk Assessment*

*Simplot should be ordered to pay for a community health survey and an updated ecological risk assessment to assess the public health and environmental impacts (including identifying and evaluating species sensitive to the contaminants and emissions at issue) of its past and ongoing contamination of areas around the Don Plant, including the Fort Hall Reservation and the Cities of Pocatello and Chubbuck. These assessments should be submitted to the U.S.*

*Environmental Protection Agency (EPA), with a copy to the Tribes. They should be supplemented by a comprehensive human health study for the neighborhoods surrounding the Don Plant to investigate the health impacts of Simplot's ongoing pollution.*

*The human health study should include a baseline health analysis to be conducted in the next one to two years, followed by an analysis in five to ten years to evaluate whether reductions in emissions under the CD have correlated with a decrease in health impacts. Although the scope of the health study should be determined with Tribal input and under the guidance of a health researcher selected by EPA, at a minimum, this study must identify the incidence of leukemia and anemia precursors, bone cancer, liver cancer, lung cancer, thyroid cancer, hair and tooth loss, COPD, chronic fatigue, burn-like lesions, skin tumors, Parkinson's Disease, vision impairment and chronic health effects from long -term or lifetime exposure to levels of ionizing radiation and other hazardous or toxic materials present in the water and air in areas surrounding the plant's phosphogypsum stacks. Employee exposure to and illnesses from toxic and hazardous substances should also be evaluated. Simplot must release records of current and former employees' health impacts for epidemiological analysis as part of this health study.*

**Response:**  The United States disagrees with the comment that the CD should require a community health survey and an updated ecological risk assessment. The Simplot Don Plant is an Operable Unit (OU) of the Eastern Michaud Flats Superfund Site (EMF Site). A comprehensive risk assessment was completed in 1998 as part of the CERCLA Record of Decision process for the EMF Site and is available here:

https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=9100NP9Q.TXT

In accordance with Section 106 of CERCLA (42 U.S.C. § 9606), the remedy selected was considered necessary to protect the public health or welfare or the environment from actual or threatened releases of hazardous substances, pollutants, and/or contaminants into the environment from the Simplot Don Plant. Simplot, as a potentially responsible party (PRP) at this Superfund site, has paid for the risk assessment through previous enforcement by the United States under CERCLA.

To assess the risks posed by site contamination as part of the Record of Decision, a Baseline Human Health and Ecological Risk Assessment (Risk Assessment) was prepared. The contaminants of concern included radionuclides, both residential and non-residential exposure scenarios were evaluated, carcinogenic and noncarcinogenic hazards were evaluated, and exposure pathways via air, water and soil were considered. The Risk Assessment did not indicate a need for additional studies or risk assessments.

**SBT 3.** *Given Simplot's Past History of Non-Compliance, More Oversight Is Needed and the United States Must Ensure that EPA's CERCLA Program Is Enforcing the CERCLA Interim Record of Decision Rather Than Allowing Noncompliance to Persist.*

*The United States must do more to ensure that Simplot complies with the CD requirements, considering Simplot's history of noncompliance and Idaho DEQ's history of nonenforcement. The CD relies on other agencies and consent decrees as a backstop, like the CERCLA Interim Record of Decision Amendment (IRODA) for the Eastern Michaud Flats CERCLA site or the 2008 Voluntary Consent Order (VCO) with Idaho, to ensure Simplot is adequately addressing*

*ongoing contamination. However, EPA's CERCLA program needs to do more to address contamination, and IDAHO DEQ needs to enforce its VCO.*

*For example, EPA's CERCLA program concluded in 2020 that no hazards remained for the Off-Site Operable Unit, even though the data collected for fluoride clearly showed increased concentrations and more frequent locations within the groundwater plume. The Tribes do not believe EPA has evaluated human health impacts from fluoride or hydrogen fluoride. Moreover, humans are not the only ones being impacted by fluoride deposition. Cattle and other animals are impacted, but Simplot and the EPA did not thoroughly investigate impacts on those species, even though it is commonly known that fluoride adversely affects them.*

*Second, groundwater remediation and monitoring fall under EPA's CERCLA program, and that program's compliance efforts need to be improved. Simplot is out of compliance with the IRODA, which requires Simplot to capture contaminated groundwater. Instead, Simplot extracts approximately 60% of the contaminated groundwater and, with EPA's full knowledge, allows the remainder to flow onto the Fort Hall Reservation.*

*Third, the Portneuf River needs to meet the Clean Water Act Total Maximum Daily Load (TMDL) for phosphorous because Simplot has failed to reduce its phosphorous emissions sufficiently, and no regulatory agency has required it to comply.*

*Fourth, as the Tribes have continually noted, Simplot has violated emission limits in state-issued permits, Permits to Construct, and Tier I/Title V air permits by introducing liquid effluent from absorbers into its cooling towers. Neither EPA nor IDAHO DEQ effectively monitors the Simplot facility, and when they do, they only monitor air emissions at the stacks, not where the impacts occur in the community. Looking at the fluoride emissions for the last 30 years only once has the facility not violated the IDAHO DEQ permit to construct. Tribes continue to raise this issue with the EPA and have been told that it is an unenforceable state standard.*

*Yet, despite these ongoing violations, the CD allows enforcement by the same EPA CERCLA, and Idaho DEQ programs that have allowed the violations to continue.*

*The Tribes, therefore, request that EPA thoroughly oversee Simplot's compliance with the CD requirements. The Tribes ask that locations and contaminants identified in the CD be monitored more effectively. Groundwater monitoring by EPA's CERCLA program currently does not include wells on the east side of the Portneuf River or radionuclide monitoring in the river. The CD should require that Simplot take additional measures, including adding these monitoring wells and increasing groundwater extraction rates to capture more of the contaminated groundwater plume and prevent more contamination from flowing off-site.*

*Reporting and notice requirements in the proposed CD must be revised to require Simplot to submit copies to the Tribes of all the necessary reports and notices, including monitoring reports and notices of any violation of the CD or threats to public health or welfare or the environment, in addition to providing them to EPA and Idaho DEQ. Alternatively, EPA should create a system to ensure that, whenever it receives a report or notice from Simplot pursuant to the CD or pursuant to permits revised to include the CD monitoring, reporting, and notice requirements, EPA will automatically provide a copy of the report or notice to the Tribes at an address of their choosing. Having such a system would guard against the possibility that the*

*requirement to provide copies to the Tribes could be overlooked due to a change in EPA personnel or for other reasons.*

**Response:**  EPA and DOJ will be responsible for overseeing Simplot's compliance with the CD requirements. EPA intends to thoroughly oversee Simplot's compliance with CD requirements, as it has for past settlements with phosphate fertilizer facilities across the United States and refer any compliance concerns to DOJ to consider whether and what enforcement should be pursued as provided for by the CD. The CD contains stipulated penalties for failure to comply with requirements (*see* Section IX of the proposed CD). Additionally, the Court retains jurisdiction over the case until termination of the and has authority to effectuate or enforce compliance with the terms of the CD (see Section XVII of the proposed CD). If the CD is entered, the United States welcomes the Tribes to raise any concerns regarding potential noncompliance with CD requirements during implementation.

Criticisms of conclusions reached by EPA and Idaho DEQ programs in prior enforcement related to the Don Plant may properly be communicated to those programs, but the United States does not conclude such criticisms are a basis for changing the terms of the CD. The CD sets forth significant compliance requirements addressing the violations alleged in the complaint filed by the United States (Complaint), reduces the environmental impacts and risks from the Don Plant's operations and future closure, and promotes resource conservation.  The United States has concluded that the CD is consistent with the statutes at issue and will promote the public interest.

Regarding the comment that there should be more groundwater monitoring wells and increased extraction rates, the United States disagrees that the proposed CD should be modified to include such additional measures, as such measures are under the purview of EPA's CERCLA program, which is charged with ensuring that groundwater monitoring and extraction should be implemented consistent with the remedial actions EPA selected for the Simplot OU, and modified to the extent necessary to meet CERCLA's requirements to protect human health and the environment.

To the extent the Tribes assert that no regulatory agency has required Simplot to meet the Clean Water Act Total Maximum Daily Load (TMDL) for phosphorous in the Portneuf River, EPA notes that this program is delegated to the State of Idaho under its authorized TMDL program. Contact information may be found at https://www.deq.idaho.gov/water-quality/surface-water/total-maximum-daily-loads/.

To the extent that the Tribes assert that the CERCLA program is not addressing nitrate contamination even though it should be measured and properly regulated, nitrate is recognized as a groundwater contaminant of concern (COC) at the Simplot Operable Unit (OU) of the Eastern Michaud Flats CERCLA site. Groundwater must be remediated to return the aquifer to its beneficial use as a potential source of drinking water. This includes meeting the nitrate primary (human-health based) maximum contaminant level (MCL) of 10 milligrams per liter (mg/L). Further, groundwater discharging to the Portneuf River must be remediated to meet risk-based concentrations to protect the Portneuf River

ecosystem. The acceptable concentration of nitrate in groundwater (a subject mentioned in a footnote to this comment) which discharges to the river is currently under evaluation.

Nitrate concentrations are routinely measured in Simplot OU monitoring wells. Simplot provides this information to SBT staff along with EPA and Idaho DEQ staff.

Simplot has constructed required infrastructure under CERCLA to perform remedial actions which must meet groundwater and surface water remedial action objectives. This effort takes time, progress has been significant, and is well documented in reports provided to regulatory agencies and Tribal staff.

Additionally, the United States notes that certain concerns raised in this comment are addressed through the CD. The United States agrees with the comment that emissions have exceeded certain emission limits on occasion, specifically the fluoride emission limits in the Title V permit. Although not a federally-enforceable standard and therefore not addressed by the CD, Idaho DEQ has documented violations of its fluoride in forage standard on lands in the vicinity of the Facility. The CD addresses violations of the federally-enforceable fluoride standard and requires Simplot to cease operation of the Reclaim Cooling Towers (cooling towers) and replace their cooling capacity with one or more newly constructed cooling ponds no later than June 27, 2026 (subject to a feasibility contingency related to the BLM/Blackrock land exchange litigation). Additionally, Simplot will take measures to minimize fluoride emissions from the cooling towers in the interim. EPA's evaluation concludes that replacement of the cooling towers with cooling ponds will result in a substantial reduction of more than 90% of fluoride air emissions compared to current levels emitted from the cooling towers, and an overall reduction of more than four-fifths of overall fluoride emissions from the Facility.

Finally, the United States does not agree that enhancements are needed to the CD's reporting and notice requirements to address the concerns raised in the comment. Pursuant to the CD, all documents requiring EPA approval and all periodic reports must be posted on a publicly accessible website (see ¶ 103). Such a requirement was in fact suggested by the Tribes as one of several options for meeting the Tribes' informational needs when the Tribes submitted public comments (dated December 30, 2015) on a previous consent decree involving Simplot's sulfuric acid plants (No. 1:15-cv-00562-BLW, D. Idaho). The United States concludes that the CD already provides an adequate mechanism for the Tribes to have ready access to all significant submissions made under the CD.

**SBT 4.** *The United States Failed to Fulfill Its Consultation Duties When Developing Mitigation Projects and Must Remedy That Failure.*

*The Tribes were not included as a party to this CD and have had very little input despite bearing the brunt of the impacts of Simplot's violations. Regarding mitigation projects, the Tribes met with the U.S. Department of Justice (DOJ) in 2005 and provided information regarding the Tribes' uses of the Portneuf River. Toward the end of DOJ's negotiations with Simplot, Tribal staff made recommendations to DOJ of possible mitigation projects, all of which were rejected. There was never a formal consultation with the Tribes on mitigation projects, and the Tribes do not concur with the proposed project in the CD.*

*The United States has a duty to consult with the Tribes when developing on-reservation mitigation projects but failed to do so for the proposed mitigation project. Instead, a few Tribal staff met with Idaho DEQ staff regarding funding ($100,000) that might be available for improvements along the Portneuf River without knowing the source or purpose of that funding. The United States' duty to consult requires contacting the Fort Hall Business Council. The United States cannot fulfill its consultation duties by contacting Tribal staff only and certainly not by conferring indirectly through a state agency, as happened here.*

*The CD provides for a mitigation project where Idaho DEQ will contract with the Tribes and the City of Pocatello to perform mitigation under the oversight of Idaho DEQ. Simplot CD ¶ 44. The mitigation involves replacing invasive plant species with native ones at three locations, including Papoose Springs and the Fort Hall Bottoms on the Reservation. Id.; Appendix 11. This proposed mitigation project fails to address several key issues stemming from Simplot's river contamination, as indicated below. Additionally, the Tribes do not understand how Idaho DEQ will oversee projects on the Reservation because Idaho DEQ has no jurisdiction there.*

*To remedy this consultation failure, the Tribes request that the CD require a full Native American Risk Assessment to identify human health risks and ecological impacts to resources used in the Shoshone-Bannock Tribes' cultural and customary activities in the Fort Hall Bottoms and other areas where the contamination may have been deposited. Tribal cultural and customary areas are impacted by groundwater contamination and air emissions. Once complete, mitigation projects that address identified impacts should be planned with the Tribes.*

*In addition, Appendix 11, Figures 1 and 4 showing the mitigation project should be corrected because the diagram identifying the "Fort Hall Bottoms" is inaccurate. All of the land along the Portneuf River, starting at Siphon Bridge, is part of the Bottoms, and it encompasses both sides of the river down to the American Falls Reservoir.*

**Response:**  The United States respects Tribal sovereignty and the government-to-government relationship and is committed to engaging in appropriate consultations and coordination with federally recognized Indian Tribes.

Settlements fall outside the scope of government-to-government consultation pursuant to Executive Order 13175 (Consultation and Coordination with Indian Tribal Government). Under the DOJ Policy on Tribal Consultation approved by the Attorney General, it is the policy of the DOJ to engage in such consultations before adopting "policies" with tribal implications. DOJ Policy Statement 0300.01 (Nov. 30, 2022), at p. 4. The Policy Statement goes on to clarify that "policies" refers to: (1) regulations or regulatory policies; (2) proposed legislation; (3) decisions regarding whether to establish federal standards; and (4) other policies for which the Department determines consultation is appropriate and practicable. The term "policies" does not include matters that are the subject of investigation, anticipated or active litigation, or settlement negotiations. Because the CD is the product of settlement negotiations related to anticipated litigation, the CD is outside the scope of policies concerning tribal consultation by DOJ.

As the Tribes are aware, however, even though the United States was not required to undertake the consultation with the SBT suggested by this comment, both EPA and DOJ undertook over many years to communicate regularly with staff and counsel representing the Tribes to solicit input, ensure that relevant public information bearing on the potential settlement was shared, and ensure that the Tribes were informed about the status of the matter. In the specific context of mitigation, the United States followed a process to identify environmentally beneficial projects that potentially could form a part of the settlement of this case, and to consider whether any of those projects met the legal requirements for mitigation. Outreach to representatives of the Tribes was part of that process. In addition, in conferring with Idaho DEQ staff, the United States learned that the Tribes' professional staff had provided input to DEQ on a number of potential projects that Tribal staff favored, including the mitigation that eventually was included in the CD.

The comment partly acknowledges these outreach efforts by the United States but asserts that the Tribes' project suggestions elicited through such outreach were rejected. We do not believe this assertion fairly characterizes what transpired. While the United States sought input from the Tribes regarding environmentally beneficial projects, the comment does not appear to recognize the possibility either that certain specific projects would not meet the legal requirements for mitigation, or that the projects could not otherwise be negotiated with Simplot and included in the settlement.

In particular, the comment does not differentiate between different types of environmentally beneficial projects that are sometimes included in judicial settlements of EPA enforcement actions:  mitigation (included in this CD), which is a component of injunctive relief sought based on the United States' determination that a court could appropriately order the defendant to implement such relief in order to remedy, reduce or offset harm caused by past or ongoing violations, and voluntary projects that could not be required or compelled by EPA, but are developed and implemented by a defendant and included in a settlement if a defendant is interested and proposes a project that meets the legal and other requirements of EPA policy for such projects. While it would not be appropriate for the United States to divulge confidential settlement discussions that occurred here, the fact that no additional mitigation project (beyond what is already specified) and no voluntary project is included in the CD cannot be assumed to mean that the United States "rejected" the Tribes' project ideas but, rather, that at least one of the foregoing preconditions was not met to include any additional projects in the settlement.

The United States determined that the project included in the CD does meet the legal requirements for mitigation in that it will redress past or ongoing harm from alleged violations by remedying, reducing, or offsetting a harm that is not otherwise remedied by the cessation of violations and prospective compliance. Here, the excess phosphorous that reached the Portneuf River, associated with the RCRA violations the United States alleges in the Complaint, has led to the growth of invasive tree species and has diminished water quality and the overall health of the ecosystem. And even though the phosphogypsum stack (gypstack) has been lined and contaminated groundwater flowing to the Portneuf River is

being pumped and treated, neither prospective compliance nor the treating of groundwater completely addresses the consequences of the past alleged violations. By removing invasive species and replanting with a diverse native riparian vegetation community, the water quality of the Portneuf River will be improved.

While the Tribes suggest that more extensive mitigation requirements would be desirable and should have been (or should now be) devised, we think it is important to note that EPA and the United States have previously concluded administrative and judicial settlements with fourteen phosphate fertilizer facilities across the U.S., all requiring extensive injunctive relief for compliance, including financial assurance, and bringing their operations into compliance with RCRA. None of the settlements to date, however, include any mitigation provisions to address the impacts of the alleged violations. Not only will the CD be the first phosphoric acid settlement to include any mitigation relief, but this mitigation is required in the context of a settlement under which Simplot will spend an estimated $150 million to implement the CD's compliance requirements, above and beyond the approximately $100 million Simplot has spent implementing the remedial measures (such as the phosphogypsum stack system liner, extraction and treatment of groundwater, and ongoing water monitoring) for the Simplot OU that EPA selected and the United States required under the 2002 CERCLA consent decree and 2010 amendment to that consent decree. Nevertheless, the United States was able to negotiate modest yet meaningful mitigation as part of the CD. Particularly in light of this context, the United States does not conclude that criticisms about the scope of mitigation under the CD would warrant a revision or rejection of the CD.

The United States also disagrees that there is a jurisdictional impediment related to the CD's mitigation requirement. The work to be undertaken by the Tribes within the Fort Hall Reservation will be performed by the Tribes. The CD provides that Idaho DEQ will enter into a contract with the Tribes under which the Tribes will implement the work on the Fort Hall Reservation under general oversight of Idaho DEQ. As to the correct the identification of the Bottoms area in the maps in Appendix 11, the United States does not agree a revision to those maps is necessary. The maps in Appendix 11 are only intended to provide a general illustration and approximation of the areas in which the mitigation work is envisaged. However, as the precise scope of work will be set forth in the contract between the Tribes and Idaho DEQ, if there is a significant discrepancy between the work areas described in the contract and the illustrations in Appendix 11, any needed updates to the maps can be made under the CD's modification provisions (CD Section XVIII).

**SBT 5.** *The CD Does Not Impose All the Requirements of a RCRA Permit and the CD Should Clearly Describe the Differences.*

*The phosphogypsum stack at the Don Plant has operated as a RCRA Treatment, Storage and Disposal Facility for decades without a permit. The Tribes request that a clear and concise table be provided to identify all RCRA permit requirements, including reporting and public participation requirements, and compare them to what the CD requires.*

**Response:**  In general, hazardous waste permits provide treatment, storage, and disposal facilities (TSDFs) with the legal authority to treat, store, or dispose of hazardous waste and detail how the facility must comply with the regulations in Title 40 of the Code of Federal Regulations (CFR) parts 260 through 270. A summary chart of EPA's hazardous waste permitting regulations can be found at the following link: https://www.epa.gov/hwpermitting/summary-chart-hazardous-waste-permitting-regulations

RCRA Subtitle C establishes a system for controlling hazardous waste from the time it is generated until its ultimate disposal - in effect, from cradle to grave. Certain materials, which would otherwise be solid wastes and subject to a requirement to determine whether they are hazardous wastes, are excluded from regulation by statute or by EPA exclusion.

EPA granted the State of Idaho final authorization to administer its hazardous waste program in lieu of the federal program on March 26, 1990, effective April 9, 1990 (55 Fed. Reg. 11015). There have been subsequent authorized revisions to the base program. Idaho Code, Title 39, Chapter 44, Hazardous Waste Management, provides the statutory authority. Idaho has incorporated the federal regulations by reference into its authorized program. Idaho DEQ is the State agency designated to implement the authorized RCRA program in Idaho and has not issued a hazardous waste permit to J.R. Simplot for operation of the Don Plant.

In this case, the parties have opposing legal arguments about whether RCRA hazardous waste requirements have been violated at the Don Plant and whether a RCRA Subtitle C permit is legally required. If such a permit were required, it would be issued by the State of Idaho (which is not a party to the CD) in accordance with its authorized program incorporating EPA's regulations. Thus, while EPA cannot provide the precise analysis the Tribes request (comparing the hypothetical state-issued permit to what the CD requires), EPA has concluded that the CD's compliance requirements are functionally equivalent to what the state-issued RCRA Subtitle C permit would provide. The United States also disagrees that the CD itself should include such an analysis. A consent decree serves only to memorialize the settlement agreement between the parties. Where a consent decree includes additional information beyond the terms of settlement (such as in the introductory "whereas" paragraphs of this CD), it is only what the parties agree to be necessary background for the settlement terms. A comparative analysis such as that described in this comment would neither memorialize the settlement terms nor provide background that the parties agreed was needed within the CD.

Here, the CD's compliance requirements that are either functionally equivalent to RCRA TSDF permit requirements (or which go beyond those permit requirements) include the requirements that Simplot:

- make RCRA hazardous waste determinations and properly manage all solid wastes generated at the facility and, if the wastes are hazardous, then Simplot must manage them in compliance with RCRA requirements. These requirements include generator requirements found in 40 C.F.R. Part 262.

- make process changes to cease commingling of Bevill-excluded and non-excluded waste streams and operate under a comprehensive set of controls (see Appendices 4 and 5A/5B to the CD). The Best Management Practices (BMP) Plan has more frequent and comprehensive monitoring and reporting requirements than typical RCRA permits found in 40 C.F.R. Part 264.

- use best engineering practices to construct, operate and close its phosphogypsum stack systems (see CD, Appendix 1). These controls, include, among other things: installing liners under new or expanded gypstacks, ponds and ditches; managing and minimizing acidic wastewater on-site; monitoring groundwater; inspecting gypstacks for signs of potential problems; closing stacks, ponds or ditches when they reach the end of usability; and providing financial means to fund the closure and long-term care management of all of its phosphogypsum stack systems. These requirements are similar to the requirements found in 40 C.F.R. Part 264, and in some instances these requirements are more stringent than the requirements found in Part 264 (e.g., the requirement to provide third-party liability financial assurance is only required during the operation of facilities. Under the CD, Simplot is required to provide third-party liability financial assurance through operation and closure of the facility).

**SBT 6.** *The CD Should Require Compliance with the Best Management Practices Plan for Minimizing and Addressing Spills and Leaks.*

*The Facility Report and the Best Management Practices (BMP) Plan for Minimizing and Addressing Spills and Leaks sets forth how Simplot plans to reduce unintended inputs of phosphoric acid, sulfuric acid, and nitric acid to Process Wastewater entering the Phosphogypsum Stack System, which includes the scrubbers. The CD should require compliance with the BMP Plan. The BMP Plan states that at any time during a calendar quarter when two or more leak or spill events of phosphoric acid, nitric acid, or sulfuric acid in a rolling 24-hour period exceed, or may exceed, Actionable Volumes, Simplot will report them pursuant to the procedures in the CD. The Actionable Volumes are 1,100 gallons of phosphoric acid, with less volume based on acid concentration, Sulfuric Acid at 70 gallons, and Nitric Acid at 170 gallons. A rolling 24-hour period could result in 1,100 gallons being spilled daily without reporting. The Tribes request that the CD additionally require the B.M.P. Plan to be amended so that any spills that may impact groundwater and surface water must be reported within 24 hours.*

*In addition, the B.M.P. Plan seems inconsistent with reporting requirements under CERCLA and EPCRA. EPCRA § 304 requires notification for any release of a CERCLA hazardous substance or extremely hazardous substance at or above the reportable quantity with potential exposure to persons off-site. 42 U.S.C. § 11004(a)-(b); 40 C.F.R. § 355.42(a). CERCLA § 103 requires any person in charge of a facility to report any release of any CERCLA hazardous substance into the environment, whether on-site or off-site (other than a federally permitted release), at or above its specified reportable quantity. Such a release must be reported to the National Response Center as soon as the person has knowledge of any release. 42 U.S.C. § 9603(a); 40 C.F.R. § 302.6(a). This includes reporting any release of an unlisted hazardous waste exhibiting the characteristic of toxicity or corrosivity.*

*Both CERCLA and ECPRA require affected tribes to be notified of relevant spills, CERCLA via the National Response Center notifying the On-Scene Coordinator once a spill is reported, 40 CFR § 300.405(e), who then notifies the tribe, and ECPRA requiring direct reporting to a tribe. ECPRA § 304; 40 CFR § 355.42(a); see also 55 Fed. Reg. at 30632 (July 26, 1990) (designating Tribes as the implementing authority for EPCRA in Indian Country). The Tribes ask that these provisions be added to the B.M.P. Plan and required by the CD.*

**Response:** The United States agrees that the CD should require compliance with the BMP for spills and leaks, and it does. See CD ¶¶ 13, 19. Violations of the compliance requirements in Section V of the CD, which includes the requirement to comply with the BMP, are subject to stipulated penalties under the CD (CD ¶ 60).

The comment about actionable volume thresholds under the BMP may reflect a misconception about how those thresholds relate to statutory reporting requirements. A leak or spill that is accidental, or any unplanned releases of materials from the primary container, conveyance piping, valves, flanges, and/or pumps with a reasonable potential to reach or exceed the BMP Actionable Volume in (Table 1) within a 24-hour period and/or which triggers the alarm limits for the acid content monitoring system at outgoing sumps is considered an incident that must be reported to EPA under the BMP. The quantities in Table 1 are based on flow rates and the operator's ability to detect changes in volumes and acid content. The operator will attempt to correct leaks from valves, flanges, pumps, or any other equipment that can be readily and safely corrected at the time of discovery. The incidents are reported to management for further action and recorded in the tracking database for future reference. The spilled or leaked material contain components of the fertilizer product that are recovered and incorporated into the fertilizer rather than being discharged to the phosphogypsum stack system. The BMP actionable volumes are not related to the release threshold under the EPCRA/TRI program. One important difference is that the releases under the BMP are releases to containment areas where recovery of the material occurs, rather than to the environment. Therefore, the BMP actionable volumes and the CERCLA and EPCRA reportable quantities serve quite different purposes. As described in Section 8.2 of the BMP, releases to non-contained areas that exceed CERCLA reporting thresholds must be reported under that statute.

The BMP actionable volumes are based upon the size and type of equipment and the operation being performed. A detection is based on a statistically significant increase in the acid content meters being used to measure the releases to contained areas.

**SBT 7.** *The CD Should Require the Cooling Tower Decommissioning Process to Be Conducted According to the Requirements for a Mixed Waste Facility.*

*The CD should require that decommissioning of the cooling tower should be conducted according to the requirements for a mixed waste facility, and the waste should be properly disposed of per the appropriate waste rules.*

**Response:** The United States disagrees with the comment that the cooling towers would be considered mixed waste units under RCRA. A similar point is raised in comment SBT 9.14, below, suggesting that the structures should be considered mixed-waste units under RCRA on the grounds that "fluoride compounds are added to the cooling tower via make-up

water. Historically, some of this make-up water came from the leachate collected from the gypstack and was indirectly put into the system to help with the operation of the cooling tower." The cooling towers would not be considered mixed waste units under RCRA on these grounds, because the gypstack waste is well below the threshold by which it would be considered a radioactive waste under Nuclear Regulatory Commission (NRC) regulation. As discussed in "TENORM: Fertilizer and Fertilizer Production Wastes," https://www.epa.gov/radiation/tenorm-fertilizer-and-fertilizer-production-wastes, gypstack waste has uranium, thorium, radium, and their decay products. None of these radionuclides would themselves cause gypstack waste to be even a low-level radioactive waste. See Tables at 10 C.F.R. § 61.55. And while a catch-all category for alpha-particle emitters places a 10 nCi/g threshold, above which a given waste would be a Class A low-level radioactive waste, EPA sampled the gypstack contents in 2005 and determined that the alpha-particle emitter concentration in the waste was approximately 0.06 nCi/g (7,100 pCi/L with a 1.2 density). The gypstack waste is therefore well below the threshold by which it would be considered a radioactive waste under NRC regulation and cannot be considered a "mixed waste" which would be subject to both RCRA and NRC regulations.

**SBT 8.** *The Periodic Reporting Period in the CD Must Be Extended.*

*CD ¶ 52 requires Periodic Reporting for two years. The requirement must be extended since in the E.M. Plan, Idaho DEQ will take at least one year to get the relevant contracts in place, and two field seasons are requested for these improvements. Given this timing, the reporting timeframe should be extended by at least a year to include all necessary documentation.*

**Response:** The United States does not agree that a change to the reporting period is warranted. The Periodic Reporting requirement under CD ¶ 52 requires that Simplot must submit quarterly reports identifying completed compliance measures and overall compliance progress for the first two year following the effective date of the CD. After this initial two-year period, Simplot must submit semi-annual reports for a period of two years, and thereafter submit annual reports until submission of a final closure application; must submit its next report within 180 days after submission of the closure application; and submit reports annually until the CD is terminated. Based on EPA's experience with other settled cases, and the expected data collection in each report, the United States concludes that the periodic reporting requirements of the CD are reasonable. The time frame for implementation of mitigation does not alter that conclusion. The CD includes separate reporting requirements for environmental mitigation, see CD ¶ 46 & App. 11 at 4, to ensure necessary documentation is provided as to the completion of the environmental mitigation project. This separate reporting requirement for mitigation makes sense. Whereas other compliance projects under the CD that are subject to CD ¶ 52 periodic reporting will be implemented directly by Simplot, the mitigation work under the CD will be performed by the Tribes and the City of Pocatello, not Simplot, under contracts with and under the general oversight of Idaho DEQ.

**SBT 9.1.** *Appendix 1.A: 1.6(b)(i)(7) (PDF p. 80):*

*Chemical characterization needs to include radiological constituents as well. Phosphate ore is associated with uranium 238 and its associated decay daughters. Although RCRA does not*

*cover radiological constituents, they are covered by CERCLA, and Simplot's facility is part of a listed CERCLA Superfund site, so the information is needed.*

**Response:**  As described above in the response to SBT 2, the presence of radionuclides was evaluated by the CERCLA cleanup process, and in any event, the RCRA program does not regulate radionuclides.

Additionally, the radionuclide content of the gypstack waste was measured by EPA in 2005, and it is well below the thresholds established by the NRC for even low-level radioactive waste.

**SBT 9.2.** *Appendix 1.B:*

*Proper characterization of all dike material needs to be completed and analytical results should include chemical and radiological analyses. This material becomes airborne and should be considered as an emission source under the Clean Air Act.*

**Response:**  As described above in response to SBT 2 and SBT 9.1, the chemical and radiological composition of phosphogypsum that would be used as dike material was sampled by EPA. The chemical composition is consistent with phosphogypsum produced elsewhere and would be of the same composition if the Don Plant had fully met the Bevill exclusion and placed only gypsum from the production process in the gypstack and thus not regulated as a hazardous waste under RCRA.

In addition, fluoride emissions from the gypstack emissions have enforceable limits in the Title V permit, therefore the gypstack already is considered an emissions source.

**SBT 9.3.** *Appendix 1.C:*

*• During the development of the first pond, sluffing was noted. During the normal operations of the past few years, Simplot's Don Plant has had several ponds where sluffing off the pond walls was mentioned as coming towards the facility. Sluffing must be appropriately reported to all agencies and not ignored. Removing liquid out of the ponds over time does not prevent sluffing.*

*• More details are needed for placing the 12 inches of locally available soils and grass/vegetated slopes. This Appendix should clarify what sort of grasses will be planted and what kind of maintenance will be done to verify that erosion will be prevented or eliminated.*

*• Page 8 (of 20) Define what is meant by stating that seepage rates will be "reduced significantly to warrant closure."*

**Response:**  In the construction of ponded areas within the phosphogypsum stack system, a 24-inch-thick compacted gypsum cover is placed over a 60-mil HDPE liner for protection. This provides more protection than conventional compacted clay soils. If wind and wave action is severe, the "sluffing" (or "sloughing") or removal of some gypsum from the pond walls may occur. The CD requires that any damage to liners be reported and expeditiously repaired. Simplot is also required to inspect all liners, detect and monitor any leaks, and report to Idaho DEQ and EPA on the repairs taken.

The United States does not agree that Appendix 1.C needs to be clarified with the additional details the comment suggests. The Appendix 8 initial Closure Plan requires all surface areas of the gypstack that are no longer needed for treatment and closure operations to be closed and revegetated. For revegetation, native plant species, sodding, and grass seed mixtures are chosen based on the plants desired properties, such as drought resistance, growth rate, and root structure to prevent damage to liners and to control erosion. The initial Closure Plan also requires a 50-year long term care and maintenance program that includes monitoring, mowing, land surface repairs, pump operations and repair, security fences, gates, and signage. Any other specific additional details regarding grass types and maintenance can be included if deemed appropriate in the final, permanent closure plan when that is adopted.

At the time the facility ceases operations, the gypstack seepage rate is high, but over time this rate significantly decreases (see Figure 32 of Appendix 8). The closure of the top portions of the gypstack cannot occur until the seepage rates are sufficiently reduced to allow for regrading and configuring of the gypstack.

**SBT 9.4.** *Appendix 1.D:*

*Need to define "critical condition."*

**Response:**  The United States disagrees with the comment that there needs to be a definition of "critical condition" added, because the CD already has a definition of what constitutes a "critical condition."  According to Appendix 1.D, Paragraph (4):

> Any of the following items shall be considered as indicating a critical condition that requires immediate investigation and may require emergency maintenance action:

> > (a) Concentrated seepage (e.g., springs or boils) on the downstream slope, at the slope Toe, or downstream from the slope Toe with active signs of Piping at the point of seepage (e.g., a gypsum or soil cone or delta at the point of seepage);

> > (b) Evidence of slope instability including sloughing, bulging or heaving of the downstream slope, or subsidence of any Perimeter Dike slope or crest;

> > (c) Structurally significant cracking of surface on crest or either face of the Perimeter Dike slope;

> > (d) General or concentrated seepage in the vicinity of or around any conduit through the Perimeter Dike; or

> > (e) Observed or suspected damage to the Liner system where there is a release or the potential for a release from the Liner system.

**SBT 9.5.** *Appendix 1.E:*

*Needs information added to include the Court Name and Civil Action Number, and the Closure Plans need to be provided to the federal and state agencies and the local agencies that could be impacted by an accident or critical condition.*

**Response:** The United States disagrees with the comment that the court name and civil action numbers need to be included because Appendix 1.E. already requires this information in the Part I Instructions. Additionally, Simplot must certify that the information supplied conforms with the requirements in Appendix 1.C of the CD (and must input the civil action number in its certification). Appendix 1.E, Part III requires that the completed application form, including all supporting data and reports, be transmitted to EPA. Appendix 1.C, Section III requires that the Permanent Closure Plan be submitted to EPA and Idaho DEQ for approval.

**SBT 9.6.** *Appendix 4:*

• *Redacted Information makes it hard to understand the processes involved, and one cannot correctly evaluate possible impacts on human health and the environment; reviewing information this way is technically and scientifically challenging.*

• *Why is the SPA considered to be confidential business information?*

• *Figure 3. What do the color differences indicate?*

**Response:** Companies submitting information to EPA may claim such information under RCRA as confidential business information (CBI). Without a Freedom of Information Act (FOIA) request, the United States protects the information claimed as CBI until such time that the information is determined to be *not* entitled to confidential treatment. In the event that EPA receives a FOIA request for the information submitted, EPA follows the process outlined in 40 CFR Part 2, subpart B.[1]

As the Tribes are aware, during the public comment period, the United States responded to the Tribes' inquiry about the CBI redactions. Specifically, counsel for the United States arranged with the Tribes' counsel a videoconference call, held on August 15, 2023, to explain to the Tribes' representatives the redacted material in the CD appendices. Simplot

---

[1] If EPA receives a FOIA request, the matter is sent to the appropriate legal office (in Headquarters, it would be the Office of General Counsel (OGC); in EPA Region 10, the request would be sent to the Office of Regional Counsel (ORC)). EPA would send the party claiming confidentiality a letter providing the company the opportunity to support any CBI claims. The relevant EPA program would make a recommendation to OGC/ORC on the confidentiality of the information. OGC/ORC then issues a final confidentiality determination. The determination is an agency finding on whether the information meets the confidentiality standards found in relevant case law and any applicable statutes. Once OGC/ORC issues a final confidentiality determination, the party asserting the confidentiality claim would have ten working days to seek judicial review of EPA's finding. If judicial review is not sought within this period, EPA will disclose the information that EPA determined did not meet the standards for confidentiality.

consented to the United States holding this call with the Tribes to explain the redactions in general terms while avoiding specific disclosure of the claimed CBI. During the call, EPA explained the type of information that was redacted and answered questions posed by the Tribes' representatives to the extent possible consistent with the obligation to respect Simplot's CBI claim. The United States specifically explained why the redacted information about which the Tribes' representatives inquired would not, even if disclosed, add to the Tribes' or the public's understanding of the CD and what it requires. We regret if this effort did not allay the Tribes' concerns or objections to the CD's CBI redactions. The body of the CD and the overwhelming majority of material in the CD's technical appendices are not redacted, and the United States continues to believe that nothing in the redactions precludes the Tribes' or the public's ability to understand the essential terms of the CD or its impacts on human health and the environment. Regarding Figure 3, the colors are used to identify and differentiate units in the Phosphoric Acid Production Process that are either grandfathered (gray), animal feed ingredients (red), mixed- use units (green), acid value recovery units (blue), SPA recovery units (purple), and granulation recovery units (yellow).

**SBT 9.7.** *Appendix 5.A:*

*Nowhere is it stated that the EPA, Idaho DEQ or Local Emergency Planning Committee (LEPC) will be notified of any spills or leaks. This is critical for all agencies involved, especially if the LEPC is activated to show up on-site and assist.*

**Response:**  As noted in the response to SBT 6, above, the CD does not supplant statutory reporting requirements that continue to apply under CERCLA.

**SBT 9.8.** *Appendix 5.B:*

*Some information classified as confidential business information elsewhere appears to have yet to be removed from this Appendix, casting doubt on whether that information truly is CBI.*

**Response:**  Please see the response to SBT 9.6.

**SBT 9.9.** *Appendix 6:*

*The timing does not match up, given that within nine months, the BMP will be completed, but many of the projects will not be up and operating for at least 70 months.*

**Response:**  The United States disagrees that the schedule for compliance projects in Appendix 6 needs revision. In general, some of the compliance projects can be completed within months of lodging of the CD, while other projects, especially those requiring new construction and process changes to reduce waste toxicity and recover phosphate value from waste streams, are much more complex and will take up to 70 months to complete. Many of the BMP tasks require significant process changes that require installation of equipment, testing, and monitoring to ensure that the modifications are working as intended. These schedules are based on careful engineering studies that take into account the safety and feasibility of the projects. The BMP requires Simplot to periodically review and analyze the effectiveness of these changes and make continuous improvements over time. EPA's experience with BMPs at other phosphoric acid facilities with filed and/or

19

entered administrative/judicial settlements has shown that these continual improvements have resulted in significant reductions of contaminants. The compliance schedule for Simplot in this CD is similar to the schedules in RCRA settlements with other phosphoric acid companies, including for facilities that do not have to contend with a shortened construction season due to cold weather (thus making the compliance project schedule under this CD at least as stringent, if not more, than the schedules approved under the previous settlements).

**SBT 9.10.** *Appendix 7:*

• *Page 9 --East Valley expansion has a predicted leakage rate of 0.18 gpm, which means that annually, it will be leaking 94,608 gallons per year, and the total volume of water being released over the 40-year projection of 3,784,320 gallons of contaminated water will be leaking from this pond alone. With the basalt outcrops in this area, the Portneuf River will be contaminated from a different location than the Batiste Springs area. The water going into the East Valley expansion must be properly characterized.*

• *The South Valley Expansion will use a predicted leakage rate of 0.21 gpm or 110,376 gallons per year. Thus, for their 40-year prediction, 4,415,040 gallons will reach the Portneuf River. The Clean Water Act anti-degradation policy does not allow for this much additional contamination to be added to the river. Some of the other leaking ponds associated with the existing phosphogypsum stack should be reducing their contribution, but these ponds instead will be seeing a significant increase in concentrations making it to the river.*

**Response:** Process wastewater is used for cooling and transporting gypsum to the gypstack and is continuously circulated throughout the site. The chemical properties of the process wastewater are consistent at all locations at the facility due to this circulation. The chemical properties at any one location should be essentially the same. To the extent that any process wastewater leaks into the groundwater, Simplot has installed a robust system of groundwater intercept wells to prevent offsite contamination.

The 0.18 and 0.21 gallon per minute expected leakage rates are within the norm for a lined gypstack. These are not considered actionable releases under the CD. These leakage rates are consistent with gypstacks at other phosphoric acid facilities involved in previous settlements.

Regarding characterization of this leakage, all interstitial water has the same characteristics regardless of location, therefore the chemical composition of the water is the same as the gypstack pond water. EPA sampled the gypstack pond water, with the following results (Sample PS-04, 1995 Inspection):

| Analyte | Value | Unit |
|---|---|---|
| pH | 1.4 | S.U. |
| Fluoride | 10,072 | mg/L |
| Total Aluminum | 235 | mg/kg |
| Total Antimony | <0.05 | mg/kg |
| Total Arsenic | 0.45 | mg/kg |
| Total Barium | 0.43 | mg/kg |

20

| Total Beryllium | 0.040 | mg/kg |
|---|---|---|
| Total Cadmium | 3.10 | mg/kg |
| Total Calcium | 2,005 | mg/kg |
| Total Chromium | 7.4 | mg/kg |
| Total Cobalt | 0.07 | mg/kg |
| Total Copper | 1.12 | mg/kg |
| Total Iron | 118 | mg/kg |
| Total Lead | <0.05 | mg/kg |
| Total Magnesium | 220 | mg/kg |
| Total Manganese | 2.97 | mg/kg |
| Total Mercury | <0.001 | mg/kg |
| Total Nickel | 2.76 | mg/kg |
| Total Potassium | 229 | mg/kg |
| Total Selenium | <0.05 | mg/kg |
| Total Silver | <0.02 | mg/kg |
| Total Sodium | 1,164 | mg/kg |
| Total Thallium | <0.05 | mg/kg |
| Total Vanadium | 11.2 | mg/kg |
| Total Zinc | 27.5 | mg/kg |

**SBT 9.11.** *Appendix 8: Closure Plan for the Facility:*

• *The Closure Plan appears as a rough estimate. Closure information is for 2025; however, the table in Section 2.3.3 states it may take between 14 and 163 years to close the facility. The numbers should be confirmed and corrected throughout.*

• *The Closure Plan relies on high evaporation rates and estimating fluoride and other emissions. PM 10 or 2.5 monitors should be placed around any evaporation source, with speciation required. Water irrigation is proposed, but it is impossible to understand estimated water balances or assess due to redactions throughout. The Tribes have recognized that the plan is to permanently leave water within the stack. Leaving water in the stack will continue to cause a hydraulic head throughout the stack, leading to continued groundwater contamination.*

• *Stack stability based on closures and actions of stacks in the south should not be used on the J.R. Simplot Don Plant stack. Dry, arid climates may lead to preferential drying in areas of the proposed 499-acre stack, leading to stability issues.*

• *The Tribes request information be provided to assess Closure Liability, Water Inventory projected, Process water evaporation, and a water balance to assess the necessary irrigation area.*

• *Again, the Tribes are unable to fully understand if the process will be protecting human health and the environment because key information is redacted.*

• *2nd paragraph on Page 4, states that Simplot's process water will be partially evaporated and permanently retained in the lined phosphogypsum stack. The next comment made about the treatment residue being evaporated could be more transparent. First, liners leak, so the*

*claim that it's permanent is grossly in error. Next, the treatment residue will be evaporated. This sentence is also misleading. It should be reworded to say that the treated water will be evaporated and treatment residue will be placed in a lined pond with the understanding that this composition will be in liquid form.*

*• Figure 32. is redacted, which was a graph that predicted seepage rate as a function of time. Why was it redacted along with all the other Figures?*

**Response:**  Please refer to SBT 9.6 about redactions and the process for obtaining information that can be disclosed through FOIA.

Closure of a phosphogypsum facility is performed in steps, with the most expensive tasks occurring in the first 5 years followed by continuously lower expenditures over time. Closure requirements include, among other things, grading and installing liners on the gypstacks and establishing a stable vegetation cover to limit rainwater infiltration and erosion, treating and removing water from ditches and ponds that contain process wastewater, daily inspections of all components of the phosphogypsum stack systems, and ultimately, closing the ditches and ponds and installing a top cover. Some water will remain in the gypstack during closure. However, reducing water volume by evaporation is a commonly accepted treatment and closure practice especially in arid locations like Idaho where evaporation far exceeds precipitation. For the first 5 years after the facility ceases operations, the volumes of wastewater requiring treatment will be the highest. This volume is continuously reduced over time to such a point that it is only a small fraction of its original volume 20 years later.  A certain amount of liquid will remain indefinitely within the interior of the gypstack. After closing the phosphogypsum stack systems, Simplot must monitor, capture and treat any discharges and safeguard the phosphogypsum stack systems for 50 years (long-term care). All of these requirements have associated costs that are consistent with known closure costs at other phosphoric acid sites across the country. The use of a 2025 closure date was not based on any projection of when closure would occur. Instead, 2025 was used solely for cost estimation and financial assurance purposes, based on the point in time when the facility would have the highest volume of untreated process wastewater circulating throughout the plant, and thus the highest management and treatment costs. Using the time when costs would be at their highest helps to ensure (along with other provisions) that the financial assurance required under the CD will be sufficient to cover the projected costs of closure.

**SBT 9.12.** *Attachment 1 to the Closure Plan:*

*This attachment is completely redacted. This was the information used for the 2018 Unit cost so it needs to be clarified how DOJ can justify redacting it as confidential business information.*

**Response:**  The unit costs were derived from contracts between the phosphate industry (Simplot and its competitors) and contractors. There are contractual agreements between multiple parties that restrict the disclosure of information. Please refer to SBT 9.6 about redactions and the process for obtaining information that can be disclosed through FOIA.

**SBT 9.13.** *Attachment 2 to the Closure Plan:*

*More details explaining the rationale as to why it was utilized would provide a better economic analysis.*

**Response:**  The closure design and engineering methods to achieve closure are conceptual in nature and provided for cost estimating purposes only. Cost data for the closure plan was based on December 2018 dollars and inflated to the first quarter of 2020 using the inflation factor published by the U.S. Department of Commerce Bureau of Economic Analysis from May 28, 2020. U.S. Commerce Department data is a widely used and accepted source of information for inflation calculations.

**SBT 9.14.** *Appendix 9:*

• *Page 4 of 9 § 2.1 states that fluoride compounds are added to the cooling tower via make-up water. Historically, some of this make-up water came from the leachate collected from the gypsum stack and was indirectly put into the system to help with the operation of the cooling tower. These structures should be considered as mixed waste in accordance with the RCRA regulations.*

• *Page 5 of 9 §2.3 explains that a variety of waters are recycled within the facility, which includes hazardous constituents associated with the various processes. The processing of minerals causes many environmental harms and negatively impacts human health and the environment.*

• *Page 6 of 9 §2.4: The Blend System simply transferred the higher concentrations of fluoride back into the gypsum stack, where the water picks up more chemicals along the way, which are then emitted*

**Response:**  The comment raises various points as to Appendix 9, which provides for interim operational measures to minimize fluoride emissions from the cooling towers prior to decommissioning and replacing the cooling towers with one or more cooling ponds.

As discussed above in response to SBT 7, the cooling towers would not be considered mixed-waste units under RCRA.

The United States agrees that a variety of waters are recycled within the facility that contain hazardous constituents associated with the various facility processes, but it is the release of constituents into the environment that would present a potential harm.

As to the third point, the Blend System places certain fluorides directly into the gypstack, rather than into the cooling towers. Since the emissions from the ponds in the gypstack are significantly less than those in the cooling towers, it is not the case that fluorides are simply transferred and then emitted elsewhere. The fluoride concentration in the gypstack reaches an equilibrium level, in which excess fluorides in the incoming water are precipitated out (which precludes them from being emitted into the air). The addition of more fluorides into the gypstack ponds is not expected to appreciably increase (if at all) the emission of fluorides from the gypstack ponds, because the equilibrium concentration of fluorides in these ponds would not significantly change.

**SBT 9.15.** *Appendix 10: Additional Definitions:*

*Definitions are generally included at the beginning of a document, not the end. The general reader does not fully understand these acronyms.*

**Response:**  The United States disagrees with the comment's suggested format change for the CD. The CD (Section III) defines terms used within the main body of the CD.  CD Appendices include definitions of terms used within a particular Appendix (e.g., Appendix 2 includes definitions of financial assurance terms used within Appendix 2). The purpose of the additional definitions collected in Appendix 10 is to include those terms used across several of the CD Appendices. The decision to organize the definitions in this way involved trade-offs. While we acknowledge that all definitions could be included in one place at the outset of the CD, given the number of definitions and the fact that many of them are used only in the Appendices, the United States concluded this approach was reasonable and understandable to the reader, especially as the CD includes a list of Appendices that identifies Appendix 10 as including additional definitions of terms used in the CD Appendices.

**SBT 10.** *Missing Documents*

*• CD ¶ 15 refers to the State of Idaho Reuse Permit. The CD should attach a copy of this permit or identify the compliance with the terms and conditions.*

*• CD ¶ 18-Acid Value Recovery System: Wastes or Other Materials Placed Directly in Production Process refers to a Consolidated Materials Management Practices report dated November 2022. This Report must be available for review and inspection to understand units that serve to manage, store, or transport Bevill-Excluded Wastes.*

**Response:**

The United States disagrees that there are documents missing from the CD that should be included or attached. As noted in our response to SBT 5 above, a consent decree serves to memorialize the settlement agreement of the parties and includes additional information only to the extent the parties agree is necessary.  A consent decree is not intended to serve as a public repository for documents of interest, particularly if those documents are elsewhere publicly available or can be obtained on request. Concerning the examples cited in the comment, the State of Idaho Reuse Permit I-104-04 can be fully accessed publicly on the following IDAHO DEQ webpage:
https://www2.deq.idaho.gov/admin/LEIA/api/document/download/9373.
The comment suggests that the CD should identify compliance with the terms and conditions with this permit. However, EPA did not issue this State of Idaho Reuse Permit and is not responsible for documenting compliance with its terms and conditions. The parties to the CD agreed that the Consolidated Materials Management Practices Report referenced in CD ¶ 18 did not need to be included as part of the CD, but it will be made available on request.

## Comments Received from Idaho Conservation League

### ICL 1. *Tribal Consultation*

*Per information shared by the Environmental Protection Agency (EPA) and the Department of Justice (DOJ) during the virtual information session for the public held on Tuesday, September 12, 2023, the Shoshone-Bannock Tribes (the Tribe) was not directly contacted as part of the process of developing the proposed Mitigation Projects (as outlined within Appendix 11 Mitigation Project Summary of the CD). Instead, it was explained that the Idaho Department of Environmental Quality (DEQ) served as a proxy representing Tribal interests. Considering many of the impacts of the alleged violations within the CD affect Tribal lands or land historically and currently used by the Tribe, and that two of the three proposed projects/sites within the Appendix 11 Mitigation Project Summary are to be implemented by the Tribe, the lack of direct consultation with the Tribe is particularly concerning. The Biden Administration's recent commitment to Tribal Justice and the DOJ's recent commitment to Tribal Justice in the adjacent sphere of violence against Tribal members only add to our concerns regarding the lack of direct consultation with the Tribe. While the Tribe may or may not have objections to the CD proposed mitigation projects and strategy, DEQ should not serve as a proxy for Tribal interests.*

*Furthermore, it is not clear from the CD to what degree the Tribal was consulted in developing the full CD itself. While it should be acknowledged that the DOJ's 2022 Tribal Consultation Policy (the Policy) specifically does not include active litigation or settlement negotiations as "policies" that require formal Consultation, the Policy does not preclude the DOJ from carrying out the spirit and intent of the Policy via informal discussion. In fact, the Policy states, "...communication between Tribes and the Department of Justice is not limited to formal Consultation. To this end, the Department of Justice will engage in ongoing communication with Tribes beyond formal Consultation."*

*Given the above concerns, we respectfully request the DOJ inquire with the Tribe about any interest they may have in initiating direct, informal discussion about proposed mitigation projects as well as any and all aspects of the CD as a whole.*

**Response:**  Please see the response to SBT 4 above. The comment also references the September 12, 2023 information session. While neither EPA nor DOJ referred to Idaho DEQ as a "proxy" for the Tribes, the United States appreciates that the explanation provided in the information session of its conversations with Idaho DEQ and the information DEQ shared with the United States about its conversations with Tribal staff may have been construed to indicate as much. The United States agrees that Idaho DEQ is not a proxy for the Tribes. In this case, the United States undertook its own analysis of projects that might be suitable as mitigation relief under the CD. One mitigation concept identified was eventually developed with Idaho DEQ, agreed to by Simplot, and included in the CD based on the United States' determination that it was appropriate mitigation. The indication of support by Tribal staff to Idaho DEQ was not part of that determination, although it buttressed the United States' conclusion that the mitigation relief was desirable and our hope that it would be supported by the Tribes.

**ICL 2. *Benefit of Noncompliance***

*The importance of both recuperating the benefit of noncompliance (BEN) and the financial models to do so are well documented by the EPA. Simply said, the BEN is a violator's economic benefit from delaying or avoiding pollution control expenditures. Per the CD, Simplot is agreeing to pay a $1.5 million civil penalty. Considering that some of the alleged violations span decades, and Simplot's annual revenue is estimated to fall between $5 to $10 billion, at face value, the stipulated $1.5 million penalty would seem minimal compared to the BEN Simplot likely sustained from the alleged violations.*

*To be sure, the question of whether the BEN is being sufficiently recuperated is informed by several factors. One, the violations described in the CD are alleged and disputed by Simplot. Two, per the CD, Simplot agrees to implement specific waste management measures it has valued at nearly $150 million, and three, there is a substantial amount of case and settlement penalty precedent established by fourteen previous violation settlements with other phosphate manufacturing facilities. However, it is unclear from the CD how the DOJ approached the above factors and whether the economic benefit of noncompliance by Simplot is ultimately being sufficiently recuperated by this penalty.*

*We leave that first factor to be addressed by the DOJ in any response to comments. As to the second factor, while the $150 million Simplot will devote to improved waste management is a commendable provision secured by the CD, it is not clear what amount of these to-be-implemented waste management methods are voluntary compared to merely practices that have always been legally require by applicable environmental law/regulation but not yet implemented by Simplot. It would seem inappropriate to include money and investment (if any) spent on practices that have always been required as counting toward recuperating the BEN.*

*Finally, as to the third factor, while case law and precedent significantly inform pending litigation, they should not be roadblocks for correcting any possible previous deficiencies in past settlements that have been carried over to this CD.*

*Given the above concerns, we request the DOJ provide further information on how the recuperation of the BEN was approached (including any models or calculations utilized) and how the $1.5 million civil penalty included within the CD meets or does not meet applicable law, regulations and guidance. Should it be found that the BEN is not sufficiently being recuperated within the proposed CD, we request that a re-evaluation be performed.*

**Response:**  The United States agrees that a civil penalty should recoup the economic benefit of noncompliance and concluded the civil penalty in this case does so. EPA maintains penalty policies under the various statutes it enforces, and these policies reflect the importance of recouping economic benefit (usually calculated using a publicly available computer model known as "BEN"), of deterring violations by including a "gravity" component that considers factors such as the extent of the violations and their environmental impact, the size of the violator, willfulness or cooperation, and also reflects litigation risks or other factors that justice may require. Application of the civil penalty policies ensures that penalties meet the relevant statutory requirements.

EPA calculated the civil penalty in this case using these applicable penalty policies: the RCRA Civil Penalty Policy, the Clean Air Act Stationary Source Civil Penalty Policy, the

Enforcement Response Policy for Section 313 of the Emergency Planning and Community Right-to-Know Act (1986) and Section 6607 of the Pollution Prevention Act (1990) [Amended], and the Enforcement Response Policy for Sections 304, 311, and 312 of the Emergency Planning and Community Right-to-Know Act and Section 103 of the Comprehensive Environmental Response, Compensation, and Liability Act.

Settlement negotiations are confidential, and the United States does not disclose figures presented in such negotiations, including any estimates of the gravity or economic benefit of alleged noncompliance. Often, the civil penalties included in previous settlements, if they involved similar alleged violations, influence the negotiation of civil penalties in subsequent cases. In calculating the gravity of the alleged violations here, as in previous phosphoric acid settlements, EPA adhered to its penalty policies by considering the potential for harm and the extent of deviation associated with the alleged violations based on the facts specific to the facility at issue. EPA also calculated economic benefit consistently with its penalty policies and how it approached the issue in previous phosphoric acid settlements. The United States disagrees with the comment's assumption that the civil penalty here does not recoup economic benefit because Simplot has high annual revenues. EPA estimates economic benefit based on the cost of the least expensive measures the company could have implemented to avoid the alleged violations and not based on a company's revenues. Here, as in previous phosphoric acid settlements, EPA considered the volumes of hazardous wastes at issue in the alleged violations and what the cost would have been to render the wastes non-hazardous or otherwise avoid their illegal management in the gypstack.

Whatever penalty figure the United States determines to seek, that penalty must still be negotiated with the defendant in a case. Often the defendant and the Government have different views not only of the alleged violations, but also of the likely outcome of litigation and the amount of penalty, if any, that a court will ultimately assess.  In this case, the United States and Simplot agreed to a $1.5 million civil penalty figure that the United States concluded is consistent with EPA's relevant penalty policies, fair in relation to the civil penalties assessed in previous settlements that have been approved by courts and involve other phosphoric acid facilities, and which recoups the economic benefit of noncompliance that EPA estimated, and an appropriate gravity component that considered, among other things, the environmental impact of the alleged violations as well as Simplot's size.

### ICL 3. *Closure Cost Estimating*

*Appendix 8 - Initial Closure Plan for the Facility of the CD presents information and calculations for how closure costs were estimated. Per the Initial Closure Plan, in general, closure costs were based on December 2018 dollars. However, some "Long-Term Costs" were inflated to 2020. Although the CD includes provisions and procedures to re-estimate and adjust closure costs annually, given the well-documented inflation that occurred in the United States since 2018 (and even 2020), it is unclear why the CD would defer the almost certainly necessary inflation-related readjustment until a future date.*

*We respectfully request the DOJ clarify exactly what inflationary adjustments were applied to estimated closure costs. Furthermore, we respectfully request that the CD include inflation*

*adjustments made to 2023 (or as close as practically possible), unless a justifiable reason to not do so can be demonstrated.*

**Response:**  Please see the responses to SBT 9.13 above and PRC 2 below. Appendix 8 was originally prepared close in time to 2020. Inasmuch as the CD will require annual inflation adjustments be made, the United States does not conclude it is necessary to revise Appendix 8 to include inflation adjustments to 2023. Thus, if the CD is entered in 2024, the cost estimate will be required to be adjusted in 2025 to reflect inflation that has occurred since 2020, and Simplot will be required to adjust the cost estimate thereafter for inflation (and other factors if applicable).

## ICL 4. *Compliance Projects Timeline*

*Appendix 6 - RCRA Project Narrative & Compliance Schedule (Compliance Project Schedule) of the CD outlines the compliance projects that would be required of Simplot, as well as their timeline for completion. The Compliance Project Schedule states that "the length of time required (to complete compliance projects) is influenced by engineering requirements, permitting and approvals, equipment lead times, a limited seasonal construction window, coordination with plant turnarounds, training development, and coordination with employee work schedules. However, it is unclear from the Compliance Project Schedule or the CD how each of these factors applies to each proposed project. We would like to see these projects be completed as expeditiously as possible. The sooner the proposed compliance projects can be completed, the quicker any environmental harm can be prevented, reversed, or corrected. Other environmental laws include regulations on compliance schedule timetables, for example, any schedule for compliance included within a National Pollution Discharge Elimination (NPDES) Permit under the Clean Water Act must require compliance as soon as possible. We are curious as to which applicable statutes, regulations, or guidance are applicable to this CD and the proposed Compliance Project Schedule. We ask the DOJ to please provide context as to what statutes, regulations, or guidance are applicable to the proposed Compliance Project Schedule.*

*We also would like to know what procedures and/or penalties are in place should Simplot fail to meet the Compliance Project Schedule timelines. Paragraphs 67 and 104 of the CD include language that appears to bind Simplot to complete certain compliance projects by their stipulated dates and potential penalties for failing to do so. However, paragraphs 67 and 104 of the CD also appear to only apply to Compliance Projects 4 through 6. It is unclear why this is the case. We ask the DOJ to please clarify this assumption and further elaborate on what procedures and/or penalties are in place should Simplot fail to meet compliance projects timelines.*

*In addition, we respectfully request the DOJ to require Simplot to provide further analysis justifying how the proposed protracted Compliance Project Schedule timeline is in the public's best interest.*

**Response:**  Please see the response to SBT 9.9 above. The RCRA compliance project timelines are not dictated by statute, regulation, or agency guidance. The compliance projects identified in Appendix 6 (except Projects 4 through 6) are subject to the stipulated penalty provisions identified in CD ¶ 60. There are certain projects (Projects 4 through 6) for which stipulated penalty provisions are retroactively enforceable if Simplot fails to

meet the milestones identified prior to the Effective Date of the CD. Certain projects are easier to implement, while others consider engineering requirements, permitting and approvals, equipment lead times, the limited construction window, and other practical considerations.

**ICL 5. *Fluoride Emissions Reduction***

*The paragraph 47 of the CD explains that State Air Permitting will allow for the credit of fluoride emissions reduction by removing the cooling towers and instead using cooling ponds. On January 20th, 2023, Idaho DEQ issued a modified Permit to Construct P-2016.0055 to the Don Plant permitting the decommission of the cooling towers and allowing the use of cooling ponds resulting in a stated reduction of over 42 tons per year of fluoride emissions. However, as stated in public comments submitted to DEQ by ICL, this 42 tons per year reduction was predicated on the use of outdated AP-42 emission factors for fluoride from cooling ponds (specifically 1.6 lbs of fluoride per acre of cooling pond per day). In fact, the most current fifth edition of AP-42 Chapter 8.9 Phosphoric Acid7, 8 states that fluoride emission from gypstack cooling ponds are "site specific" and that "based on our findings concerning the emissions of fluoride from gypsum ponds, it was concluded that no investigator had as yet established experimentally the fluoride emission from gypsum ponds."*

*Despite this fact, DEQ allowed the use of a gypstack cooling pond fluoride emission factor that was used in previous permitting actions but one that was ultimately derived from a now outdated version of AP-42 (specifically from the Third Edition of AP-42 updated from 1978 to 1985). In a response to comments, DEQ stated they worked with Simplot to resolve this issue, and reviewed a 1978 EPA study "Evaluation of Emissions and Control Techniques for Reducing Fluoride Emissions from Gypsum Ponds in the Phosphoric Acid Industry, EPA-600/2-78-124" to determine the DEQ approved 1.6 lbs fluoride per acre per day emission factor was appropriate. Ultimately DEQ concluded that "since there have been no documented investigations that are readily available to describe the emissions of fluoride from the gypsum stack system, DEQ must accept the use of the previously approved emission factor until such a time that a better source is made available."*

*It does not appear DEQ seriously considered the need for Simplot and Don Plant Facility to conduct a site-specific study of gypstack cooling pond fluoride emissions as the fifth edition of AP-42 Chapter 8.9 would imply is most prudent.*

*We respectfully request for the DOJ and/or the EPA to comment as to whether they find the fluoride emissions reduction calculation approach used by DEQ acceptable. Furthermore, the CD appears to limit the authority to which the DOJ and the CD have over the fluoride reduction permitting action of DEQ (see paragraph 30 of the CD) compared to the authority the CD is granted in reviewing and approving an "Alternative Proposed Fluoride Reduction Plan" in lieu of the DEQ approved approach. Given this consideration, we respectfully request the DOJ and/or the EPA to comment on what course of action may be available to correct DEQ's approach if it is found to be unacceptable.*

**Response:**  See our response to SBT 3 above. As noted there, EPA's evaluation is that the requirement to replace the cooling towers with cooling pond(s) will reduce by more than 90% the current level of fluoride emissions from the cooling towers, and result in more than a four-fifths overall reduction in fluoride emissions from the Don Plant. The critique

and questions concerning Idaho DEQ's use of a specific emission factor in its permitting process do not concern the CD's terms. The CD is not itself a permit, and while replacement of the cooling towers with cooling pond(s) requires permitting by the state, it is a matter for the state's permitting authority to follow its own permitting process. Emission factors (such as the AP-42 factor cited here) are used in permitting, drawn from experience across the country. Use of such generic factors necessarily produces only an emissions estimate inasmuch as emissions vary from site to site. Here, it is not necessary for Simplot to determine an exact emissions factor for the proposed Don Plant cooling pond(s) in lieu of using a generic emissions factor such as AP-42, nor would it in any event affect EPA's conclusion that the replacement of the cooling towers with cooling pond(s) at the Don Plant will result in very significant reductions of fluoride emissions.

### ICL 6. *BMP Actionable Thresholds*

*Appendix 5.A - Minimizing and Addressing Spills and Leaks of the CD includes required procedures for reducing unintended inputs of phosphoric acid, sulfuric acid, and nitric acid to Process Wastewater entering the Phosphogypsum Stack System. More specifically, Table 1 - BMP Actionable Volumes includes thresholds for which specific BMPs must be initiated. However, little support for why these specifically proposed thresholds are most appropriate is provided in the document.*

*We respectfully request that the DOJ expand on how these thresholds were developed, provide supporting justification for the proposed threshold, and reevaluate as necessary.*

**Response:**  Please see the EPA response to SBT 6, above.


## Comments Received from Portneuf Resource Council

**PRC 1.** *For comparison to this CD/SA (Settlement Agreement), the 1998 FMC RCRA violation and the civil penalty was for numerous RCRA hazardous waste violations at its phosphorus production facility in Pocatello, Idaho. In the settlement, FMC agreed to spend a total of approximately $170 million -- including the largest civil penalty ever obtained to date under the Resource Conservation and Recovery Act (RCRA) of $11,864,800. Consequently, the proposed fine for violations of environmental regulations at the Simplot Don Plant is inappropriate and potentially damaging to the communities surrounding the Simplot Don Plant.*

**Response:**  Please see the response to ICL 2 above.  In this case, Simplot is required to pay a civil penalty of $1.5 million in addition to compliance measures estimated to cost $150 million, as well as remedial actions Simplot has previously implemented under CERCLA on which Simplot has spent approximately $100 million. The size of the civil penalty in the FMC settlement does not suggest that the $1.5 million civil penalty here must or should have been higher. The FMC case involved a distinct set of allegations and penalty considerations associated with completely different manufacturing processes and hazardous wastes as well as environmental risks. A more apt comparison would be to the civil penalties assessed in previous phosphoric acid settlements approved by courts: $1,510,023 for one PCS Nitrogen Corp. facility (M.D. La. entered Oct. 19, 2022); $775,000

for one J.R. Simplot Co. facility (D. Wyo. entered Sept. 4, 2020); $1.398 million for one Innophos Corp. facility (entered Oct. 5, 2017); a total of $8.0 million in two consent decrees involving eight Mosaic Corp. facilities (M.D. Fla. entered Aug. 5, 2016 and E.D. La. entered July 6, 2016); and $701,050 for one CF Industries facility (M.D. Fla. entered Sept. 28, 2010). The civil penalties in those five judicially-approved phosphoric acid settlements covering twelve facilities thus averaged $1.03 million per facility. The United States also disagrees with the comment that the penalty is potentially damaging to the communities surrounding the Simplot Don plant, as all civil penalties are by law required to be deposited directly into the United States Treasury, 31 U.S.C. § 3302(b), and are not directed to specific communities.

**PRC 2.** *The estimate for closing the Don Plant is too low and details on how the cost will account for PRC inflation and how the money will be secured are missing from the agreement.*

**Response:**  The United States disagrees that the Cost Estimate for closure and long-term care is "too low," and the comment does not identify any analysis or basis supporting this assertion. The CD's Cost Estimate was calculated based on the point in time when the manner and extent of the operation of the Phosphogypsum Stack System would make closure and long-term care the most expensive, which is consistent with EPA's RCRA financial assurance regulations. See Appendix 2, Section II, Paragraph 1.a.

Appendix 2, Section II, Paragraph 4 provides that Simplot must annually update the Cost Estimate to reflect inflationary adjustments. There are two ways that Simplot can update the Cost Estimate for inflation: (1) recalculating the costs in Current Dollars; or (2) using an inflationary factor derived from the most recent Implicit Price Deflator ("Deflator") for the Gross National Product published by the U.S. Department of Commerce in its Survey of Current Business, in the manner as specified by 40 C.F.R. §§ 264.142(b) and 264.144(b). The details are included in Appendix 2, Paragraph 4.b.1 & 2. Additionally, Appendix 2, Paragraph 4.d. requires Simplot to submit an update to the Cost Estimate every five years that reflects substantive adjustments (e.g., revised treatment protocols, additional studies, treatment costs, etc.). The Cost Estimate includes the cost of cover material, topsoil, seeding, fertilizing, mulching, labor, land surface care, and any other costs of compliance with Appendix 1.C of the CD (Appendix 2, Section II, Paragraph 1.a).

As required in Appendix 2, Section III, Paragraph 9, Simplot must establish Financial Assurance in an amount at least equal to the Cost Estimate. The establishment of Financial Assurance must occur within thirty (30) days of the Effective Date of the CD, or within ten (10) days of EPA's acceptance of Simplot's initially submitted Cost Estimate, whichever is later (see Appendix 2, Section III, Paragraph 6). Simplot may choose from the Financial Mechanisms specified in 40 C.F.R. §§ 264.143(a)-(e) and 264.145(a)-(e) to establish Section III Financial Assurance, provided that, if Simplot is using Third-Party Mechanisms (a trust fund, letter of credit, surety bond, or insurance), the Trustee of any trust fund, or the provider of any letter of credit, surety bond, or insurance shall not be a Related Party to Simplot (See Appendix 2, Section III, Paragraph 10).

Please also see response to SBT 9.11, above.

**PRC 3.** *Mitigation proposed does nothing to remedy the negative effects that the Simplot Don Plant has had on the surrounding environment and the health of the communities.*

**Response:** The comment does not identify the basis for this assertion, and the United States disagrees. Please see the response to SBT 4 above.

**PRC 4.** *The proposed fine is double the Simplot Rock Springs plant fine, but the population effects are so much greater at the Don Plant. High population here in Pocatello and Chubbuck and unchecked development is getting closer and closer to the plant and the gypstack. Environmental and health liabilities increase as residential, educational, and economic developments grow closer and closer to the Don Plant and gypstack. Local agencies, municipal organizations, city, and county liabilities increase as these developments are approved without notice to the affected populations. Please add provisions in the CD/SA that the Simplot Don Plant must notify all local governments, agencies, and developers of the dangers and hazards of growth in the contamination zone of this Superfund Site.*

**Response:** Please see responses to ICL 2 and PRC 1 above regarding the civil penalty amount.

The United States disagrees with the request to add provisions in the CD to notify developers, agencies, and local governments about dangers and hazards of growth around the Simplot Don Plant. The CD sets forth compliance requirements to protect human health and the environment over the operating life and eventual closure of the facility, and includes notification and reporting requirements:

- The initial closure plan is attached to the CD as Appendix 8 and is available to the general public;
- The permanent closure plan must be submitted to EPA and Idaho DEQ for approval (see CD Appendix 1.C, Section III). This closure plan must include an "area information report," which includes providing land use information, such as identification of adjacent landowners, zoning, present land uses, roads, highways, rights-of-way, or other easements;
- In addition to the area information report, the permanent closure plan must describe how performance standards are met in Appendix 1.C., Section III.G. Fencing will also be installed in Phase 7 of closure, and additional measures must be taken to prevent human and wildlife intrusion (see Appendix 1.C., Section III.J);
- If a critical condition is confirmed, then Simplot must notify EPA immediately (see Appendix 1.D, Section III and Paragraph 53 of the CD). Additionally, the notice requirements associated with critical conditions does not relieve Simplot of its obligation to comply with any federal and state laws;
- Implementation of the Best Management Practices (BMP) plan to identify and address leaks/spills requires more frequent and comprehensive monitoring and reporting requirements than what is included in typical RCRA TSDF permits (see Appendix 5.A, Sections 2, 3 and 4). The BMP does not relieve Simplot of its obligation to comply with any federal, state, or local laws applicable to hazardous materials releases to the environment;
- The CD does not remove or eliminate Simplot's obligation to obtain permits or approvals from federal, state, or local entities with jurisdiction over the Don Plant.

Simplot must submit timely and complete applications and take such actions as are
necessary to obtain all such permits or approvals as may be necessary to fulfill its
compliance obligations (see Paragraphs 41 and 42 of the CD);

- For information about EPCRA/CERCLA reporting obligations, see the response to
SBT. 1 above.

**PRC 5.** *Simplot's denials of violations in the settlement agreement are unacceptable and
present a risk to the communities of the Shoshone-Bannock Tribes, the city of Pocatello, and
the city of Chubbuck.*

**Response:**  The United States disagrees with this comment. As in most of our civil judicial
and administrative settlements, a defendant/respondent settles claims without any
admission of liability. Simplot denies the violations and has colorable legal arguments
against liability that it could assert in litigation but is agreeing to table these arguments in
order to obtain the repose and certainty that settlement provides. In exchange, the CD
secures extensive injunctive relief that will protect public health and the environment,
mitigate impacts from past phosphorous releases to the Portneuf River, as well as requiring
Simplot to pay a significant civil penalty. The comment does not explain how Simplot's
denial of liability for the alleged violations presents a risk to the Tribes or any other
community.

**PRC 6.** *App. 1E Permanent Closure Application. We recommend that Simplot submit the
permanent closure application now with date to start closure in 2025.*

**Response:**  The United States disagrees with this recommendation. Pursuant to Appendix
1.C, Section III of the CD, Simplot is required to notify EPA and Idaho DEQ at least ninety
(90) days before the permanent deactivation of the Phosphogypsum Stack System or
within thirty (30) days following a decision to permanently cease operations, whichever is
later. Within two-hundred and-seventy-five (275) days of the notification, Simplot shall
submit for approval a closure application (Appendix 1.E to the CD) to EPA and Idaho DEQ,
as well as a permanent closure plan. There is no current basis to conclude that the date for
permanent closure will be in 2025.

**PRC 7.** *The CD/SA fails to address a potential collapse of the gypstack across Portneuf River,
damming it and causing flooding throughout the Portneuf River Valley, even after stack
closure. Local authorities and agencies are completely unprepared for such an occurrence and
there has been no emergency planning for such an event. Denying that it could ever occur is
unacceptable and irresponsible of Simplot and all surrounding agencies and municipalities.*

**Response:**  The United States disagrees that the CD fails to address a potential collapse of
the phosphogypsum stack. Appendix 1.B includes the phosphogypsum stack system
construction and operational requirements, which are designed to ensure the physical
integrity of impoundments used to manage Phosphogypsum and Process Wastewater. The
requirements establish minimum design, construction, operation, inspection, and
maintenance requirements to ensure that the Phosphogypsum Stack System
impoundments meet critical safety standards and do not cause unplanned releases to the
environment. The general criteria included in Appendix 1.B. include performance

standards, a Phosphogypsum Stack System operation plan, groundwater monitoring and reporting, surface water management, leachate management, and an Interim Stack System Management Plan (Appendix 1.B, Section 1). Simplot is also required to maintain and prepare (if none exists) a contingency plan for operating its Phosphogypsum Stack Systems. The contingency plan must be updated on an annual basis and shall address unplanned releases of Process Wastewater and shall include plans necessary to respond to emergency situations (Appendix 1.B, Section IX).

Simplot must comply with the requirements in Appendix 1.C of the CD for the closure of Phosphogypsum Stack Systems and Components, including the performance standards in Section III. G. When the Phosphogypsum Stack System is undergoing closure, the Permanent Closure Plan must specify which particular closing steps or operations must be inspected and approved by EPA before proceeding with subsequent closure actions. A final survey must be performed after closure is complete by an engineer or registered third-party land surveyor to verify that final contours and elevations of the Phosphogypsum Stack System or Component thereof are in accordance with the plan approved by EPA (Appendix 1.C., Section V).

**PRC 8.** *River monitoring of all contaminants of concern (COCs) associated with the Simplot Don Plant Superfund Site should start now and into perpetuity.*

**Response:** Please see response to SBT 2, above.

**PRC 9.** *Stability analysis is included but no emergency response plan exists within Simplot, the Cities PRC of Pocatello and Chubbuck, or FEMA. Do a failure analysis and emergency response plans with alt community entities.*

**Response:** Please see responses to PRC 4 and PRC 7 above.

**PRC 10.** *Economic benefit of noncompliance: What was the economic benefit to the Don Plant for non-compliance during the negotiations and that amount should be clearly disclosed to the public.*

**Response:** Please see response to ICL 2 above. As noted there, settlement negotiations are confidential and while the United States does not disclose figures presented in such negotiations, including calculations estimating the economic benefit of noncompliance, in this case the United States concluded the civil penalty required by the CD would recoup the economic benefit of noncompliance.

**PRC 11.** *Long-term care of a closed facility and gypstack should be in perpetuity, not just for a limited time.*

**Response:** The United States disagrees that long-term care of the Phosphogypsum Stack should be in perpetuity. Simplot is responsible for monitoring and maintenance of the Facility, including the applicable requirements of Appendix 1.C, Section III, in accordance with an approved Permanent Phosphogypsum Stack System Closure plan for fifty (50) years. In addition, EPA may extend this time period if it determines that the closure design or closure operation plan under the Permanent Phosphogypsum Stack System Closure plan

was ineffective in meeting the standards in Appendix 1.C., or if an extension is necessary to protect human health and the environment (Appendix 1.C, Section VI).

The Long-Term Care period and requirements for Simplot are more stringent than the requirements a permitted RCRA treatment, storage, or disposal facility would have to meet for post-closure care (see 40 CFR Parts 264.117 and 265.117, which generally require a 30-year post-closure care time period).

**PRC 12.** *Timeline for closure is way too slow.*

**Response:** The United States disagrees with this comment. Please see response to SBT 9.11 above.

**PRC 13.** *Area info report: Info should include public and private wells within 2 miles of the stack.*

**Response:** The United States disagrees with this suggestion. Existing monitoring wells installed by the Don Plant pursuant to the CERCLA cleanup provide regular indications of groundwater quality, especially in the down-gradient area north of the phosphogypsum stack system. Hydrogeological studies have shown that contamination that is released from the phosphogypsum stack system will end up in the springs adjacent to the Portneuf River and in the river itself. Therefore, public or private wells are not expected to be impacted. There is no evidence that contamination in the phosphogypsum stack system extends out to 2 miles.

**PRC 14.** *All contaminants of concern (COCs) should be included in surface and groundwater sampling, not just phosphorous.*

**Response:** The United States disagrees with this comment. The comment does not identify which COCs would be incorporated into a list of "all" contaminants of concern (COCs) beyond phosphorous. However, Simplot is monitoring groundwater wells and springs in the Compliance Area for the analytes that are shown in Table 2-10 of the February 2021 Groundwater and Surface Water Monitoring Plan Survey, which is attached to Appendix 1.A of the CD. In addition, Simplot is sampling surface water for analytes listed in Table 2-11, which includes nine (9) analytes in addition to phosphorus. For a description of the monitoring that is occurring in the Assessment Area, please see response to PRC 16 below.

**PRC 15.** *Simplot should provide groundwater quality data from both sides of the Portneuf River and onto the Reservation.*

**Response:** The United States disagrees with this comment. Simplot has provided, and is currently providing, groundwater quality data from both sides of the Portneuf River. Please see the February 2021 Groundwater and Surface Water Monitoring Plan Survey, which is attached to Appendix 1.A of the CD. Simplot is monitoring groundwater on both sides of the Portneuf River as identified in Figure 2-4, Monitoring Locations in the Assessment Area. Please see the reporting schedule in Section 3 of the February 2021 Groundwater and Surface Water Monitoring Plan Survey.

**PRC 16.** *Monitoring in the assessment area must include all contaminants of concern (COCs) in all wells on both sides of the river and all the way onto the Reservation.*

**Response:** The United States disagrees with this comment. The comment does not identify which contaminants of concern (COCs) would be incorporated into a list of "all" COCs. However, Simplot is monitoring groundwater in the Assessment Area for all of the analytes listed in Table 2-2 of the February 2021 Groundwater and Surface Water Monitoring Plan Survey, which is attached to Appendix 1.A of the CD. Monitoring locations in the Assessment Area are identified in Figure 2.4 of February 2021 Groundwater and Surface Water Monitoring Plan Survey. The monitoring locations include wells on both sides of the Portneuf River.

**PRC 17.** *Clean Water Act violations should be included in the CD/SA.*

**Response:** The United States disagrees with this comment, which we likewise addressed in the September 12, 2023 information session. The comment does not identify what Clean Water Act violations occurred at the facility involved in this action and, as we also noted in the information session, the United States has not identified any. If it had identified Clean Water Act violations involving the Simplot Don Plant, as stated in the information session, the United States would have considered addressing such violations in this case or in a separate enforcement action. The Complaint does not allege that Simplot violated the Clean Water Act, and it would not be appropriate for the CD, intended to resolve the Complaint's allegations, to address (unidentified) Clean Water Act violations. At the same time, nothing in the CD precludes the United States from undertaking future enforcement for violations of the Clean Water Act, or any other violations that are not alleged in the Complaint or addressed by the CD, if any such violations are identified.

**PRC 18.** *Contamination of Reservation resources should be discussed in the CD/SA.*

**Response:** The United States disagrees with the comment. As noted in the responses to SBT 5 and SBT 10 above, a consent decree serves to memorialize the settlement agreement between the parties and may include other information that the parties agree is relevant background for the settlement terms. In this case, the CD provides such background that the parties agreed was relevant, setting forth in the CD's "whereas clauses" a description of the environmental impacts of the Don Plant, including to resources used by the Tribes. See CD pp. 5-9

**PRC 19.** *Specifically, who with the Tribes was conferred with on Appendix II, Mitigation? Was it an official Tribal consultation with the Fort Hall Business Council? If not, then it should have been.*

**Response:** Please see responses to SBT 4 and ICL 1 above.

**PRC 20.** *Fluoride emissions within a 1-mile radius of the Don Plant: Fluoride in forage (within a one-mile radius of the Don Plant has exceeded the agreed upon standard for the past 22+ years. Fluoride emissions from the Don Plant towers also exceed fluoride air standards. Evaporative emissions from gypstack ponds and wind-blown fluoride dust from gypstack are*

*high. Proposed cooling ponds will also have emissions that have been improperly characterized and predicted by Idaho DEQ.*

**Response:**  Please see responses to SBT 3 and ICL 5 above.  EPA agrees with the comment that emissions from the cooling towers have exceeded certain fluoride air standards on occasion, specifically the fluoride emission limits in the Title V permit. Our response to SBT 3 details the CD's requirements to address fluoride emissions from the cooling towers that will result in a substantial reduction of fluoride air emissions from the Facility.

Wind-blown fluoride dust is outside the scope of this CD. However, overall fluoride emissions from the Facility will be reduced substantially by this settlement.

As discussed above in our responses to SBT 3 and ICL 5, the characterization and prediction of fluoride emissions at the cooling ponds does not concern the CD's terms nor does it affect EPA's evaluation that the CD's requirement to replace the cooling towers with cooling pond(s) will result in very substantial reductions in fluoride emissions from the Don Plant cooling towers and from the Don Plant overall.

**PRC 21.** *How and who will regulate the site to ensure the settlement agreement is properly followed and completed? Who will regulate and enforce?*

**Response:**  Please see response to SBT 3 above.

**PRC 22.** *How will the bond or financial instrument that covers decommissioning and revegetation of the site upon closing be updated for inflation? Should not all exposed areas and slopes have temporary revegetation for erosion and stormwater control and be bonded as well?*

**Response:**  Please see response to PRC 2 above. In addition, Appendix 1.B includes operational requirements for perimeter dikes, which includes vegetative cover to inhibit wind and water erosion on the Outside Slope. Such vegetation must be maintained and visually inspected (Appendix 1.B, Section IV). Lateral expansions of Phosphogypsum Stack Systems, new phosphogypsum stack systems, or components must be inspected for cracks and sloughing.

**PRC 23.** *How will dust particulates be controlled over time if the gypstack is not revegetated as it is built and used?*

**Response:**  During construction and operation of the gypstack, Simplot uses water to control fugitive emissions from roads, side slopes, and other surfaces of the gypstack. In some areas, Simplot installs geofabric-lined road base to reduce dust. In July, 2020, Idaho DEQ issued the Simplot Don Plant a Title V Operating Air Permit (No. TI-2017.0024) that regulates air emissions from the phosphoric acid manufacturing plant and the associated gypstack. This permit establishes compliance requirements to limit air emission hazards. The permit requirements applicable to fugitive dust are found in Sections 3.1 to 3.4 of the Title V Permit. Additionally, when the gypstack undergoes closure at the end of its useful life, a final geomembrane cover and vegetation are installed on top of the stacks which significantly limits any dust escaping from the stacks.

**PRC 24.** *It is recommended that either DOJ or EPA with IDAHO DEQ list in one location all the legal decisions and permits under all environmental jurisdictions with permitting points of contact for all Records of Decisions, Voluntary Consent Orders for all State and Federal jurisdictions. Including permits and VCO's under the CAA, CERCLA, RCRA and CWA. There needs to be one inclusive list of all permit authorizations. The complexity of this site requires an understanding of the public of all the pieces and the big picture.*

**Response:**  To the extent the comment asks that the suggested document compilation be part of the CD, please see responses to SBT 5, SBT 10, and PRC 18 above. With respect to repositories of relevant site information outside the CD, the United States notes that EPA maintains a webpage devoted to the EMF Site (https://cumulis.epa.gov/supercpad/cursites/ csitinfo.cfm?id=1001308) which provides a detailed summary of the available information regarding contamination at the EMF Site, downloadable copies of pertinent reports and other documents, points of contact within EPA, and a section devoted to announcements regarding public participation and how interested members of the public can get involved with the current Consent Decree or other matters.

**PRC 25.** *How will the legislation passed by the Idaho State Legislature that codifies in law the engineering requirements of the Simplot Wyoming Agreement and Settlement as pushed by Simplot be integrated into this Settlement? How will new technology and solutions in the future be integrated? Going back to the Idaho legislature to change standards that were not specific to the Don Plant Operations needs to be fully understood and disclosed to the public.*

**Response:**  The CD sets forth its own compliance requirements but recognizes that other relevant requirements also exist or may in the future be enacted. The CD addresses existing and future requirements that may exist outside the CD in several ways. Pursuant to Paragraph 41 of the CD, "[w]here any compliance obligation under this Section requires Simplot to obtain a permit or approval from a federal, state, or local entity with jurisdiction over the Facility, Simplot shall submit timely and complete applications and take such actions as are necessary to obtain all such permits or approvals." In addition, Paragraph 95 of the CD states, "[t]his Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local law or regulation. While this Consent Decree resolves the Parties' dispute regarding the violations alleged in the Complaint as set forth in Paragraph 91, compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws, regulations, or permits." Simplot therefore must comply with all applicable state and local laws, including any engineering requirements, related to its facility operations. If there is any new technology or solution associated with Phosphogypsum Stack System closure, Simplot may update its Initial Closure Plan to incorporate the change(s) in accordance with Appendix 1.C, Section II of the CD. Finally, Paragraph 103 of the CD acknowledges the possibility that the future laws or regulations, whether state or federal, might concern requirements established by the CD and, if so, might form the basis for a modification to the CD, subject to the United States' reservation of the right to oppose such a modification and the requirement under Paragraph 94 of the CD for court approval of any material CD modification.

**PRC 26.** *Closure costs were based on December 2018 dollars. That is almost 5 years old. Why were costed equated to 2022/23 at the latest plus an assumed 3% inflation into 2025? "Long-term Costs" were inflated to 2020, though. Why not 2023 (see pg 440 of 509). This same page seems to then indicate all costs were inflated to 2020. Can EPA clarify the ultimate cost estimation.*

**Response:**  Please see response to SBT 9.11, SBT 9.13, and PRC 2 above.

**PRC 27.** *A most expensive closure date is assumed to be 2025, yet no discussion on why this assumption is presented. What if the facility expands? How would a successful land swap affect this assumption?*

**Response:**  Please see responses to SBT 9.11 and PRC 6 above, related to the closure date assumption of 2025. Appendix 1.B, Section V of the CD describes lateral expansions of existing Phosphogypsum Stack Systems. Construction requirements, such as liners, of such lateral expansions are described in Appendix 1.B, Section VI of the CD. Appendix 1.C, Section II of the CD describes that Simplot must update the Initial Closure Plan with a Cost Estimate that is submitted in accordance with Appendix 2, Section II. This update to the Initial Closure Plan must include a description of the physical configuration, which must account for any lateral expansion of the Phosphogypsum Stack System. For example, if the BLM/Blackrock land exchange litigation (*Shoshone-Bannock Tribes of the Fort Hall Reservation v. Laura Daniel-Davis*, et al., No.: 20-cv-00553-BLW (D. Idaho), on appeal (9th Cir. Nos. 23-35543, 23-35544)) does not result in Simplot's loss of the land it acquired from BLM, Simplot could choose to laterally expand the existing Phosphogypsum Stack System onto that land and the process for updating the cost estimate would occur as described above.

**PRC 28.** *Appendix B, Attachment 2, STACK CLOSURE AND LONG-TERM CARE COST ESTIMATE FOR PHOSPHOGYPSUM STACK SYSTEM (pg 212 of 509) What is the history of this calculation document? How was it developed? Do previous settlements show this calculation method is effective?*

**Response:**  Please see response to SBT 9.13 above.

**PRC 29.** *Appendix 8, Initial Closure Plan for the Facility (pg 420 of 509) - "No treated wastewater will be discharged into adjacent surface waters" (pg 421 of 509) What about land application and functionally equivalent discharge?*

**Response:**  The CD does not allow land application of treated wastewater. EPA does not understand what the comment's term "functionally equivalent discharge" means in this context.

**PRC 30.** *Please add a provision in the CD/SA that the Simplot Don Plant must publish their annual toxics inventory in all the local and regional newspapers.*

**Response:**  Please see response to SBT 1 above. As noted there, Form R information submitted by Simplot is available on a public website. The website contains the toxics release inventory information for all facilities which submit reports. Given this open and immediate availability of Simplot's toxics release inventory information, the United States

does not conclude that posting the information in local or regional newspapers is necessary. We also note that neither EPCRA nor CERCLA requires any other companies to do so.

**PRC 31.** *Please add a provision in the CD/SA that Simplot will provide air monitoring (PM10 and chemical content) at all schools, day care facilities, care facilities, low-income housing areas, and medical facilities to ensure that these vulnerable populations are shown equitable protection from Don Plant emissions.*

**Response:**  The United States believes that the CD embodies relief that is appropriate to the claims alleged in the Complaint and is designed to protect human health and the environment over the operating life and eventual closure of the facility and beyond. The requirements alleged to be violated under the CAA and other statutes do not expressly require such air monitoring. And while the Court possesses equitable authority to fashion appropriate relief, which in appropriate circumstances might include air monitoring, there are practical limitations in settlement negotiations for relief to reasonably correspond with the statutory requirements at issue and be acceptable to both parties. The United States therefore does not conclude that the CD could or must now be modified to include the additional air monitoring suggested in the comment.

We also note that, as discussed in the response to SBT 2, a comprehensive risk assessment was conducted as part of the CERCLA process for the EMF Site that considered, among other things, the potential threats from airborne and other contamination.

**PRC 32.** *The Bevill Amendment was the result of a successful political and industry lobbying effort. Just because phosphogypsum at wet acid plants is exempt from regulation as hazardous waste does not mean that the material is not dangerous to human health and the environment.*

**Response:**  The United States does not interpret this observation as a comment on the specific terms of the CD. However, we note that it is not the role of DOJ or EPA to second guess or determine the reasons for Congress' enactment of the Bevill Amendment. As required by the Bevill Amendment, EPA engaged in a rulemaking proceeding in which it received public comments about excluding materials that Congress listed, such as phosphogypsum and process wastewater from phosphoric acid production, from hazardous waste regulation. The result of the Bevill rulemaking was the exclusion of those wastes from the definition of hazardous wastes under RCRA. Nevertheless, the United States sought to enforce RCRA hazardous waste requirements in this action based on its conclusion that the EPA Bevill regulations did not exempt Simplot from liability for the violations alleged in the Complaint, and this enforcement effort resulted in the proposed CD. The extensive RCRA compliance requirements of the CD, and in previous settlements with companies in this industry, are designed to address the hazards from improper management of wastes at phosphoric acid production facilities and to ensure environmentally sound closure and post-closure care when the facilities are no longer operating.

**PRC 33.** *EPA Region 10 is strongly encouraged to improve its responsibilities to communicate with Pocatello and Chubbuck communities and regularly inform the public of actions at the Eastern Michaud Flats Superfund Site.*

**Response:** EPA is open to any suggestions that would result in improvements to its communications with local communities. However, as noted in our response to PRC 24 above, EPA maintains a website that provides significant information about and actions regarding the EMF Site.

**PRC 34.** *Idaho DEQ has never been a proxy for communication with the Shoshone-Bannock Tribes, a sovereign nation. For DOJ and EPA to make that statement during the information session was both inappropriate and ignorant of local governments and their relationships.*

**Response:** Please see responses to ICL 1 and SBT 4 above. We regret if the commenter interpreted the explanation provided during the September 12, 2023 information session as either inappropriate or ignorant. The United States' representatives at that meeting sought only to respond to the specific question posed about the mitigation identification process and neither stated nor endorsed the proposition that discussions with Idaho DEQ are a proxy for communications with the Tribes.